**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
COURT FILE NO.: 20-CV-1764 JRT/LIB**

| | |
|---|---|
| Jesse G. Sherman,<br><br>                 Plaintiff,<br><br>v.<br><br>Sheffield Financial, LLC,<br><br>              Defendant. | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Plaintiff Jesse Sherman, (hereinafter "Plaintiff") commenced this action for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA") after Defendant Sheffield Financial, LLC, (hereinafter "Defendant") failed to reasonably investigate and correct its misleading reporting of Plaintiff's account. Defendant's dogged refusal to correct its misleading reporting after receiving multiple disputes caused Plaintiff to suffer actual damages in the form of reduced credit, emotional distress, embarrassment, frustration, and anxiety constituting actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and § 1681n. By filing this motion, Plaintiff asks the Court to find that Defendant failed to perform reasonable investigations of his disputes in violation of 15 U.S.C. § 1681s-2(b), and that Defendant's violations of 15 U.S.C. § 1681s-2(b) were willful as a matter of law.

1

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    Plaintiff opens a secured line of credit with CitiMortgage.

On or about March 26, 2016, Plaintiff and his then-wife, Amy S. Sherman, opened an account with Defendant, account ending in 82574. (*See* Declaration of Mark L. Vavreck ("Vavreck Decl.") ¶ 2, Exhibit A – Account Statement at 1.) The account was a loan secured by a Polaris Ranger ATV Side by Side. (*See* Vavreck Decl. ¶ 2, Exhibit B - Plaintiff's Application for Credit with Defendant and Automatic Payment Agreement, March 26, 2016 at 7.) At Plaintiff's request, Defendant set up automatic payments to be deducted from Plaintiff's bank account. *Id.* at 1.

On April 18, 2018, Plaintiff's marriage to his then-wife, Amy S. Sherman, was dissolved pursuant to a Red Lake County, Minnesota Judgment and Decree in Court File No. 63-FA-18-88. (*See* Vavreck Decl. ¶ 2, Exhibit C – Divorce Order, In re the Marriage of Amy S. Sherman and Jesse G. Sherman, at 6.) In the Judgment and Decree, Plaintiff was awarded the Polaris Ranger free and clear of any claim by his ex-wife, Ms. Sherman. *Id.*

Prior to, during, and following the divorce proceedings, Plaintiff continued to make timely payments on his account with Defendant. (*See* Vavreck Decl. ¶ 2, Exhibit A – Account Statement at 4.)

On September 4, 2019, Ms. Sherman, as a single individual, filed a voluntary Chapter 7 Bankruptcy Petition in the District of Minnesota, Case No. 19-65049. (*See* Vavreck Decl. ¶ 2, Exhibit D – Bankruptcy Petition of Amy S. Sherman, September 4, 2019.) In this Petition, Ms. Sherman listed the Polaris Ranger as an asset in which she had no interest, noting "Not

in possession; Awarded to ex-husband per divorce decree." *Id.* at 11. She listed BB&T[1] as the creditor on the account, and elsewhere in her Petition stated that BB&T was a secured creditor. *Id.* Plaintiff was unaware of his ex-wife's bankruptcy filing. (*See* Vavreck Decl. ¶ 2, Exhibit E – Deposition of Jesse Sherman, ("Sherman Dep.") 13:18-14:22.)

As a result of Ms. Sherman's listing of the Polaris Ranger in her Bankruptcy Petition, Defendant cancelled Plaintiff's automatic payments. Answer at ¶ 31. Defendant did not notify Plaintiff that it was cancelling the automatic payments. (*See* Vavreck Decl. ¶ 2, Exhibit F – Deposition of Karen Wiles, ("Wiles Dep.") 29:7-16.) Defendant ceased sending Plaintiff monthly statements, so Plaintiff did not receive notice that payments were not being made. *Id.* Plaintiff's automatic payment agreement with Defendant never indicated that Defendant could cancel automatic payments without warning to Plaintiff. (*See generally* Vavreck Decl. ¶ 2, Exhibit B – Plaintiff's Application for Credit with Defendant and Automatic Payment Agreement, March 26, 2016.) If Defendant had informed Plaintiff when automatic payments were set up that the payments could be cancelled without notice, Plaintiff would have been concerned and would have known to take precautions to ensure payments continued. (*See* Vavreck Decl. ¶ 2, Exhibit E – Sherman Dep. 90:23-91:7.)

On October 1, 2019, Plaintiff called Defendant and informed it of the divorce and stated that he had taken possession of the Ranger. (*See* Vavreck Decl. ¶ 2, Exhibit F –Wiles Dep 62:8-17.) He wanted to remove his ex-wife from the account but was informed that to do so he would need to get a loan from a third party, as Defendant would not remove his ex-

---

[1] Defendant was a division and/or subsidiary of BB&T Bank, which merged with SunTrust Banks in December 2019 to form Truist Financial. Answer at ¶ 30.

wife from the account. *Id*. Defendant did not inform Plaintiff of the cancelled automatic payments nor of his ex-wife's bankruptcy. (*See* Vavreck Decl. ¶ 2, Exhibit F –Wiles Dep. 63:3-13.)

As a result of the cancelled automatic payments, Plaintiff missed two monthly payments. Answer at ¶ 32. After Plaintiff missed the first payment, Defendant charged off the account and started reporting it to the credit reporting agencies as "charged off." (*See* Vavreck Decl. ¶ 2, Exhibit F – Wiles Dep. 29:17-21.)

For more than two months, no one notified Plaintiff of his wife's bankruptcy, the cancellation of automatic payments, or Plaintiff's missed payments. (*See* Vavreck Decl. ¶ 2, Exhibit E – Sherman Dep. 13:18-14:22.) On or about November 13, 2019, Plaintiff noticed that his credit score had decreased. *Id*. (noting that Plaintiff contacted Defendant within days of seeing his decreased credit score); (*See* Vavreck Decl. ¶ 2, Exhibit G – Defendant's Payment Notes, last revised August 19, 2020 at 3,) (indicating that Plaintiff started regularly calling Defendant on November 13, 2019). Only then did he learn that he had missed two payments. (*See* Vavreck Decl. ¶ 2, Exhibit E – Sherman Dep. 13:18-14:22.) Plaintiff called Defendant, and Defendant informed Plaintiff of the cancelled ACH payments and his ex-wife's bankruptcy filing, even though it violated company policy to reveal that information. (*See* Vavreck Decl. ¶ 2, Exhibit F – Wiles Dep. 76:14-77:12.) Plaintiff paid the overdue amount and continued to make his scheduled payments. Exhibit A at 4-5 (noting payment on November 14, 2019 of $519.02 and continued payments).

Aside from the two months during which automatic payments were cancelled without notice, Plaintiff never missed a payment on the account. (*See generally* Vavreck Decl. ¶ 2, Exhibit A – Account Statement.)

On January 17, 2020, Plaintiff wanted to obtain financing for a new car. Plaintiff felt that his credit report was inaccurate because it indicated that his account with Defendant was "charged off" even though—aside from the when the automatic payments were cancelled without notice—Plaintiff had never missed a payment and was continuing to pay on the account. *Id.* Plaintiff called Defendant to try to fix his credit report, and was told to call and dispute with the credit reporting agencies.

That same day, Plaintiff called Equifax and disputed the account furnished by Defendant, explaining that the account should not have been charged off because automatic payments were cancelled as a result of his ex-wife's bankruptcy and because he was making timely payments. (*See* Vavreck Decl. ¶ 2, Exhibit H – Defendant's Response to Equifax ACDV, January 17, 2020 at 1.) Thereafter Equifax forwarded Plaintiff's dispute information to Defendant via Automated Consumer Dispute Verification ("ACDV") as required by 15 U.S.C. § 1681(a)(2). *Id.*

Defendant failed to conduct a reasonable investigation into the account. Specifically, Defendant's agent confirmed the reporting for Equifax and did not mark the account as disputed by the consumer by switching the Compliance Condition Code to "XB" or similar.[2]

---

[2] There are a variety of codes that might indicate that a consumer is disputing the account, including XB (consumer disputes and furnisher is investigating), XC (furnisher completed its investigation and consumer disagrees with the result), and XH (furnisher completed its investigation).

*Id.* (verifying that current reporting with the Compliance Condition Code blank was correct). This is consistent with Defendant's policy of never marking accounts as disputed in response to "indirect disputes"—that is, a consumer dispute to a credit reporting agency ("CRA") that is then forwarded to Defendant. (*See* Vavreck Decl. ¶ 2, Exhibit I – Grimes Dep. 48:11-50:2.).

On or about January 22, 2020, Plaintiff called Equifax and disputed the account furnished by Defendant. (*See* Vavreck Decl. ¶ 2, Exhibit J – Defendant's Response to Equifax ACDV, January 22, 2020 at 1.) Equifax forwarded Plaintiff's dispute information to Defendant via ACDV as required by 15 U.S.C. § 1681(a)(2). *Id.* Again Defendant failed to conduct a reasonable investigation into the account because it did not mark the account as disputed by the consumer by switching the Compliance Condition Code to "XB" or similar. *Id.*

On or about January 29, 2020, Plaintiff gave Defendant a third opportunity to mark his account as disputed. Plaintiff called Equifax and disputed the account furnished by Defendant. (*See* Vavreck Decl. ¶ 2, Exhibit K – Defendant's Response to Equifax ACDV, January 29, 2020 at 1.) Equifax forwarded Plaintiff's dispute information to Defendant via ACDV as required by 15 U.S.C. § 1681(a)(2). *Id.* Defendant failed to conduct a reasonable investigation into the account because Defendant did not mark the account as disputed by the consumer by switching the Compliance Condition Code to "XB" or similar. *Id.*

On February 6, 2020 Plaintiff paid off the balance of his account. (*See* Vavreck Decl. ¶ 2, Exhibit A – Account Statement at 5.)

On or about February 20, 2020, Plaintiff hired attorney Kevin Duffy to contact Defendant and credit reporting agencies to stop the inaccurate reporting of Plaintiff's account.

(*See* Vavreck Decl. ¶ 2, Exhibit L – Letter from Kevin T. Duffy to Defendant, February 20, 2020 at 3.)    On February 20, 2020, Mr. Duffy sent letters to BB&T, Experian, and TransUnion, which stated in relevant part:

> Mr. Sherman and his ex-wife, Amy S. Sherman were divorced . . . [on] April 18, 2018. I have included a copy of that Judgment and Decree with this letter. In the Judgment and Decree under the Conclusions of Law at Paragraph 2, Mr. Sherman was awarded the Polaris Ranger free and clear of any claim by his ex-wife, Amy S. Sherman.
>
> * * *
>
> On or about September 4, 2019, Amy Sherman, as a single individual, filed a voluntary Chapter 7 Bankruptcy Petition . . . . In this Petition, she listed the Polaris Ranger as an asset in which she had no interest because of the divorce decree. . . .
>
> The reason I am writing this letter is because the credit score of Jesse Sherman has dropped substantially as a result of the Bankruptcy filing by his ex-wife and the listing of BB&T as a creditor. The bottom-line here is that Mr. Sherman did not file Bankruptcy and he has made all of the payments on the Polaris Ranger in accordance with the original terms. Because of this fact, his credit score should not be adversely affected because his ex-wife has filed a Chapter 7 Bankruptcy and erroneously listed the Polaris Ranger as an asset in which she has no interest and listed a creditor, BB&T, even though she has no liability to pay and has not paid on the debt to BB&T. I would

appreciate it if you would investigate this matter in further detail and correct Mr. Sherman's credit score so that it is not adversely affected by this recent Chapter 7 Bankruptcy filing by his ex-wife. If there is going to be a problem with this request or you have additional questions, please feel free to contact me.

(*See* Vavreck Decl. ¶ 2, Exhibit L – at 1-2.) Mr. Duffy enclosed several attachments with the letter, including a release (so credit reporting agencies could communicate with Mr. Duffy), a copy of the dissolution order from Plaintiff's divorce, and a copy of Plaintiff's payment history. (*See generally*, Exhibit Vavreck Decl. ¶ 2, Exhibit L.)

Even though Mr. Duffy's letter to BB&T was a direct dispute—the type of dispute in which Defendant updates Compliance Condition Codes, (*See* Vavreck Decl. ¶ 2, Grimes Dep. 48:11-50:2) —Defendant still did not update any of its reporting on the account to "disputed." In addition, Experian and TransUnion each sent an ACDV to Defendant regarding the account ending in 82574, as required by 15 U.S.C. § 1681(a)(2). (*See* Vavreck Decl. ¶ 2, Exhibit M – Defendant's Response to Experian ACDV, March 11, 2020, at 1); and (*See* Vavreck Decl. ¶ 2, Exhibit N – ACDV from TransUnion to Defendant, February 28, 2020 at 1). Defendant failed to conduct a reasonable investigation into the account. Specifically, Defendant's agent confirmed the reporting for Experian and TransUnion and did not mark the account as disputed by the consumer by switching the Compliance Condition Code to "XB" or similar. (*See* Vavreck Decl. ¶ 2, Exhibit M – Defendant's Response to Experian ACDV, March 11, 2020, at 1); and (*See* Vavreck Decl. ¶ 2, Exhibit N – ACDV from TransUnion to Defendant, February 28, 2020 at 1).

Some additional facts about Defendant's dispute processing procedures are crucial. Defendant processes 1,500 – 2,000 disputes per month. (*See* Vavreck Decl. ¶ 2, Grimes Dep. 14:16-14:22.) Defendant's policy is to never update the Compliance Condition Code to reflect that a consumer disputed information unless it previously received a direct dispute from the consumer. (*See* Vavreck Decl. ¶ 2, Grimes Dep. 48:11-50:2.) In other words, if a consumer sends an "indirect" dispute—that is, a dispute sent through a CRA, which in turns sends an ACDV to Defendant—Defendant *never* marks the account as disputed. Defendant also has a strange policy of sometimes treating consumers at the account level, and other times at the individual level. For instance, when Plaintiff's ex-wife declared bankruptcy, automatic payments from Plaintiff were shut off. But when Plaintiff asked Defendant to start sending statements again, an agreement to "hold harmless" from him—but not from his ex-wife— was sufficient to restart statements. (*See* Vavreck Decl. ¶ 2, Grimes Dep. 82:1-83:18.) This holds true even when, as here, borrowers on a join account provided separate contact information. (*See* Vavreck Decl. ¶ 2, Grimes Dep. 19:10-20:20; and 34:1-35:1.)

As a result of Defendant's inaccurate reporting to the credit reporting agencies, Plaintiff has suffered reduced credit, emotional distress, embarrassment, frustration, and anxiety. (*See* Vavreck Decl. ¶ 2, Exhibit E – Sherman Dep 43:21 – 47:18.) Plaintiff struggled to obtain credit from several banks due to Defendant's inaccurate reporting. (*See* Vavreck Decl. ¶ 2, Exhibit E – Sherman Dep.13:18-14:22 and 40:3-9).

Sherman Dep. .

## **SUMMARY JUDGMENT STANDARD**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment

shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When a motion for summary judgment is properly made and supported, the adverse party may not rest upon the allegations or denials in its pleading, but must instead set forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Johnson v. Hamilton*, 452 F.3d 967, 972 (8th Cir.2006); *Thompson v. Hubbard*, 257 F.3d 896, 898–99 (8th Cir.2001).

## **ARGUMENT**

I. **SUMMARY JUDGMENT ON FCRA LIABILITY IS WARRANTED BECAUSE DEFENDANT FAILED TO MARK PLAINTIFF'S ACCOUNT AS 'DISPUTED' AS REQUIRED BY LAW.**

### A. **Obligations of Furnishers Under the FCRA**

Congress enacted the Fair Credit Reporting Act ("FCRA"), "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47 (2007). To ensure that credit reports are accurate, the FCRA imposes duties on "furnishers", the sources that provide information to the credit reporting agencies ("CRAs"). Section 1681s-2 sets forth two categories of duties on furnishers like Defendant.

The first category, Subsection (a), details the duty "to provide accurate information," and specifically includes the following:

> (3) Duty to provide notice of dispute. If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.

15 U.S.C. § 1681s-2(a)(3). The duty to provide accurate and complete information, including notice of a dispute, is constant. Once the furnisher is notified by the consumer through any means that the account information is disputed, the furnisher must include notice of that dispute any time it reports information about the account to the CRAs. This first category is enforceable by state and federal agencies.

Plaintiff asserts that Defendant violated the "investigation" duties contained in the second category, set forth in 15 U.S.C. § 1681s-2(b)(1), when it failed to conduct a reasonable investigation of his late-payment disputes. Upon receipt of a consumer dispute from a CRA,[3] the furnisher must:

> (1) investigate the disputed information;
> (2) review all relevant information provided by the CRA;
> (3) report the results of the investigation to the CRA;
> (4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and
> (5) modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable.

15 U.S.C. § 1681s-2(b). Accordingly, furnishers are required to determine whether the information that they previously reported to a CRA is "incomplete or inaccurate." If a furnisher fails to comply with their obligations under § 1681s-2(b), the FCRA authorizes a consumer to assert a private cause of action.

---

[3] 15 U.S.C. § 1681i(a)(2) requires CRAs promptly to provide such notification containing all relevant information about the consumer's dispute to the furnisher of information.

When responding to a dispute, a furnisher will provide a Compliance Condition Code (CCC) to the CRA that indicates whether a consumer has disputed a particular account. The available CCCs are listed in the Credit Reporting Resource Guide ("Metro-2 Manual" or "CRRG"), a manual that is published annually by the Consumer Data Industry Association ("CDIA"). For purposes of reporting loans currently in or formerly in dispute, the following CCCs are relevant:

- XB: "Account information disputed by consumer under the Fair Credit Reporting Act. Definition: Reported when the completeness or accuracy of the account information is disputed by the consumer under the FCRA and investigation of the dispute is in progress by the data furnisher."

- XC: "Completed investigation of FCRA dispute – consumer disagrees. Definition: Reported when the investigation of an FCRA dispute has been completed by the data furnisher; however, the consumer disagrees with the outcome of the investigation."

- XH: "Account previously in dispute – investigation completed, reported by data furnisher (To be used for FCRA or FCBA disputes). Definition: Reported when the investigation of a dispute by the data furnisher was completed."

(*See* Vavreck Decl. ¶ 2, Exhibit O – 2019 Credit Reporting Resource Guide at 2-4). Recent cases have grappled with uncertainty as to when each of these codes should be used. *See, e.g.*, *Matson v. Edfinancial Services LLC*, No. 14-cv-1052-JPS, 2015 WL 5010515 (E.D. Wis. Aug. 21, 2015); *Wood v. Credit One Bank*, No. 3:15-cv-594, 2017 WL 4203551

(E.D. Va. Sept. 21, 2017). However, this case falls into the easier category of cases in which the account was not marked as disputed *at all*. *See Saunders v. Branch Banking Trust Co.*, 526 F.3d 142, 148 (4th Cir. 2008); *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173.

Numerous courts have found furnishers liable for reporting information to CRAs that was 'technically accurate' but still misleading. *Hrebal v. Seterus, Inc.*, 598 B.R. 252, 266 (D. Minn.) (*Hrebal I*) (collecting circuit court decisions). In addition, many courts have found that it is a violation of the FCRA if a furnisher fails to mark an account as disputed. *Doss v. Great Lakes Educ. Loan Servs., Inc.*, No. 3:20CV45, 2021 WL 1206800, at *10 (E.D. Va. Mar. 30, 2021) (finding the consumer stated a viable claim because the furnisher failed to send notice of the dispute to the CRA through which the consumer submitted his dispute, in violation § 1681s-2(b)(1)(C), "as well as to all the other CRAs, in violation of § 1681s-2(b)(1)(D)"); *Lichtman v. Chase Bank USA, N.A.*, No. 18-CV-10960 (CS), 2020 WL 1989486, at *7 (S.D.N.Y. Apr. 27, 2020) (noting that the Third, Fourth, Sixth, Ninth, and Tenth Circuits have all found a cause of action where a furnisher fails to mark an account as disputed); *Carrasco v. M&T Bank*, No. CV SAG-21-0532, 2021 WL 1634711, at *3 (D. Md. Apr. 27, 2021); *Hrebal v. Nationstar Mortg. LLC*, 385 F. Supp. 3d 849 (D. Minn. 2019) ("*Hrebal II*") (collecting cases and granting Plaintiff's Motion for Partial Summary Judgment).

## B. Defendant Failed to Mark Plaintiff's Account As Disputed.

As just explained, furnishers must comply with several requirements in response to a consumer dispute. Two are relevant to this case. First, a furnisher is required "to report

the results of the investigation to the [CRAs]." § 1681s-2(b)(1)(C). This includes informing the CRA that the consumer disputes the account. After all, CRAs are under a continuous duty to provide notice of disputes. 15 U.S.C. § 1681s-2(a)(3). After each dispute, Defendant was obligated to inform the relevant CRA(s) that the account was disputed by the consumer. Specifically, Defendant should have sent a Compliance Condition Code (CCC) of "XB" or similar to the CRAs.

Second, furnishers are required, upon receiving notice of a dispute, to report the results and "if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information." 1681s-2(b)(1)(D). "[M]ultiple circuit courts have held that, 'even if credit information is technically correct, it may nonetheless be inaccurate if, through omission, it creates a materially misleading impression.'" *Hrebal v. Seterus, Inc.*, 598 B.R. 252, 266 (D. Minn.) (quoting *Seamans v. Temple Univ.*, 744 F.3d 853, 863 (3d Cir. 2014)); *see also Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1186 (10th Cir. 2013); *Boggio*, 696 F.3d at 617; *Gorman*, 584 F.3d at 1163.

"[A] furnisher may create a materially misleading impression when, having received notice of a consumer's potentially meritorious dispute, the furnisher subsequently fails to report that the claim is disputed." *Hrebal v. Seterus, Inc.*, 598 B.R. at 266 (internal quotations omitted); *accord Llewellyn*, 711 F.3d at 1186; *Saunders*, 526 F.3d at 149-50; *Gorman*, 584 F.3d at 1162-64 (reasoning that "fail[ing] to report a bona fide dispute" "could materially alter how the reported debt is understood").

*Hrebal* is neatly on point. There the court reasoned:

"a reasonable juror may find that simply re-affirming [the consumer]'s delinquency, without any mention of a dispute, rendered [the furnisher]'s credit reporting inaccurate because through omission it created a materially misleading impression that [the consumer] was more financially irresponsible than he actually was. Indeed, [the consumer] had just successfully completed a (years-long) Chapter 13 bankruptcy plan . . . and had not missed a mortgage payment in over five years."

*Hrebal* 598 B.R. at 268. Although the *Hrebal* court initially denied cross motions for summary judgment, on reconsideration, the court granted summary judgment in the Plaintiff's favor. *See generally*, *Hrebal v. Nationstar Mortg. LLC*, 385 F. Supp. 3d 849 (D. Minn. 2019) ("*Hrebal II*"). The court specifically noted that "in the last four years alone, at least four federal district courts have granted a plaintiff partial summary judgment under the 'failure to report a debt as disputed' theory of liability discussed herein." *Id*. (collecting cases).

Here, as in *Hrebal*, the information Defendant furnished to the CRAs was misleading. The fact that the account was charged off would lead one to believe that Plaintiff failed to make payments for 120-180 days, as that is almost always the amount of time creditors wait to charge off debt. The reality, as in *Hrebal*, is that Plaintiff is a far less risky borrower than Defendant's reporting would lead third parties to believe. Plaintiff missed only two payments, and only because Defendant cancelled automatic payments

15

without warning to Plaintiff. Plaintiff quickly repaid outstanding amounts as soon as he became aware of this fact, and even paid off his debt early.

Defendant had numerous opportunities to correct this misleading reporting.[4] Plaintiff disputed the misleading reporting—directly to Defendant and indirectly through CRAs—no fewer than six times. Each time, Defendant had a statutory obligation to conduct a thorough investigation. Each time, the account was not showing as disputed by the consumer. And each time, Defendant refused to correct the Compliance Condition Code to indicate that the account was, in fact, disputed.

In sum, because Defendant's reporting was misleading, Defendant was required to notify all three CRAs of Plaintiff's dispute, in order to correct the misleading report. *See Doss v. Great Lakes Educ. Loan Servs., Inc.*, No. 3:20CV45, 2021 WL 1206800, at *10 (E.D. Va. Mar. 30, 2021) (finding the consumer stated a viable claim because the furnisher failed to send notice of the dispute to the CRA through which the consumer submitted his dispute, in violation § 1681s-2(b)(1)(C), "as well as to all the other CRAs, in violation of § 1681s-2(b)(1)(D)").

Courts have created one exception for furnishers when it comes to marking accounts as disputed: there is no obligation to note the dispute if it is not "bona fide" or at the very least "potentially meritorious." However, courts have consistently held that a bona fide dispute need not be one that would necessarily succeed at trial. See, e.g., Wood, 277

---

[4] Similarly, Defendant had numerous opportunities to provide notice to Plaintiff that automatic payments would be cancelled (or alternatively, that Plaintiff would not be notified if they were cancelled). See pages 3-4, *supra*.

F.Supp. 3d at 854-55 (ruling that it is "materially misleading" to continually report a dispute as "resolved" when the consumer, through the filing of ACDVs, "continue[s] to dispute the validity of" the at- issue debt); see also Saunders v. Branch Banking & Trust Co., 526 F.3d 142, 150 (4th Cir. 2008) (noting that "a disputed debt differs materially from an undisputed debt even if the consumer would not succeed at a trial of the dispute") (emphasis added). Here, there is no doubt that Plaintiff's dispute meets this bar.

The undisputed facts prove that the misleadingly-reported payment history stem from an error committed by Defendant. Defendant was aware of the continuing dispute over the status of Plaintiff's account and had an obligation to provide such notice to the CRAs and Plaintiff's current and prospective creditors. Without noting Plaintiff's continuing dispute of the accuracy of the reporting, Defendant created a materially misleading impression to the credit reporting agencies and users of Plaintiff's credit report, in violation of 1681s-2(b). *Seamans v. Temple University*, 744 F.3d 853, 867 (3rd Cir. 2014) (holding that the furnisher's failure to report the consumer's "potentially meritorious" dispute may constitute a "material inaccuracy" and vacating the district court's order granting summary judgment on the consumer's Section 1681s-2(b) claims); *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1186 (relying on *Boggio* and *Saunders* in denying the furnisher's motion for summary judgment).

## II.    DEFENDANT'S FCRA VIOLATIONS WERE WILLFUL AS A MATTER OF LAW.

A data furnisher can be held liable for punitive damages if it is determined that it willfully failed to comply with any portion of the FCRA. 15 U.S.C § 1681n.  In *Safeco Insurance Co. of*

*America v. Burr*, the Supreme Court held that "willfulness" included not only knowing violations, but also those which are reckless or committed with reckless disregard of the law. 551 U.S. 47, 57 (2007). While the *Safeco* Court ultimately concluded that the defendants had not acted willfully because their conduct was based upon an objectively reasonable reading of the FCRA at the time, the same cannot be said of Defendant in this case. 551 U.S. at 69-70.

Although the issue of willfulness is generally a question of fact for the jury, the Court may determine willfulness as a matter of law if it concludes that there is no genuine issue of material fact that Defendant's conduct created "a risk [of an FCRA violation] substantially greater than that which is necessary to make [its] conduct negligent. *Safeco*, 127 S.Ct. at 2215. Implementing a system that creates an unjustifiably high risk of inaccuracies necessitates an award of punitive damages. *Id.*; *see also Scheel-Baggs v. Bank of Am.*, 575 F. Supp. 2d 1031, 1043 (W.D. Wis. 2008).

A reasonable furnisher, upon receiving a dispute, would either make the changes requested by a consumer or verify current reporting and mark the account as disputed.[5] This makes sense, because if the furnisher determined that the account should be reported differently, it would make the change; otherwise, there is an ongoing dispute about the account, and that dispute should be reported. Indeed, courts have noted cases in which "[a furnisher's] decision to report the debt without any mention of a dispute was misleading [and] . . . can be expected to have an adverse effect." *Saunders*, 526 F.3d at 150

Defendant, on the other hand, has a deliberate policy of not marking accounts as

---

[5] A third option also allowed by the FCRA would be to cease reporting the trade line in question.

disputed. Defendant's policy is to never update the Compliance Condition Code to reflect that a consumer disputed information unless it previously received a direct dispute from the consumer. (*See* Vavreck Decl. ¶ 2, Grimes Dep. 48:11-50:2); (*See also* Vavreck Decl. ¶ 2, Exhibit P, Deposition of Brandon White ("White Dep.") 52:11 – 52:14) ("[W]e never update the compliance condition code unless they're disputing the compliance condition code.").

In other words, if a consumer sends an "indirect" dispute—that is, a dispute sent through a CRA, which in turns sends an ACDV to Defendant—Defendant *never* marks the account as disputed. But several courts have held that failure to respond to an indirect dispute by marking the account as disputed can constitute a violation of the FCRA. *See, e.g., Seamans*, 744 F.3d 853; *Llewellyn*, 711 F.3d 1173; *Saunders*, 526 F.3d 142.

Moreover, Plaintiff disputed his account both directly and indirectly, and the account was never marked as disputed. He disputed the account indirectly at least five times, and directly in writing to Defendant once. Yet the account was never marked as disputed.

Additionally, Defendant's irregular policies pertaining to bankruptcy by a single consumer on a jointly-owned account create cracks for other consumers in the same position as Plaintiff to fall through. Suppose an jointly-owned account held by consumer A and consumer B, and that they share a mailing address. If consumer A files for bankruptcy, Defendant's policy is to treat the consumers together for bankruptcy purposes, and shut off autopay for both consumers. Grimes Dep. 82:1-83:18. But when considering credit reporting, Defendant has the resources to treat consumers A and B separately and to mark one account as charged off and the other as discharged in bankruptcy. As a result, the consumer B's automatic payments are shut off without warning or notification (even though he lists a

separate cell phone number and other contact information) and then his credit report is tainted.[6]

Thus, Defendant's conduct cannot be described as a mistake or mere negligence. It follows a deliberate policy that hurts consumers by omitting information—information required by the FCRA—from their credit reports. And it is extremely unlikely that Plaintiff is the first consumer harmed by Defendant's policy. Defendant processes 1,500 – 2,000 disputes per month. (*See* Vavreck Decl. ¶ 2, Grimes Dep. 14:16-14:22.). Every dispute that fails to explicitly ask that a consumer's account be marked as disputed is not marked as disputed, creating misleading accounts for consumers beyond just Plaintiff.

Defendant never updated its reporting to provide notice that the account status was disputed because Defendant does not train its agents to use the Compliance Condition Code field in all of the instances it should. Such a lackadaisical approach to credit-reporting disputes in spite of Defendant's knowledge of the FCRA and its statutory duties entitles Plaintiff to summary judgment in his favor on the issue of willfulness.

## CONCLUSION

In sum, Plaintiff's credit history was without blemish until Defendant—without warning—cancelled Plaintiff's automatic payments. Plaintiff repeatedly sought to have these negative marks removed from his credit report but was rebuffed. Crucially, Defendant

---

[6] Additionally, Defendant has a policy known as "goodwill," which is designed to aid consumers when reporting might be technically accurate but unjust in a particular situation. However, Defendant has indicated that it only allows goodwill adjustments if a consumer does not dispute the reporting and also that Defendant does not honor goodwill adjustments.

did not indicate on Plaintiff's reports that the relevant account was disputed; such a mark would have enabled Plaintiff to tell his story and correct the misleading reporting. And this was not a random mistake or omission; Defendant has a policy of never marking accounts as disputed unless specifically requested by the consumer. For all of the above reasons, Plaintiff respectfully requests that the Court determine Defendant violated 15 U.S.C. § 1681s-2(b) by failing to reasonably investigate each of his disputes and that Defendant's actions were willful and committed with reckless disregard of the law entitling Plaintiff to pursue an award of punitive damages at trial.

Dated: November 1, 2021

Respectfully Submitted,
By: s/Mark L. Vavreck            .

Mark L. Vavreck, Esq.
Attorney I.D. #: 0318619
**GONKO & VAVRECK PLLC**
Designers Guild Building
401 North Third Street, Suite 640
Minneapolis, MN 55401
Telephone:  (612) 659-9500
Facsimile:  (612) 659-9220
Email: mvavreck@cgmvlaw.com


Thomas J. Lyons, Jr., Esq.
Attorney I.D. #: 249646
**CONSUMER JUSTICE CENTER, P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
Telephone: (651) 770-9707
Email:
tommy@consumerjusticecenter.com

***ATTORNEYS FOR PLAINTIFF***