# EXHIBIT I

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
COURT FILE NO.:  20-cv-1764-JRT-LIB

Jesse G. Sherman,          )
                           )
        Plaintiff,   )
                           )
v.               )
                           )
Sheffield Financial, LLC,      )
                           )
        Defendant.   )


VIDEOCONFERENCE DEPOSITION
OF
JUSTIN GRIMES,
on behalf of
SHEFFIELD FINANCIAL, LLC

June 18, 2021
1:30 p.m.


Reporter:  Carolyn Taylor Pekas, RPR

---

Page 2

1    The videoconference deposition of Justin Grimes,
2  on behalf of Sheffield Financial, LLC, is taken on
3  June 18, 2021, with all parties appearing via Zoom,
4  commencing at 1:30 p.m., pursuant to Notice.
5
6         A P P E A R A N C E S
7  CONSUMER JUSTICE CENTER P.A.
   367 Commerce Court
8  Vadnais Heights, Minnesota 55127
   651.770.9707
9  tommy@consumerjusticecenter.com
   By Thomas J. Lyons,
10 appearing on behalf of Plaintiff.
11 KUTAK ROCK
   60 South Sixth Street, Suite 3400
12 Minneapolis, Minnesota 55402-4018
   612.334.5022
13 andrew.shedlock@kutakrock.com
   By Andrew R. Shedlock,
14 appearing on behalf of Defendant.
15
   Also Present:  Karen Wiles
16
17
18
19
20
21
22
23
24
25

---

Page 3

1          I N D E X
2  WITNESS:                PAGE NO.
3     JUSTIN GRIMES, on behalf of SHEFFIELD
      FINANCIAL, LLC
4
   EXAMINATION:
5
6  By Mr. Lyons............................  6
7  By Mr. Shedlock........................  91
8  By Mr. Lyons - Further Examination........  92
   By Mr. Shedlock - Further Examination....  93
9
   Corrections Sheet...........................  95
10
   Signature Sheet.............................  96
11
   Notary Reporter's Certificate..............  97
12
            FIRST
13 EXHIBITS:          REFERENCE
14   (The exhibits were marked prior to the
      deposition by counsel unless otherwise noted.)
15
   No. 7...................................  76
16  Complaint, Jury Trial Demand;
      Sheffield00005 - Sheffield00016
17
   No. 9...................................  70
18  Email chain;
      Sheffield00020 - Sheffield00023
19
   No. 15..................................  32
20  Email chain; Miscellaneous Documents;
      Sheffield00057 - Sheffield00119
21
   No. 17..................................  82
22  Indirect Dispute Processing Audit;
      Sheffield00899
23
   No. 18..................................  68
24  BB&T Risk Management Organization;
      Bankruptcy Policy;
25  Sheffield00852 - Sheffield00898
            FIRST

---

Page 4

1  EXHIBITS:          MARKED  REFERENCE
2  No. 19..................................  50
   Automated Consumer Dispute Verification;
3  Sheffield00139 - Sheffield00140
4  No. 20..................................  45
   Automated Consumer Dispute Verification;
5  Sheffield00137 - Sheffield00138
6  No. 21..................................  39
   Automated Consumer Dispute Verification
7  No. 22..................................  63
   Automated Consumer Dispute Verification
8
   No. 23..................................  67
9  Letter to Experian from Duffy Law Office;
   2/20/20;
10 EXP-SHERMAN 000001 - EXP-SHERMAN 000031
11 No. 24..................................  78
   Metro 2 Spreadsheet;
12 Sheffield00130 - Sheffield00134
13 No. 25..................................  18
   Compilation of Metro 2 file reporting;
14 Sheffield00127 - Sheffield00129
15 No. 27..................................  58
   TransUnion Corporation document;
16 TU000040 - TU000040
17 No. 28..................................  36
   Collection History;
18 Sheffield00120 - Sheffield 00126
19 No. 29.......................  23  23
   Screenshot of Mr. Grimes' computer
20 screen
21 No. 30...................  93  57
   Credit Reporting Resource Guide;
22 Compliance Condition Codes; Exhibit 8
23
24
25

Civil Action Group
763-576-8832

Page 5

DOCUMENT/INFORMATION REQUESTS:

No. 1.......................................  62
Sheffield version of Exhibit 27
No. 2.......................................  62
Images attached to the ACDV, if saved

No. 3.......................................  75
Composite printout (Sheffield 022)
No. 4.......................................  80
Reports

PORTIONS OF TRANSCRIPT REQUESTED TO BE MARKED:
No. 1:  Page 33, Line 2
        "Q.  Okay.  And would correspondence like
    what we're looking at in Deposition Exhibit
    Number 15, would that be imaged or saved
    somewhere that your ACDV analyst could access?
        "A.  I cannot answer that.  That's outside
    of Sheffield's and my realm."

No. 2:  Page 62, Line 15

Page 6

-----
JUSTIN GRIMES,
on behalf of
SHEFFIELD FINANCIAL, LLC,
having been first duly sworn to tell the truth,
the whole truth, and nothing but the truth,
testified as follows:
-----
EXAMINATION
BY MR. LYONS:
    Q.  Mr. Grimes, can you state your full name for
the record, spelling your last?
    A.  Justin Keith Grimes, G-R-I-M-E-S.
    Q.  And what is your home address, sir?
    A.  My home address is 5201 Riverwest Road, and
that's Lewisville, North Carolina 27023.
    Q.  Mr. Grimes, what is the year of your birth?
    A.  It is 1986.
    Q.  '86?
    A.  Yes, sir.
    Q.  Okay.  And have you ever had your deposition
taken before?
    A.  I have not.
    Q.  I take it you've never been designated as an
expert witness before?

Page 7

    A.  I have not.
    Q.  Okay.  Have you personally ever sued anyone
before?
    A.  No, I have not.
    Q.  Has anyone ever sued you personally before?
    A.  Yes.
    Q.  Who has sued you personally?
    A.  I had -- a person I went to high school
with, their parents tried to sue me one time.
    Q.  Okay.  And how long ago was that?
    A.  Lord.  That was 2003, maybe.  It was over an
automobile accident.
    Q.  Okay.  And did that case get dismissed, or
was there a resolution in some manner?
    A.  It was dismissed.
    Q.  Okay.  Did you ever file bankruptcy?
    A.  No.
    Q.  Have you ever been arrested?
    A.  No.
    Q.  Did you serve in the military?
    A.  No.
    Q.  Did you go to high school?
    A.  Yes.
    Q.  Where did you go to high school?
    A.  North Forsyth High School in Winston-Salem.

Page 8

    Q.  And did you graduate?
    A.  I did.
    Q.  Okay.  What year did you graduate?
    A.  Technically speaking, 2004.  December
of 2004.
    Q.  Did you take some time off in the middle
there?
    A.  No.  I actually graduated a half a semester
early.
    Q.  Excellent.  And after high school, did you
go on to college?
    A.  I went to trade school.
    Q.  Okay.  What trade school?
    A.  I went to NASCAR Technical Institute, UTI.
    Q.  And did you get a degree from there?
    A.  No.  I got certifications, but no degree.
    Q.  What was the certification in?
    A.  I was certified in -- I believe it was seven
systems to do with Ford and Ford automobile systems.
    Q.  And after you received that certificate, did
you actually go work in that line, with
automobiles?
    A.  I did.
    Q.  And where did you work at?
    A.  Parkway Ford.

2  (Pages 5 to 8)

Page 9

1    Q.   Where is that located?
2    A.   Winston-Salem.
3    Q.   Okay.  And how long did you work for Parkway
4  Ford?
5    A.   Two years.
6    Q.   And what two years were those?
7    A.   I believe it was 2006 to 2008.
8    Q.   Okay.  And after Parkway Ford, where did you
9  work?
10   A.   I worked for Modern Chevrolet for a year.
11   Also in South Carolina?
12   A.   North Carolina.
13   Q.   Or North Carolina.  I'm sorry.  And so you
14  worked there for about a year?
15   A.   Yes, sir.
16   Q.   Would it be the same, in some kind of auto
17  repair?
18   A.   Yes.  I was a technician.
19   Q.   Okay.  And after Modern Chevrolet, where did
20  you go?
21   A.   Sheffield Financial.
22   Q.   And what year did you start there?
23   A.   2009.
24   Q.   What division did you start in at Sheffield?
25   A.   Underwriting.

Page 10

1    Q.   Okay.  And how long did you stay in
2  underwriting?  From 2009 to when?
3    A.   2000- -- oh.  2016 or 2017, somewhere in
4  there.
5    Q.   Okay.  And what did you change to?
6    A.   The role I'm currently in today.
7    Q.   And tell me that role, please.
8    A.   I am the assistant regulatory review
9  manager.
10   Q.   And tell me the job responsibilities that
11  the assistant regulatory review manager has.
12   A.   The job responsibilities I currently have
13  are around -- I handle a lot of the regulatory
14  monitoring for Sheffield Financial.  Also manage the
15  credit dispute department.
16       I'm trying to think of other roles and
17  responsibilities.  I handle -- at one point I handled
18  part of the recovery division.  That's no longer the
19  case.
20       And then I have just some general day-to-day
21  compliance things that I -- that happen, that come
22  up, and questions that come up as well.
23   Q.   Does the compliance and questions that come
24  up -- does that have to do with credit reporting at
25  all, or no?

Page 11

1    A.   Yes, some of it does.
2    Q.   Tell me -- give me an example of what would
3  come up in credit reporting that would require your
4  daily involvement.
5    A.   Questions come up as if I have a -- an
6  underwriter will come up and ask a question about a
7  tradeline that may have been presented on an account
8  and wanted to know why it looks funny, from another
9  area, like another lender.  I've had questions that
10  come up around inquiries and people disputing -- they
11  say, "Well, why did you pull my credit?"  Or I'd have
12  questions that come up around credit disputes in
13  general where somebody will say, "This person says
14  that we -- we didn't -- we're not reporting
15  correctly.  What do I need to do?"
16   Q.   And would those be more of the direct
17  disputes as opposed to indirect through the credit
18  reporting agencies?
19   A.   A lot of those, we almost consider those
20  inquiries because they're not really direct disputes.
21  They're more of a question or an inquiry in the
22  aspects of what they're looking for.
23   Q.   Got it.  Okay.  So let's take a step back.
24  On the monitoring, you know, of the -- of the rules
25  and regulations, does that have to do with monitoring

Page 12

1  anything having to do with the Fair Credit Reporting
2  Act?
3    A.   Yes.
4    Q.   All right.  And tell me what source you use
5  to monitor things with regard to the Fair Credit
6  Reporting Act.
7    A.   I --
8        MR. SHEDLOCK:  Object to vague as to the
9  term "source."
10       You can answer.
11       THE WITNESS:  Say that again, Andrew.  I'm
12  sorry.  I missed that.
13       MR. SHEDLOCK:  When I object, I'll just note
14  an objection for the record, and you can still answer
15  the question unless I tell you not to answer.
16       So my objection was vague as to the term
17  "Source."  You can answer the question.
18       THE WITNESS:  Okay.
19   A.   Sources are -- the Metro 2 files that we
20  provide to the credit bureaus is the primary source
21  that I review.
22       Also, there is some review of account
23  reporting views, which some of the times are called
24  soft pulls, and then also some other items such as
25  applications or documentation in our servicing

Page 13

1  system.
2      Q.  (BY MR. LYONS)  Okay.  Any review of case
3  law or decision -- judicial decisions that impact the
4  credit reporting agencies or the Fair Credit
5  Reporting Act?
6      A.  Not often.  Most of the time that comes from
7  an internal attorney that we may have, or any kind of
8  case law or changes will come from a corporate level.
9      Q.  And then are you made aware of those at --
10     you know, overseeing the credit dispute
11  department,
12  are you privy to that information?
13     A.  Yes, I'm privy to -- to those.
14     Q.  Okay.  So have you ever heard of the case
15  Saunders, S-A-U-N-D-E-R-S, v. Branch Banking & Trust
16  Company of Virginia?
17     A.  I have not.
18     Q.  Okay.  So the short form for it would be
19  Saunders v. BB&T, and it was a 4th Circuit case from
20  2008.  You've never heard of that case before?
21     A.  I have not.
22     Q.  Okay.  Tell me about the credit dispute
23  department.  How many people do you oversee?
24     A.  Currently, there's two dispute analysts that
25  we have full-time, and then we have a -- another as a

Page 14

1  fill-in or kind of overflow as needed.
2      Q.  And who are those three persons?
3      A.  The two that I currently manage directly are
4  Annette Spillman, Kelly Pipton, and the overflow is
5  Brandon White.
6      Q.  All right.  And did you know that I already
7  took Brandon White's deposition in this case?
8      A.  I did, yes.
9      Q.  Okay.  And have you reviewed that
10  deposition?
11     A.  I have not reviewed it word for word, no.
12     Q.  Okay.  And you said Kelly Tipton?  Did I get
13  that -- is that T-I-P-T-O-N?
14     A.  Yeah, P-I-P-T-O-N.
15     Q.  Thank you.
16     Okay.  And what is the volume for the
17  processing of ACDVs for your team?  Is it -- are you
18  trying to do so many a day? A week? A month? How
19  does it work?
20     A.  Basically, they work them as they can.  It
21  is -- we average about 1,500 to 2,000 a month
22  currently, right now.  And we have, on average, 30
23  days to respond, although we far exceed most of
24  the time.
25     Q.  You do process them within 30 days?  Is that

Page 15

1  what you said?
2      A.  Yes.
3      Q.  Okay.  All right.  And did you ever process
4  ACDVs before in your career at Sheffield?
5      A.  I have not.
6      Q.  Okay.  And have you had some training in the
7  Fair Credit Reporting Act?
8      A.  Yes.
9      Q.  All right.  And do you understand your role
10  as -- or Sheffield's role in processing disputes from
11  the credit reporting agencies?  Do you understand
12  that is a responsibility that Sheffield has if
13  it gets notice from the CRAs?
14     A.  Yes.
15     Q.  Okay.  And Sheffield is charged with
16  performing a reasonable investigation related to
17  those disputes.  Correct?
18     A.  Correct.
19     Q.  All right.  And not only does reasonable
20  investigation requirements under the FCRA stand true
21  for Sheffield, but also that the reporting is
22  complete and accurate, both.  Right?
23     A.  Correct.
24     Q.  All right.  And sometimes completeness has
25  to do with updating the reporting to show that the

Page 16

1  customer may dispute the way Sheffield is reporting.
2  Do you understand that?
3      A.  I do.
4      Q.  Okay.  And do you -- in what ways does
5  Sheffield communicate to the credit reporting
6  agencies that a consumer has a dispute with the way
7  Sheffield is reporting?
8      A.  We have one of two ways that that can be
9  done.  We can either file what's called an AUD to
10  update the -- or notify the bureaus through e-OSCAR,
11  or we have a way in our system to add a Compliance
12  Condition Code that would go on our month-end
13  processing to -- on our Metro 2 file.
14     Q.  Okay.  Does Sheffield ever use the
15  Compliance Condition Code in an ACDV?
16     A.  Not usually.  We do if it's applicable, but
17  only if it's applicable in that time.
18     Q.  And tell me what you mean by that.  What are
19  the circumstances in which the consumer -- or the
20  Compliance Condition Code would be used in an ACDV?
21     A.  The Compliance Condition Code would be used
22  in an ACDV if there was a situation in which
23  we had
24  received notice of a dispute in which -- that the
25  bureaus were not notified or had not been notified at

Page 17

1 the time of the ACDV or if we had -- in our system we
2 had actually coded the account and the bureaus for
3 some reason were not showing that code.
4     Q.   And under what circumstances would Sheffield
5 code an account with the -- or -- yeah, code an
6 account with a Compliance Condition Code?
7         MR. SHEDLOCK:  Objection.  Vague.  Calls for
8 a narrative.
9         You can answer, if you know.
10     A.   There are a couple different scenarios.  I
11 don't -- I don't know right off -- I don't have them
12 in front of me, all of the Compliance Condition Codes
13 circumstances, but I do know that a -- an account
14 that is in credit dispute is one of those, or the XB
15 code, and the only way that that would be added to an
16 ACDV is if we had actually been notified of the
17 direct dispute and had coded that account and for
18 some reason that ACDV did not have that code attached
19 on it.
20     Q.   (BY MR. LYONS)  Okay.  So let me try to
21 understand that.  In order for the XB Compliance
22 Condition Code to be used in an ACDV, Sheffield would
23 have to look on the -- on what it -- on its prior
24 monthly reporting and see that it had been used
25 prior?

Page 18

1     A.   If it was supposed to be present.
2     Q.   Okay.
3     A.   Meaning that we -- that we had coded it, and
4 to validate -- not necessarily that we -- if we did
5 or did not report it.  If it's in our servicing
6 system that it should be present and it's not
7 present, then we would add it back to it or add it to
8 there.
9     Q.   Okay.  And where would that XB code be found
10 for the ACDV credit analyst to see if it should be
11 reported?
12         MR. SHEDLOCK:  Objection.  Vague.
13         You can answer.
14     A.   It would be -- it would be on the credit
15 reporting information screen in our servicing system.
16     Q.   (BY MR. LYONS)  Okay.  If you'll bear with
17 me, I have a copy of that.  Take a look at
18 Deposition
19 Exhibit Number 25.
20         MR. SHEDLOCK:  Brandon, do you have those
21 exhibits in front of you?
22         THE WITNESS:  I'm bringing them up now.
23         MR. SHEDLOCK:  Sorry, Justin.  I don't know
24 why I said Brandon.  My apologies.
25         THE WITNESS:  That's okay.  Give me one

Page 19

1 second.  I'm bringing them up.
2         MR. LYONS:  Excellent.  That's what I was
3 going to ask you.  Thank you.
4         THE COURT REPORTER:  Mr. Grimes, I don't
5 know why, but I'm barely hearing you.  Is there
6 something you can do to raise your volume a little
7 bit?  I can hear you, but barely.
8         THE WITNESS:  Let me see if I can move my
9 phone up higher on the desk.  Is that any better?
10        THE COURT REPORTER:  That's much better.
11 Thank you.
12     A.   Okay.  Exhibit 25, I see it here.  It looks
13 like it says -- the first page has record number with
14 a few different records there.
15     Q.   (BY MR. LYONS)  Yeah.  And what I'll do,
16 Mr. Grimes, is on the bottom right, see where it has
17 that Sheffield Bates number, where it says
18 Sheffield00127?
19     A.   Yes, sir.
20     Q.   Okay.  I'll refer to the page like that.
21 So, for example, Exhibit 25 has Sheffield 127 through
22 129.  Right?
23     A.   Yes, sir.
24     Q.   All right.  So can you identify this
25 document for me?

Page 20

1     A.   Yes, sir.
2     Q.   What is it?
3     A.   This is a -- this is a -- it looks like a
4 summarization or a compilation of the
5 (Indiscernible).
6         THE COURT REPORTER:  I didn't hear that.  A
7 compilation of what?
8         THE WITNESS:  The Metro 2 file reporting.
9     Q.   (BY MR. LYONS)  Great.  And is this what you
10 were referring to in determining or answering my
11 question about what would the ACDV dispute analyst
12 look at to find out if the XB code should be
13 populated in the Compliance Condition Code field?
14     A.   No.
15     Q.   Where would the analyst look?
16     A.   They would look in our servicing system.
17     Q.   Okay.  And tell me the name of the servicing
18 system.
19     A.   It would be -- the short name is CIM, or
20 Customer Information Management.
21     Q.   Okay.  And where in CIM would the agent
22 look?
23     A.   There is a screen called credit reporting,
24 and underneath that, there is a tab that would have
25 this on it.

Page 21

1    Q.  Okay.
2    A.  It's under credit -- or reporting codes and
3  original information.
4    Q.  Okay.  Let's see.  I don't think I've ever
5  seen that page or that tab.  Let's see here.
6        MR. LYONS:  Counsel, maybe you can help me.
7  Does that sound like a document that has been
8  produced?
9        MR. SHEDLOCK:  I'm not sure.  I'd have to
10  review the documents, too.
11        MR. LYONS:  Say that one more time.
12        MR. SHEDLOCK:  I would have to review the
13  documents as well.  I'm not sure.
14        MR. LYONS:  Okay.  Why don't we take a break
15  and find out about that.
16        MR. SHEDLOCK:  Okay.  Off the record?
17        MR. LYONS:  Yeah.  Sure.
18        (A discussion was held off the record.)
19        MR. LYONS:  Let's go back on the record.
20    Q.  (BY MR. LYONS)  Mr. Grimes, do you have
21  access to that screen right now?
22    A.  I do.
23    Q.  Okay.  And are you looking at it right now?
24    A.  I am.
25    Q.  Okay.  And is there a way to screenshot that

Page 22

1  information?
2    A.  Yes, sir.
3    Q.  Okay.  Well, great.  Let's screenshot it and
4  send it around.
5        MR. LYONS:  I think the easiest way to do
6  it, Mr. Shedlock, will be for him to screenshot it
7  and email it to you and somehow email it to me and
8  the court reporter, I guess.
9        MR. SHEDLOCK:  Yeah.  Just give me a
10  screenshot of what you've got, and I'll send it
11  around, and we'll continue on.
12        THE WITNESS:  I'll forward it to you.
13        MR. SHEDLOCK:  Yeah, go ahead.
14        MR. LYONS:  Maybe the easiest way to do this
15  would be if it gets to you, Mr. Shedlock, we could --
16  you could email it to the court reporter, and she
17  could populate it on the screen so we can all see it.
18  Because you don't have it either.  Right?
19        MR. SHEDLOCK:  Hold on.
20        Justin, can you send it to me as an
21  attachment, by chance?
22        THE WITNESS:  Yes.  Bear with me one second.
23        (Brief pause in proceedings.)
24        MR. SHEDLOCK:  Tommy, I just sent it to you.
25        Madam Court Reporter, what's your email

Page 23

1  address?
2        (A discussion was held off the record.)
3        THE COURT REPORTER:  I just put it in the
4  chat.  It's reporteracr@gmail.com.
5        MR. SHEDLOCK:  Okay.  I've sent you what
6  he's looking at.
7        THE COURT REPORTER:  Let's go off the record
8  while I check for it.
9        (A discussion was held off the record.)
10    Q.  (BY MR. LYONS)  Mr. Grimes, can you see
11  what's up on the screen?
12    A.  I can.
13    Q.  Okay.  And we'll call this Exhibit --
14        MR. LYONS:  What did you say, Mr. Shedlock,
15  we're up to?
16        MR. SHEDLOCK:  29.
17        MR. LYONS:  29.  We'll mark this as Exhibit
18  29.
19        (Deposition Exhibit 29 marked for
20  identification.)
21    Q.  (BY MR. LYONS)  So this is the screen you
22  were referring to that has historical information
23  regarding the compliance code?
24    A.  This is where it would be stored at if it
25  was -- if it was assigned on an account, and that

Page 24

1  would be the first box at the top.
2    Q.  Right.  I see it up there.  So tell me, are
3  the ACDV credit dispute analysts supposed to
4  immediately go to this screen to find out if the XB
5  code should be populated?
6    A.  They go here to see if it is currently
7  accessed on an account or when the last change was
8  made to have it on an account.
9    Q.  Okay.  And would -- if it's not on the
10  account prior to processing an ACDV, the analyst
11  would never add the XB code.  Is that correct?
12        MR. SHEDLOCK:  Objection.  Speculation.
13        You can answer.
14    A.  The other place they could look for any kind
15  of information, if it should be added or not, would
16  be under the notes or the contact -- I believe you
17  guys would call it a contact, but it's under the
18  notes for the account.
19    Q.  (BY MR. LYONS)  And would they -- they are
20  charged with reviewing the entire set of account
21  notes to see if it should be included, or what would
22  indicate that it should be added?
23    A.  (No audible response.)
24        MR. SHEDLOCK:  I think we're having some
25  audio issues.  He can just hop back on when he's

Civil Action Group
763-576-8832

Page 25

1  ready.
2          (A discussion was held off the record.)
3          MR. SHEDLOCK:  Justin, can you hear us?
4          THE WITNESS:  I'm sorry.  My phone -- I hit
5  a button.  Somebody was trying to call me at the
6  exact same time, and I hung up on the wrong call.
7          MR. LYONS:  Okay.  No problem.
8          Okay.  So, Madam Court Reporter, can you
9  read him the last question that I posed?
10         (The requested portion of the record
11         was read by the court reporter as follows:
12         "Q.  And would they -- they are charged
13         with reviewing the entire set of account
14         notes to see if it should be included, or
15         what would indicate that it should be
16         added?")
17     A.  Yes, they would review the entire account
18  history.
19     Q.  (BY MR. LYONS)  And what are they looking
20  for in the account history, somebody previously
21  coding the file as XB?
22     A.  There could be a note, the prior coding of
23  XB.  There could be a note of an indication of a
24  direct dispute.  There could be a note -- well, those
25  would be the two main -- the two ones that I can

Page 26

1  think of.
2     Q.  And does the direct dispute have to be
3  disputing the Compliance Condition Code?
4     A.  No.
5     Q.  Okay.  It could just be disputing anything
6  about the account.  Correct?
7     A.  Correct.
8     Q.  Okay.  And if a direct dispute was received
9  about anything having to do with the account, it
10  should be flagged XB.  Is that correct?
11         MR. SHEDLOCK:  Objection.  Speculation.
12  Vague.
13         You can answer.
14     A.  Correct.
15     Q.  (BY MR. LYONS)  Okay.  And you understand
16  that the XB code then is populated to the credit
17  reporting agency so that the Sheffield tradeline
18  shows that the consumer is disputing the way
19  Sheffield is reporting.  Correct?
20     A.  Ask that again.
21     Q.  Sure.  You understand that by populating the
22  Compliance Condition Code field with XB, that that
23  then is going to show up on a consumer's credit
24  report that that specific tradeline, the Sheffield
25  tradeline, is disputed.  Right?

Page 27

1     A.  Correct.
2     Q.  That's the purpose of the XB code.  Correct?
3     A.  Correct.
4     Q.  Okay.  And I think I heard you say that the
5  XB code could be populated through an AUD.  Right?
6  That's an automatic update to the credit reporting?
7     A.  Correct.
8     Q.  And it could be populated in an ACDV.
9  Correct?
10     A.  Correct.
11     Q.  Any other way?
12     A.  The month-end credit reporting, the AUD, and
13  the ACDV.
14     Q.  Perfect.  Okay.  And is that the policy and
15  procedure at Sheffield since you've been there with
16  relationship to the -- to your role in credit
17  disputes?
18     A.  Meaning the coding of the XB?
19     Q.  Yes.
20     A.  Yes.
21     Q.  Okay.  In preparation for your deposition
22  today, did you review any documents?
23     A.  Yes.
24     Q.  What did you review?
25     A.  I reviewed the multiple exhibits that were

Page 28

1  listed to me as best I could, and including ACDVs and
2  some account notes and some of the case documents,
3  the -- the legal documents that came early on.
4     Q.  Okay.  And other than your attorney, did you
5  ever speak with anyone in preparation for your
6  deposition?
7     A.  Do you mean like speak with other parties
8  beforehand just to clarify things?
9     Q.  Yeah.
10     A.  Yes.
11     Q.  Who did you speak with?
12     A.  I spoke with our in-house attorney.
13     Q.  Who is that?
14     A.  Regina Dalon.
15     Q.  How do you spell Regina's last name?
16     A.  D-A-L-O-N.
17     Q.  Okay.  Anybody else?
18     A.  I also spoke with Billy Deck.
19     Q.  B-I-L-L-Y, first name; last name spelled
20  how?
21     A.  D-E-C-K.
22     Q.  Okay.  And what is Billy Deck's position?
23     A.  He is head of credit bureau services for
24  Truist Bank.
25     Q.  And when did you speak with Billy Deck?

7 (Pages 25 to 28)

Page 29

1    A.   I actually spoke with him shortly before we
2  got on the call today.
3    Q.   Okay.  And was Regina Dalon on that call?
4    A.   I spoke with her on a separate call.
5    Q.   Fine.  It was just you and Billy Deck on the
6  call before you got on the deposition.  Correct?
7    A.   I -- I spoke with Regina also before we got
8  on with the deposition as well.
9    Q.   Okay.  But on your call with Billy Deck,
10  Regina was not a party to that call?
11    A.   No.
12    Q.   Okay.  So tell me what you talked to Billy
13  Deck about today in your phone call.
14    A.   I was actually clarifying the corporate
15  direct dispute address that Truist Bank publishes and
16  what that address was.
17    Q.   And why did you want to clarify that?
18    A.   I wanted to clarify that address because we
19  no longer use that address, and there was a time that
20  we were having direct disputes sent to credit bureau
21  services, and they would forward the direct disputes
22  to the line of business.
23    Q.   Okay.  And was that -- did you have an old
24  address that you were looking at and wondering if
25  that was still good?

Page 30

1    A.   Yes.  I was -- I first wanted to know what
2  that address was because I could not recall what the
3  address was.
4        And then, second, I wanted to -- I wanted to
5  confirm the actual -- you know, actual address and
6  where it was actually going and make sure it was
7  going on the document that we actually had in the
8  exhibits.
9    Q.   Okay.  And was that the PO Box 1847 address?
10    A.   Yes.
11    Q.   All right.  And what did Billy Deck tell you
12  about the PO Box 1847 address?
13    A.   That is the address for credit bureau
14  services for Truist Bank.
15    Q.   Okay.  In Wilson, North Carolina?
16    A.   Yes.
17    Q.   ZIP Code 27894.  Right?
18    A.   Yes.
19    Q.   And that was the address that the lawyer,
20  Duffy Law Office, sent the dispute on behalf of
21  Mr. Sherman back in February of 2020.  Right?
22    A.   Correct.
23    Q.   And am I right that your department never
24  received a copy of that dispute?
25    A.   Correct.

Page 31

1    Q.   Okay.  So were you wondering why that was
2  that it never found its way to your department?
3    A.   Yeah.  I was confirming that address, and
4  then I also confirmed when that address was changed.
5  We publish the direct dispute address per the FCRA on
6  our website in two places, and when that address was
7  changed, we actually changed to our direct address,
8  which is a PO box in Winston-Salem, December of 2019.
9    Q.   Okay.  And when you say you changed the
10  address, you changed it on the website?
11    A.   Yes.
12    Q.   Okay.  Did you send notice out to the
13  customers alerting them of the change to the direct
14  dispute address?
15        MR. SHEDLOCK:  Objection.  Vague as to the
16  term "the customers."
17        You can answer.
18    A.   No.
19    Q.   (BY MR. LYONS)  Okay.  But the procedure
20  prior to the change, and even probably subsequent to
21  the change, was that if BB&T received a direct
22  dispute at the old address, that it would somehow be
23  forwarded on to you all.  Correct?
24    A.   Correct.
25    Q.   Okay.

Page 32

1    A.   The -- also, clarifying that address --
2        MR. SHEDLOCK:  Justin, Justin, there's no
3  question pending.  Sorry.
4    Q.   (BY MR. LYONS)  Mr. Grimes, did you want to
5  clarify something about the address?
6    A.   At this time, I'll cease to talk.
7    Q.   Well, no.  Now I'm asking you the question.
8    A.   Yes, the bankruptcy department also receives
9  mail at that same address.
10    Q.   The BB&T did at that address at that time,
11  in February of 2020?
12    A.   Correct.
13    Q.   Okay.  And you saw -- this is on Exhibit 15.
14  That's kind of the document we're talking about.
15  Exhibit 15, tell me when you have that up in front of
16  you.
17    A.   I have it up now.
18    Q.   Okay.  So you see on the second page of
19  Exhibit 15, down on the bottom right-hand corner it
20  says Sheffield 58?  Do you see that?
21    A.   Yes, sir.
22    Q.   And this is the correspondence that you were
23  talking about from February 20, 2020, that had the
24  bankruptcy address, PO Box 1847 in Wilson,
25  North Carolina.  Right?

8  (Pages 29 to 32)

Page 33

1    A.   Correct.
2    Q.   Okay.  Now, did you ask Billy Deck whether
3  or not their system had record of receiving this
4  correspondence?
5    A.   I did not.
6    Q.   Okay.  And would correspondence like what
7  we're looking at in Deposition Exhibit Number 15,
8  would that be imaged or saved somewhere that your
9  ACDV analyst could access?
10   A.   I cannot answer that.  That's outside of
11 Sheffield's and my realm.
12     MR. LYONS:  Okay.  Madam Court Reporter,
13 will you mark that in the deposition?  Just mark that
14 question and that answer.
15     THE COURT REPORTER:  Okay.
16   Q.   (BY MR. LYONS)  Okay.  So I think you
17 answered this before, Mr. Grimes, but just so the
18 record is clear, this February 20, 2020,
19 correspondence and all the attachments, you didn't --
20 your department didn't see that in February of 2020.
21 Correct?
22   A.   Correct.
23   Q.   And it wasn't until you were preparing for
24 this deposition that you saw it for the first time.
25 Is that right?

Page 34

1    A.   Correct.
2    Q.   Okay.  Would a correspondence like this in
3  Deposition Exhibit Number 15, would that cause the
4  department, your department, to update the XB -- or
5  the Compliance Condition Code to XB?
6    A.   Let me read this document.  I haven't read
7  it word for word all the way through.
8    Q.   Absolutely.  Take your time.
9    A.   (Examining.)  Yes.
10   Q.   And so, basically, what the lawyer is
11 conveying, and maybe you know it even from your
12 deposition prep, is that -- and review of the
13 documents, is that -- here's basically what happened.
14 Right?  There were two account holders on the Sherman
15 account.  Right?  Amy and Jesse.  Right?  Are you
16 aware of that?
17   A.   Yes.
18   Q.   Okay.  Amy filed for bankruptcy, and as a
19 result, that shut off the automatic payments for
20 Jesse.  Right?
21   A.   Correct.
22   Q.   Okay.  And that had an adverse impact on his
23 credit.  Right?  Because then --
24   A.   Correct.
25   Q.   Yeah.  So then he wasn't -- the payments

Page 35

1  weren't happening, Sheffield wasn't getting paid, and
2  they were reporting him adversely.  Correct?
3    A.   Correct.
4    Q.   All right.  So I get it.  This is a big
5  stack of information.  Right?  We've got payment
6  history in here; we've got account statements; we've
7  got all kinds of things in here.  But when Sheffield
8  gets letters from lawyers like this, typically what
9  does your -- what does your department do?
10   A.   This would have been forwarded to the legal
11 department.
12   Q.   And would it have been forwarded to Regina
13 Dalon?
14   A.   No.  It would have been forwarded to -- our
15 legal department has kind of a general mailbox area
16 that it would have been sent to.
17   Q.   So would that have been to Regina Dalon, or
18 would it have been to BB&T's legal department?
19   A.   BB&T's legal department.
20   Q.   Okay.  But would you -- before sending it or
21 simultaneously with sending it to the legal
22 department, would you have flagged the Compliance
23 Condition Code with XB?
24     MR. SHEDLOCK:  Objection.  Speculation.
25   A.   Yes.

Page 36

1    Q.   (BY MR. LYONS)  Okay.  And I appreciate your
2  candor, Mr. Grimes.
3        Okay.  So, obviously, in reviewing the notes
4  and reviewing the screenshot that we marked as
5  Deposition Exhibit 29, that never happened.  Right?
6    A.   Correct.
7    Q.   Okay.  So there was no flagging of the
8        Compliance Condition Code in February of
9  2020, but,
10 as you know, then later on there were indirect
11 disputes sent to Sheffield from the credit reporting
12 agencies.  Correct?
13   A.   Correct.
14   Q.   Okay.  So let's talk about those for a
15 minute.  And I'm going to direct your attention to --
16 I really think the easiest one to read, according to
17 Ms. Wiles, is Exhibit 28.  Tell me when you're there.
18   A.   Exhibit 28?
19   Q.   Yes.
20   A.   I am there.  It ends -- or begins with
21 Sheffield 120?
22   Q.   You've got it.  You've got it.
23   A.   Okay.
24   Q.   Okay.  So the first time that your
25 department seems to touch the account and enter any

9 (Pages 33 to 36)

Page 37

1     notes is on January 20, 2020. That's at Sheffield
2     123. Let me know when you're there.
3         A.  I am there.
4         Q.  All right. Okay. And Susan Kirk is an
5     analyst -- credit dispute analyst under your
6     supervision. Is that correct?
7         A.  In 2020, she would not have been under my
8     supervision.
9         Q.  Who did she work for at that time?
10        A.  I can't confirm exactly who it was because
11    there was a slight shift in departments. It would
12    have probably been John Nicholson.
13        Q.  Okay. So you weren't -- in January of 2020,
14    you weren't in charge of the credit dispute analysts?
15        A.  I was not managing them, no.
16        Q.  Okay. Remind me of what -- you were still
17    in credit, or not, at that time?
18        A.  Yes. Yes.
19        Q.  But your supervision roles didn't have to do
20    with the credit analysts; is that what I'm gathering?
21        A.  I -- I handle all the -- handled all the
22    monitoring and reviews of the activities that they
23    did. I did not manage the people on a day-to-day
24    basis.
25        Q.  So would you do, like, the auditing of them

Page 38

1     or review?
2         A.  Yes.
3         Q.  Okay. Now I follow you. Okay. So be that
4     as it may, on January 20, 2020, Susan Kirk processes
5     ACDV from Equifax through the e-OSCAR system.
6     Correct?
7         A.  Correct.
8         Q.  So let's stop there and talk kind of big
9     picture for a minute. Back in January 2020, Susan
10    Kirk had access to the same collection notes that
11    we're looking at here. Right?
12        A.  Yes.
13        Q.  Okay. She would have access to the payment
14    history. Correct?
15        A.  Correct.
16        Q.  And would she have access to bankruptcy
17    documents and bankruptcy information?
18        A.  Yes.
19        Q.  Would she have even access to the bankruptcy
20    filing information that BB&T received?
21        A.  I can't speak to that.
22        Q.  If you wanted to know the answer to that
23    question, who would you ask?
24        A.  Meaning if I wanted to know if she had
25    access or if I needed that information myself?

Page 39

1         Q.  Let me ask it a different way. So I asked
2     you that question, would she have had access to
3     BB&T's records related to the filing of the
4     bankruptcy, and you said, "I don't know about that."
5     If you wanted to go find out the answer to that
6     question, who would you ask?
7         A.  I would go back and probably ask Annette
8     Spillman or Brandon White.
9         Q.  Okay. Two other ACDV dispute analysts.
10    Right?
11        A.  Yes.
12        Q.  Okay. And if you wanted to find out from
13    someone other than the analyst -- who was your
14    supervisor? Did I already ask you that? I'm sorry
15    if I did.
16        A.  My supervisor is Allyson Brown.
17        Q.  Okay. And what's her title?
18        A.  She is a -- the -- I can't -- they just
19    changed it, so I'm not sure on the exact title. It
20    has something to do with the regulatory risk and
21    review manager, but I can't remember the prefix, if
22    they've changed it to a new prefix or not, to be just
23    Sheffield or to be a greater group than that.
24        Q.  Okay. All right. So now I'd like you to
25    look at Deposition Exhibit Number 21.

Page 40

1         A.  Okay.
2         Q.  Can you identify Exhibit Number 21?
3         A.  Meaning have I ever seen this or recognize
4     this document?
5         Q.  Do you recognize this document as an ACDV?
6         A.  No.
7         Q.  What do you think this document is?
8         A.  I can speculate that it's an ACDV just based
9     off the way it's listed, but that's not the form that
10    I've seen them in before.
11        Q.  Right. That's not the Sheffield version of
12    the ACDV. Correct?
13        A.  Correct. That's not the -- the e-OSCAR
14    version of the ACDV that I've seen.
15        Q.  Okay. But do you see Susan Kirk's name on
16    there as responding to this?
17        A.  Yes.
18        Q.  All right. And the responder's phone
19    number, right below that, is (336) 766-1388. Do you
20    see that?
21        A.  Yes.
22        Q.  All right. And is that Susan Kirk's phone
23    number or the phone number of the Sheffield credit
24    department?
25        A.  That is our general phone line that goes to

10  (Pages 37 to 40)

## Page 41

1    our receptionist.
2        Q.   Okay.  All right.  I'm going to represent to
3    you that we received this document from Equifax
4    purporting to be an ACDV that they got from BB&T or
5    Sheffield.  Do you see that where it says "Grantor
6    Name"?
7        A.   Yes.
8        Q.   Okay.  All right.  Kirk, in the notes in
9    Deposition Exhibit 28, says no images were attached
10   to the ACDV.  Right?
11       A.   Yes.
12       Q.   And when you look at Exhibit 21, at the
13   bottom of the page where there's a reference to
14   whether there were images attached, do you see that
15   there were no images sent?  Correct?
16       A.   Yes.
17       Q.   Okay.  And do you see the dispute in the top
18   right-hand corner of Exhibit 21?
19       A.   Yes.
20       Q.   And does that seem to match what Ms. Kirk
21   wrote in her notes from January 20, 2020?
22       A.   Yes.
23       Q.   Okay.  And you see the response date on
24   Exhibit 21 is the same date that Kirk entered her
25   notes.  Right?

## Page 42

1        A.   Yes.
2        Q.   Okay.  All right.  Now, this wasn't an
3    identity or a not-mine dispute.  Correct?
4        A.   Correct.
5        Q.   So Kirk didn't have to match up or respond
6    to the identity portion of the ACDV.  Correct?
7        A.   Correct.
8        Q.   All right.  Instead, the dispute was
9    concerning account status, payment rating, account
10   history, and the like.  Right?
11       A.   Right.
12       Q.   All right.  And the account, at the time it
13   was reported, was reporting as a charge-off.  Is that
14   correct?
15       A.   Correct.
16       Q.   And so in order to investigate whether or
17   not the charge-off was accurate or complete, does
18   Kirk just check Sheffield's records to see if the
19   account status code is correct, or should Kirk go
20   deeper and find out whether or not the charge-off in
21   and of itself is correct?
22       A.   They are to not only check the status in the
23   system, but they also review the account notes to
24   ensure the account history is accurate.
25       Q.   Okay.  So it's not enough just to match, you

## Page 43

1    know, like a 97 in the Sheffield system to the 97
2    that's reporting on the ACDV.  Right?
3        A.   Correct.
4        Q.   Okay.  Do you see the "FCRA Relevant
5    Information" field on Exhibit 21?
6        A.   Yes.
7        Q.   And do you know what that field is for?
8        A.   That field is a pre-formed field that the
9    customers can send when they do a dispute.
10       Q.   Okay.  So do you understand that that can be
11   populated both by the customer and also the credit
12   reporting agency?
13       A.   Yes.
14       Q.   Okay.  And is that information important for
15   the Sheffield dispute analyst to consider and review
16   when processing an ACDV?
17       A.   It is something that they review.
18       Q.   But does it impact the way they
19   should conduct their investigation, is what I'm
20   asking.
21       A.   (No audible response.)
22       Q.   In general.
23       A.   I would say it depends on what's there.
24       Q.   Okay.  So they should review it and then
25   make the determination about whether or not it's

## Page 44

1    going to help them in their investigation or whether
2    they should ignore it.  Is that fair?
3        A.   Yes.
4        Q.   If the account was charged off in -- give me
5    one second.
6            If the account was charged off in October
7    of 2019, is the past due balance always going to be
8    the charged-off amount minus any subsequent payments?
9        A.   No.  The past due amount is the complete
10   balance owed at that time.
11       Q.   What's the difference between the past due
12   balance and the current balance?
13       A.   That's the same thing.  I misunderstood the
14   way you said that.
15       Q.   Okay.  So just so the record's clear and I
16   didn't -- I'm certainly not trying to put words in
17   your mouth, but is it your testimony, then, that the
18   current balance and the past due balance are one and
19   the same?
20       A.   Correct.  At the time of the charge-off on
21   the account.
22       Q.   Okay.  Next ACDV appears to be on
23   January 23, 2020.  Do you see that in Deposition
24   Exhibit Number 28 at page Bates Number 124?  Do you
25   see that?

Page 45

1    A.  You said 123?
2    Q.  It's actually --
3    A.  January 23, 2020?
4    Q.  Correct.  Sheffield 124.
5    A.  Correct.
6    Q.  Okay.  And that ACDV was from Equifax.
7  Right?
8    A.  Yes.
9    Q.  No images attached.  Right?
10    A.  Correct.
11    Q.  And that was processed by Brandon White?
12    A.  Correct.
13    Q.  And that ACDV is Exhibit 20.  Would you pull
14  that up real quick?
15    A.  Okay.
16    Q.  Okay.  Have you got that one in front of
17  you?  That's Sheffield 137 and 138.  Right?
18    A.  Yes.
19    Q.  Okay.  And this ACDV was coded as a "019;
20  Included in the bankruptcy of another person.  Verify
21  Consumer Information Indicator."  Do you see that?
22    A.  Correct.
23    Q.  And this ACDV, Sheffield would -- it appears
24  wasn't populating anything in the Consumer
25  Information Indicator field.  Correct?

Page 46

1    A.  Correct.
2    Q.  And is that how that should be reported?
3    A.  Yes, sir.
4    Q.  Okay.  Because my guy -- because Sherman
5  didn't file bankruptcy.  Right?
6    A.  Correct.
7    Q.  Okay.  So it's interesting.  The credit
8  department, or your department, reports information
9  based on an account holder level.  Right?
10    MR. SHEDLOCK: Objection.  Vague.
11    A.  Meaning --
12    Q.  (BY MR. LYONS)  Yeah, I'm sorry.  That was
13  vague.  Let me be more specific.
14    I talked to Ms. Wiles this morning in her
15  deposition, and we talked a lot about bankruptcy and
16  charge-off and all the rest of this, and her world is
17  that:  Listen.  If the account is bankrupt at an
18  account level, that's how it is for everybody,
19  whether it's a filer or non-filer.  Do you
20  understand what I'm saying?
21    A.  Yes.
22    MR. SHEDLOCK: Objection.  Misstates
23  Ms. Wiles' previous testimony.
24    But you can answer.
25    Q.  (BY MR. LYONS)  Mr. Grimes, do you

Page 47

1  understand that?
2    A.  Yes, sir.
3    Q.  Okay.  But credit reporting doesn't do that;
4  credit reporting actually goes on an account holder
5  basis.  Right?
6    A.  Correct.
7    Q.  Okay.  Do you know why there's that
8  distinction?
9    A.  I do not.
10    Q.  Thank you.
11    All right.  No consumer compliance -- or no
12  Compliance Condition Code is listed on Exhibit 20.
13  Right?
14    A.  Compliance Condition Code, no.
15    Q.  Right.  Nothing was populated by Sheffield
16  prior to the ACDV being sent by Equifax to Sheffield.
17  Right?
18    A.  Correct.
19    Q.  And Sheffield didn't respond to Equifax to
20  populate anything in the Compliance Condition Code
21  field.  Correct?
22    A.  Correct.
23    Q.  When you look back at the notes, though,
24  that we marked as Deposition Exhibit Number 28, you
25  can see in the notes, though, that this guy, Jesse

Page 48

1  Sherman, one of the account holders, is disputing
2  that he's being tagged for late payments and a
3  charge-off despite the fact that he didn't file
4  bankruptcy.  Right?
5    MR. SHEDLOCK: Objection to the extent that
6  it misstates the document.  The document speaks for
7  itself.
8    Mr. Grimes, you can answer.
9    A.  I can see that Mr. Sherman has an issue with
10  how we're reporting.
11    Q.  (BY MR. LYONS)  Okay.  So when the dispute
12  analyst, in this case Brandon White, looks back at
13  the notes, right, like he should do, correct, when
14  processing an ACDV -- right?
15    A.  Correct.
16    Q.  Okay.  -- and sees that this guy's got --
17  clearly has got a dispute with how it's being
18  reported, should he then flag the Compliance
19  Condition Code in response to Exhibit 1?
20    A.  No.
21    Q.  Why?
22    A.  Because -- because the notes in the system
23  do not constitute a direct dispute.
24    Q.  Okay.  And is it the policy and procedure of
25  Sheffield that the only time that the dispute

12  (Pages 45 to 48)

Page 49

1  analysts are to update and populate the Compliance
2  Condition Code is if there has been a previously
3  received direct dispute?
4      A.   For the coding of XB specifically, yes.
5      Q.   So they can never make the determination
6  themselves at the time they're processing the ACDV to
7  flag the Compliance Condition Code as XB unless they
8  see a prior written direct dispute.  Is that right?
9      A.   Unless there is an outstanding prior direct
10  dispute.
11      Q.   Tell me what you mean by that.
12      A.    That means just -- if you were to write me
13  that you were disputing your credit history, at the
14  time that I'm notified that you're disputing that
15  from a direct standpoint, I go to the credit bureau
16  and inform them of that dispute.  Once that dispute
17  has been answered or we have processed the dispute
18  and given a response, then that code is removed.
19      Q.   What if the response to the dispute is -- is
20  something that the consumer doesn't agree with?  Does
21  that matter?
22      A.   Not normally.
23      Q.   Tell me when it would matter.
24      A.   It would be if the customer wrote back in at
25  that time that they disagreed with the dispute.

Page 50

1      Q.   So they'd have to write another letter?
2      A.   Correct.
3      Q.   Is that procedure written down anywhere?  I
4  looked, and I couldn't find that procedure.  Is that
5  a written procedure?
6      A.   Not that I'm aware of.
7      Q.   Okay.  So that's just some kind of, like,
8  oral tradition or oral history that this is the way
9  we do it here at Sheffield; and somebody tells you,
10  and you tell somebody else; that person tells
11  somebody else?  Nobody really writes that down.
12  Right?
13      A.    That hasn't been written down
14  (Indiscernible).
15          THE COURT REPORTER:  Mr. Grimes, I didn't
16  hear the end of your answer.  Would you repeat it,
17  please?
18          THE WITNESS:  I said that hasn't been
19  written down at this time.
20          THE COURT REPORTER:  Thank you.
21      Q.   (BY MR. LYONS)  Okay.  Mr. Grimes, let's
22  turn to page -- back to Exhibit 28, the notes,
23  Sheffield 125.  That's the next ACDV.  Right?  And
24  that's Brandon White again on January 30, 2020?
25      A.   Correct.

Page 51

1      Q.   All right.  Now, this one -- this ACDV was
2  from Equifax, and we've marked that as Deposition
3  Exhibit 19.  Let me know when you have that in front
4  of you.
5      A.   I have it.
6      Q.   Great.  Exhibit 19 is Sheffield 139 and 140.
7  Right?
8      A.   Yes, sir.
9      Q.   And you recognize this as the ACDV from
10  Equifax that was processed by Brandon White on
11  January 30, 2020.  Right?
12      A.   Yes, sir.
13      Q.   So we've got -- this dispute code is 106.
14  Right?  Disputing the present/previous account
15  status, payment rating, account history.  Right?
16      A.   Correct.
17      Q.   All right.  Now, this time the FCRA relevant
18  information field says:  Consumer states that his
19  paying on this -- that his still paying this account
20  and this account should not be reported as a
21  charge-off.  This should be updated.
22          Do you see this?
23      A.   Yes, sir.
24      Q.   So that's what I was kind of getting at
25  before.  So now, while the account status code is a

Page 52

1  97, which you and I know means charge-off?  Right?
2      A.   Correct.
3      Q.   Okay.  He's saying that's not right, that
4  I've paid on this account and it shouldn't be charged
5  off.  Right?  Is that how you delineate that FCRA
6  relevant information statement?
7      A.   Yes.
8      Q.   Okay.  And then if White were to go back and
9  look at the account notes that we talked about in
10  Exhibit 28, he would see the history, right, of what
11  Sherman has been complaining about?  Right?
12      A.   Correct.
13      Q.   All right.  So now, same question.  So given
14  all this background information, should White flag
15  the Compliance Condition Code with an XB this time?
16      A.   No.
17      Q.   And the reason because of that is why?  Same
18  answer as before.  Right?
19      A.   The reason because of that is because the
20  dispute came directly from the bureau, and it's the
21  responsibility of the credit reporting agency to flag
22  the XB at that point.
23      Q.   Okay.  Now, tell me where that -- where your
24  knowledge of that is coming from.  How do you know
25  that Equifax is now charged with the duty to update

Page 53

1  the Compliance Condition Code?
2      A.  That is page 5-32 in the CDIA guide.
3      Q.  Okay.  And do you have that up in front of
4  you?
5      A.  I do.
6      Q.  Okay.  Give me one second, and let me try to
7  catch up to you.
8          Do you have other information at your
9  disposal to respond to my questions today during this
10  deposition?
11      A.  Meaning that I have other exhibits or things
12  that -- that -- I don't know the way to put it.
13  Other documentation that you don't have at your
14  disposal or don't have currently in the exhibits?
15      Q.  Yes.
16      A.  I have the CDIA guide, which I thought was
17  provided.  And then I have just some general notes I
18  have from a conversation with our in-house attorney
19  as well.
20      Q.  Okay.  So I want you to preserve those
21  notes, don't throw those away, that you have with
22  your attorney.
23          And we talked about the screens that you
24  have available to you that I didn't have that we
25  asked to you screenshot.  Right?  You have that at

Page 54

1  your disposal in this deposition.  Right?
2      A.  Correct.
3      Q.  Okay.  And now you're referring to -- what
4  was the page?  5 dash what?
5      A.  5-32.
6          MR. SHEDLOCK:  Do you know what, Justin?
7  Let's do this.  Let's go ahead and any information
8  that you have on a screen or notes, just go ahead and
9  put those away and don't refer to them anymore during
10  the deposition.  And if you do happen to look at
11  something, just note it for Mr. Lyons as you answer
12  him, but let's just do this one on memory.  I know
13  it's a little tricky with Zoom depositions.
14          THE WITNESS:  Okay.
15          MR. SHEDLOCK:  And Mr. Lyons is certainly
16  entitled to ask if you're reviewing other things, but
17  we're obviously not going to be turning over any
18  attorney notes.
19          MR. LYONS:  Well, we don't know about that.
20  That's why you're going to hold on to them.
21          MR. SHEDLOCK:  Well, we're not turning over
22  any notes he took after a conversation with an
23  attorney.  That's classic attorney-client
24  communication.
25          MR. LYONS:  Not if he's using them in the

Page 55

1  deposition.  He certainly is going to turn those
2  over.
3          MR. SHEDLOCK:  He certainly will not.
4          MR. LYONS:  Well, we'll have an argument
5  about that off the record in front of a judge.  But
6  everybody understands that he's on notice of
7  spoliation, do not destroy those notes.  Right,
8  Mr. Shedlock?  You understand that?
9          MR. SHEDLOCK:  You can make your request to
10  myself and Mr. Grimes, and we'll consider it.
11          MR. LYONS:  I'm not asking for production.
12  I'm putting you on notice that those are to be
13  preserved and not destroyed.  Do you understand that
14  request?
15          MR. SHEDLOCK:  I understand your request.
16  Not agreeing to it at this time.
17          So, Justin, just going forward, just don't
18  have anything on your screens, and if Mr. Lyons asks
19  you for information, just do it to the best of your
20  memory.  Not a big deal.
21          THE WITNESS:  Okay.
22      Q.  (BY MR. LYONS)  Okay.  5 dash -- Mr. Grimes,
23  5 dash what was it?
24      A.  32.
25      Q.  5-32.  Okay.  And where are you looking that

Page 56

1  requires the credit reporting agencies to update the
2  Compliance Condition Code field?
3      A.  There, it would be under Exhibit 8, I
4  believe is what it says at the top, and it states
5  that if you receive a -- an indirect -- indirect
6  dispute from the credit bureaus, that you are not to
7  populate the Compliance Condition Code.
8      Q.  Oh, okay.  So it's not that they should;
9  it's just that you better not?
10      A.  Yeah, that we're not supposed to.  It's --
11  it's their requirement, or it's not our obligation to
12  handle that.
13      Q.  It's their -- you understand it to be their
14  responsibility?
15      A.  Correct.
16      Q.  Okay.  And that's the second page of
17  Exhibit 8.  Right?  Exhibit 8 is -- and by
18  "Exhibit 8," we're talking about the CDIA manual,
19  Sheffield 333 and 334.  Do I have the Bates numbers
20  right on that?
21      A.  Let me pull up Exhibit 8.  You said
22  Exhibit 8, as in after 7, before 9?
23      Q.  No.  I'm sorry.  I thought you said
24  Exhibit 8, but let's make it easier.  When you looked
25  at the CDIA manual, you were referencing 5-31, -32,

14 (Pages 53 to 56)

Page 57

1  and -33. Right?
2      A.  Yeah.  Oh, I see what you're saying.
3  Exhibit 8 in the CDIA guide.  Yes.
4      Q.  Exactly.  And just for the record, that's
5  Sheffield 333, 334, and 335?
6      A.  I don't have that in front of me.
7      Q.  How did you know that -- what were you
8  reading from?
9      A.  I have a copy of it.
10     Q.  Oh, got it.  You were reading from your own
11  manual that's not Bates-labeled.  Right?
12     A.  Correct.
13     Q.  Okay.  But it was 5-31, 5-32, and 5-33.
14  Right?
15     A.  Yeah, I know it was -- 5-32 was the page I
16  was looking on with Exhibit 8 at the top of it where
17  it says "Compliance Condition Code."
18     Q.  But that page doesn't have any reference to
19  XB.  Correct?
20     A.  No.
21     Q.  Right.  XB appears on page 5-31.  Correct?
22     A.  I believe so.  I don't have it in front of
23  me at this time.
24         MR. LYONS:  Okay.  I'm going to mark as
25  Deposition Exhibit Number 30 Exhibit A of the CDIA

Page 58

1  that has the Compliance Condition Codes that the
2  witness was reading from.  It's Sheffield 33, 34, and
3  35.
4         I'll get you a copy of it, Madam Court
5  Reporter.
6         Mr. Shedlock, you're familiar with that
7  page -- those pages.  Correct?
8         MR. SHEDLOCK:  Yes, I believe we produced
9  the CDIA.
10        MR. LYONS:  Yeah.  Okay.
11     Q.  (BY MR. LYONS)  Okay.  The next ACDV that
12  was received by Sheffield was on February 26, 2020,
13  according to Exhibit 28.  Is that right, Mr. Grimes?
14     A.  26?
15     Q.  28.  Exhibit 28, Sheffield 125.
16     A.  On February 26, 2020?
17     A.  That's correct.
18     A.  Correct.
19     Q.  All right.  And that was processed by
20  Annette Spillman.  Right?
21     A.  Correct.
22     Q.  And that was -- that one came -- that ACDV
23  came from TU.  Right?
24     A.  Correct.
25     Q.  And it had images attached.  Correct?

Page 59

1      A.  Correct.
2      Q.  All right.  And I'm going to show you what's
3  been marked as Exhibit 27.  Tell me when you have
4  that in front of you.
5      A.  I have it in front of me.
6      Q.  All right.  Have you seen this document
7  before?
8      A.  Not prior to this exhibit, you know, prior
9  to this.
10     Q.  Prior to the deposition?
11     A.  Yeah, the -- the documents provided in the
12  deposition.  Mr. Shedlock provided this document to
13  me, but prior to that, no.
14     Q.  Okay.  So do you understand this to be an
15  ACDV from TransUnion?
16     A.  Based on what I see here, I can surmise
17  that's what it is, yes.
18     Q.  Okay.  And if you note on the -- let's see
19  here.  Annette Spillman's name is kind of in the
20  middle.  Do you see it there?
21     A.  Yes.
22     Q.  All right.  The (252) 296-0520, do you
23  recognize that number?
24     A.  I do not.
25     Q.  And the images that are attached to the ACDV

Page 60

1  and the ACDVs themselves, those are to be imaged or
2  stored in Sheffield's system.  Is that right?
3      A.  Correct.
4      Q.  And tell me that process.  How do they do
5  that?
6      A.  Well, they -- basically, when e-OSCAR
7  provides an image along with a dispute, they are to
8  save not only the ACDV, but also the images as well
9  that are attached to that dispute.
10     Q.  Okay.  And for whatever reason, is it your
11  understanding that neither the image -- or the ACDV
12  nor the image related to the Spillman notation here
13  on February 26, 2020, was saved?
14     A.  I am not sure.  I would have to research
15  that.
16     Q.  Tell me what you would do to research that.
17     A.  I would look in our system under that area
18  to see what images were attached or what images were
19  stored there.
20     Q.  Okay.  So walk me through that process.  So
21  you're -- do we go back to the home screen that we
22  looked at before?
23     A.  No.  This is actually on a shared drive in
24  Sheffield Financial, not in the servicing system.
25     Q.  Okay.  And what system is that?

Civil Action Group
763-576-8832

Page 61

1    A.   I -- I'll be honest with you.  I just know
2  it in Windows.
3    Q.   Okay.  But it's a shared file system between
4  BB&T and Sheffield?
5    A.   No.  This is just internal to Sheffield.
6    Q.   Okay.  And somewhere in that system, you can
7  go and retrieve ACDVs and images attached to ACDVs?
8    A.   Any image saved, you can retrieve.
9    Q.   Any image what?
10    A.   If you have -- any image that's saved there,
11  if you have access to that folder, you can
12  retrieve
13  it.
14    Q.   Do the dispute analysts have access to that
15  folder?
16    A.   Yes.
17    Q.   Okay.  And if the ACDV and the image
18  attached that we're talking about here from
19  TransUnion were not saved by Spillman, would that be
20  a violation of company policy?
21    A.   Yes.
22    Q.   But you haven't done the research to find
23  out whether or not it's there.  Right?
24    A.   I don't believe I have -- well, I take that
25  back.  I do have a copy of it.

Page 62

1    Q.   You have a copy of it that is -- that was
2  retained by Sheffield?
3    A.   Yes.
4    Q.   Okay.  And the ACDV, both?
5    A.   I have a copy of the ACDV.  I don't have a
6  copy of the images at this time.  That does not mean
7  that they're not present.  I just don't have them.
8    Q.   Okay.  But you have a different version of
9  Exhibit 27.  Correct?
10    A.   Correct.
11    Q.   You have the Sheffield version, not the
12  TransUnion version?
13    A.   Correct.
14    MR. LYONS:  Counsel, that's never been
15  produced.  We would ask that that be produced.
16    MR. SHEDLOCK:  Sure.  I'll just need a list
17  of everything you want afterwards.
18    MR. LYONS:  Well, it should have already
19  been produced, but it wasn't, so that's more on you
20  than on me.
21    But, Madam Court Reporter, will you mark
22  this spot in the deposition?
23    THE COURT REPORTER:  Yes, I will.
24    Q.   (BY MR. LYONS)  And so we can circle back at
25  another time, Mr. Grimes, after that's been produced,

Page 63

1  and I'll ask you questions about that ACDV, but did
2  you say you did -- you can tell or you can't tell
3  whether the images attached to the ACDV are saved as
4  well?
5    A.   I cannot at this time.
6    Q.   All right.  We would ask that you produce
7  those if they -- if they have been saved.
8    Okay.  Back on Exhibit 28, Sheffield 125.
9  It looks like the next ACDV processed, Mr. Grimes,
10  was on March 11, 2020.  Am I reading that correct?
11    A.   Correct.
12    Q.   Okay.  And that ACDV -- do you know whether
13  or not you have a Sheffield copy of that ACDV?
14    A.   I do not.
15    Q.   Okay.  And do you have a Sheffield copy of
16  the images that were attached?
17    A.   I cannot speak to that.
18    Q.   You don't know if they're saved?
19    A.   I'm not sure.
20    Q.   Okay.  You haven't looked?
21    A.   I -- they're -- I know at some point in this
22  there was a file in that same time period that had a
23  corruption in it, that there was a -- something
24  saved, but I can't speak to if it's this ACDV
25  directly or not.

Page 64

1    Q.   Okay.  So let's take a look at Exhibit
2  Number 22.  Let me know when you're there.
3    A.   I am there.
4    Q.   Okay.  Exhibit 22, I'm going to represent to
5  you, is this ACDV that Brandon White completed on
6  March 11, 2020, as referenced in the Sheffield notes
7  in Exhibit 28.  Okay?
8    A.   Okay.
9    Q.   Its response date is the same, March 11,
10  2020.  It has an image attached.  It's attached to
11  Exhibit 22.  Do you see that?
12    A.   Yes.  We're talking about Sheffield 169
13  through subsequent --
14    Q.   196.
15    A.   Yes.
16    Q.   All right.  Now, when Sheffield dispute
17  analysts that are processing ACDVs receive the image
18  attachments, are they supposed to go through the
19  image attachments thoroughly?
20    A.   Yes.
21    Q.   Okay.  Every page.  Right?
22    A.   Correct.
23    Q.   Okay.  And to not do so would be a violation
24  of company policy.  Correct?
25    A.   Correct.

Page 65

1    Q.   And is that policy written down somewhere?
2    A.   I don't know that that specifically is
3    written down.
4    Q.   Okay.  That's more of the word-of-mouth
5    policy that we talked about before.  Right?
6    A.   Meaning that, you know, the -- a thorough
7    investigation.
8    Q.   Right.  But that policy about a thorough
9    investigation and going through every page page by
10   page and reviewing it all, that's not written down.
11   Right?
12   A.   That is not written down, no.
13   Q.   Okay.  All right.  So if you'll notice, the
14   image attachment here is that letter from the lawyer
15   again.  Right?  It's almost identical to the one I
16   showed you before that we marked as Deposition
17   Exhibit Number 15.  Right?
18   A.   Correct.
19   Q.   All right.  Now, this time around would a
20   dispute like this with a letter from a lawyer
21   attached to it require -- strike that.
22       When an ACDV analyst gets a dispute -- an
23   ACDV like this with an image attached from a lawyer,
24   is there a special procedure for handling that?
25   A.   No.

Page 66

1    Q.   It doesn't get forwarded on to legal,
2    doesn't get flagged in any sort of way that legal
3    should take a look at it.  Right?
4    A.   They make the determination if it should be
5    forwarded to legal or not.
6    Q.   And what is the criteria that they review to
7    figure out whether it should be forwarded to legal?
8    A.   That would be a -- an internal decision or a
9    decision that that analyst has.
10   Q.   So they've got total --
11   A.   It's a -- there's no formal documentation
12   that states if this, then this.
13   Q.   So they do it by gut or by feel or by
14   instinct or what?
15   A.   It would be based off the -- what they
16   deemed the severity or if that was just a basic
17   dispute with an attorney there or if there was
18   additional information that needed legal to review.
19   Q.   Okay.  But again, no written procedure on
20   that?
21   A.   No.
22   Q.   And Sheffield gives those agents, those ACDV
23   agents, total and full discretion to make that
24   decision.  Right?
25   A.   Yes.

Page 67

1    Q.   Okay.  And I think I did ask you -- or you
2    see on Exhibit 22, Compliance Condition Code, nothing
3    was populated, and nothing was populated -- nothing
4    was populated to the agent, and the agent populated
5    nothing back.  Correct?
6    A.   Correct.
7    Q.   And that is in accordance with company
8    policy.  Right?
9    A.   Correct.
10   Q.   Okay.  Okay.  And then about seven hours
11   later, White gets another ACDV in his queue.  Right?
12   A.   Correct.
13   Q.   And that's at 2:45, he processes another
14   ACDV, this time from Equifax.  Right?
15   A.   Correct.
16   Q.   First one was from Experian; this one is
17   from Equifax.  Right?
18   A.   Correct.
19   Q.   Okay.  And let's mark -- take a look at
20   Deposition Exhibit Number 23.  Tell me when you're
21   there.
22   A.   I am there.
23   Q.   Okay.  In your preparation for the
24   deposition, were you able to find a Sheffield image
25   ACDV or attached image for this dispute?

Page 68

1    A.   I was not.
2    Q.   Okay.  And that may be part of that
3    corrupted file like you talked about before.  Right?
4    A.   Right.
5    Q.   All right.  So I'm going to represent to you
6       that on the last page of Exhibit 23 is the
7    ACDV that
8    was produced by Experian and processed by Brandon
9    White.  Do you see that on the last page?
10   A.   Yes.
11   Q.   All right.  And up on the top, it says,
12   "Document View," and you understand that that means
13   that there was an image.  Right?
14   A.   Yes.
15   Q.   All right.  And the image is the first pages
16   that are marked Experian Sherman 1 through 29.
17   Correct?
18   A.   Yes.
19   Q.   All right.  And no population of anything in
20   the Compliance Condition Code field.  Right?
21   A.   Right.
22   Q.   And nothing reported back by Brandon White.
23   Correct?
24   A.   Correct.
25   Q.   And if he would have forwarded this on to

17 (Pages 65 to 68)

Page 69

1  legal or to a supervisor to review or anything else,
2  that would be notated in the notes in Exhibit 28.
3  Correct?
4      MR. SHEDLOCK: Objection. Speculation.
5  A.   Correct.
6  Q.   (BY MR. LYONS) Okay.
7  A.   Correct.
8  Q.   And since the filing of this lawsuit, are
9  you aware of whether or not Sheffield has updated the
10 Compliance Condition Code to XB?
11 A.   I am not sure right offhand.
12 Q.   The screenshot that we looked at before,
13 Exhibit 29, was that a current -- when you pulled
14 that up, was that an as-of-today reporting?
15 A.   No.
16 Q.   What was the date that that was through?
17 A.   Being that the account is archived, that
18 means that -- that screen is no longer -- or that
19 account is no longer reported to the credit bureaus,
20 so that account has been archived for more -- or has
21 no payment history for more than a year.
22 Q.   But when you say it's not being reported,
23 it's currently being reported, but it's being
24 reported in the version that was the last reported
25 taped version. Correct?

Page 70

1  A.   No. We are no longer reporting that.
2  Whatever the bureaus had historically may be what
3  they're displaying, but from a Metro 2 standpoint or
4  a file generation report, once an account pays off,
5  you are to cease reporting, once paid in full, up to
6  three months after.
7  Q.   Okay. But what I'm saying to you is -- or
8  maybe we're talking the same thing over each other.
9  Let me ask it a different way.
10      Sheffield is not reporting on a monthly
11 basis anymore the Sherman account. Correct?
12 A.   Correct.
13 Q.   And the last reporting of the Sheffield
14 account did not have the XB code in the Compliance
15 Condition Code field. Right?
16 A.   Correct.
17 Q.   And since that time, Sheffield has done
18 nothing to update its reporting to reflect the XB in
19 the Compliance Condition Code field. Correct?
20 A.   Not to my knowledge.
21 Q.   Will you pull up Exhibit 9? And let me know
22 when you have that document in front of you.
23 A.   I have it.
24 Q.   Okay. Exhibit 9 is Sheffield 20 through 23.
25 Right?

Page 71

1  A.   Yes, sir.
2  Q.   And what -- let's just take a look at the
3  first page, Sheffield 020. What is -- what are we
4  looking at here?
5  A.   These are account reporting histories, or,
6  basically, what some people refer to as a soft pull
7  or a view of the Sheffield tradeline, how it's
8  reporting currently.
9  Q.   Okay. Some people call them bull's-eyes.
10 Right?
11 A.   Correct.
12 Q.   Okay. So the first page on the top is the
13 Experian bull's-eye or the Experian soft pull related
14 to Jesse Sherman. Right?
15 A.   Correct.
16 Q.   And it says that $4,845 was charged off and
17 then subsequently paid. Correct?
18 A.   Correct.
19 Q.   And Sherman went from being current on the
20 account to charged off, right, from one month to the
21 next? First he was current, and then the next thing
22 we knew, it was charged off. Right?
23 A.   Correct. From a credit reporting
24 standpoint, that is correct, yes.
25 Q.   And below is the TransUnion soft pull,

Page 72

1  right, for Jesse Sherman?
2  A.   Yes.
3  Q.   And the date of first delinquency is October
4  of 2019?
5  A.   Correct.
6  Q.   And what does that mean? Does that mean
7  that the first date that he failed to pay was in
8  October of 2019?
9  A.   No. That means the -- that is -- means that
10 the date in which the delinquency that proceeded or
11 the action that he is currently in, that was the date
12 for that.
13 Q.   So when -- so first delinquency date,
14 October of 2019, is that accurate or not?
15 A.   That is accurate, yes.
16 Q.   Meaning that he missed his payment in
17 September or he missed his payment in October?
18 A.   That means that he was 30 days late in
19 October.
20 Q.   Got it. And then if you would turn to the
21 next page, Sheffield 21, that's the TransUnion soft
22 pull for Amy Sherman. Right?
23 A.   Correct.
24 Q.   And that was done in August of 2020. Right?
25 A.   Correct.

18  (Pages 69 to 72)

Page 73

1    Q.  Can you soft pull on bankruptcy accounts?
2    A.  Yeah, you can do an account history review
3  of a bankruptcy account.
4    Q.  And the date of Amy's first delinquency was
5  9 -- September of 2019.  Is that right?
6    A.  That is correct.
7    Q.  So she had a first delinquency date a month
8  prior to Jesse's.  Right?
9    A.  Correct.
10    Q.  And how do you explain that if they're joint
11  account holders?
12    A.  Because for Amy, the date of first
13  delinquency, as per the CDIA guide, is the date in
14  which the bankruptcy filing was received by
15  Sheffield.
16    Q.  Even though she wasn't delinquent in
17  September of 2019.  Right?
18    A.  Correct.  She was -- never mind.
19    Q.  Go ahead.  If you want to clarify your
20  answer, go ahead, Mr. Grimes.  I didn't mean to -- if
21  you've got something to explain, go ahead.
22    A.  Yeah.  Absolutely.  The delinquency for her
23  is not the actual payment history.  The delinquency
24  for her is her status of Chapter 7 bankruptcy, and
25  that's why she has a date of first delinquency, not

Page 74

1  because her payments were past due.
2    Q.  Take a look at Sheffield 022.  This is the
3  what?  What does this reflect?  This is a Sheffield
4  Financial tradeline for who?
5    A.  022?  I believe that's Jesse Sherman,
6  indicated at the top under "Customer Inquiry,"
7  "Name."
8    Q.  Okay.  And is this reporting to which -- is
9  this a -- is this a soft pull from some agency?
10    A.  That's Equifax.
11    Q.  Okay.  And it shows that it -- the account
12  was charged off January of 2020?
13    A.  The charge-off date is actually cut off in
14  this image.
15    Q.  Oh.  Is there a different screen that you
16  have that shows the entire report?
17    A.  No, it's on --
18        MR. SHEDLOCK:  Well, I think --
19        (Simultaneous indiscernible crosstalk.)
20        MR. LYONS:  Say that again.  I'm sorry,
21  Mr. Shedlock.
22        MR. SHEDLOCK:  Clarify for me, Mr. Grimes,
23  but I think what he's referring to is on the right --
24  kind of the right column, it says "charge-off," and
25  that means -- you can't even see some of the other

Page 75

1  words over there.
2        THE WITNESS:  Correct.
3        MR. LYONS:  Yeah, well, I was looking up at
4  the payment history grid, and I don't -- I guess
5  you're right.  There's not enough month there.
6  Right?
7        THE WITNESS:  No.  I'm -- I'm meaning
8  that -- where I was looking at is on the right-hand
9  side of the page.  It says "charge-off," and it cuts
10  off.  That's where the charge-off date would be
11  listed at.
12        MR. LYONS:  Okay.  But do we -- so do we
13  know if there's a more readable or complete
14  screenshot of this, Mr. Shedlock?
15        MR. SHEDLOCK:  This is how it was received
16  and produced.  No idea.
17    Q.  (BY MR. LYONS)  Okay.  Well, I would ask
18  that you find out if there is a more complete
19  printout.  Right?  Because you can't answer my
20  questions, can you, Mr. Grimes, based on this
21  document?
22    A.  Yeah, based off the way this is, I can't
23  answer that question completely.
24    Q.  Thank you.
25        And same with the last one.  Right?  023?

Page 76

1    A.  I can't speak to the charge-off date on this
2  one.
3        MR. SHEDLOCK:  Tommy, can we get a break
4  here pretty soon?  I think we've been going two
5  hours.  I don't know if --
6        MR. LYONS:  Absolutely.  Let's take a break
7  right now.  Just let me give you an idea.  Yeah, I
8  probably only have probably another half hour, but
9  let's do take a break.  That's a great idea.  Do you
10  want to take ten?  Five?
11        MR. SHEDLOCK:  Let's do ten.  How does come
12  back at 3:35 Minnesota time, 4:35 North Carolina time
13  work?
14        MR. LYONS:  Perfect.  Thank you.
15        (Recess taken from 3:26 p.m. to 3:38 p.m.)
16        MR. LYONS:  Back on the record.
17    Q.  (BY MR. LYONS)  Mr. Grimes, would you pull
18  up Exhibit 7?
19    A.  (Examining.)
20    Q.  Let me know when you're there.
21    A.  I'm here.
22    Q.  Sheffield 005 through 016, do you see that?
23    A.  Yes.
24    Q.  And that's the Complaint that Mr. Sherman
25  filed in United States District Court, District of

19  (Pages 73 to 76)

Page 77

1    Minnesota. Do you see that?
2        A.   Yes, sir.
3        Q.   All right. And would this constitute a
4    written direct dispute?
5        A.   Not that I would say, no.
6        Q.   Okay. All right. That Complaint was filed
7    on August 13, 2020.
8            And then if you would pull up Exhibit 15,
9    and let me know when you're there.
10       A.   Exhibit 15? I have it pulled up.
11       Q.   Excellent. The first page of Exhibit 15 is
12   Sheffield 57. And this looks like an email string
13   originated on the bottom half, I think, from
14   Alexandra Page at Truist, or BB&T, to Christina
15   Wilson at Truist on August 14, 2020. Do you see
16   that?
17       A.   Yes.
18       Q.   And do you know who either of those women
19   are, Alexandra or Christina?
20       A.   I believe Christina works in the bankruptcy
21   department for Truist.
22       Q.   Okay. And then the top portion seems to be
23   an email from Christina Wilson to Sydney Stocks. Do
24   you know Sydney Stocks?
25       A.   Sydney Stocks works in the bankruptcy

Page 78

1    department at Truist as well.
2        Q.   Okay. There's a note from -- there's a note
3    down below that that seems to read, "Forwarded letter
4    to Sydney to contact DA" -- and that's debtor's
5    attorney? Do you know?
6        A.   I -- I'm not sure of that.
7        Q.   Okay. And "have the client file a dispute
8    with Sheffield if they believe we are reporting
9    incorrectly to the credit bureau. CLW."
10           Do you -- am I interpreting that right, or
11   don't you know because it doesn't have anything to do
12   with you?
13       A.   I'm not sure about that. That's a totally
14   different area than where I'm in.
15       Q.   Gotcha. Okay. So that's probably a better
16   question for BB&T.
17           All right. Let's look at -- I asked you to
18   look at Exhibit 24 before, but we didn't talk much
19   about it. Take a look at Exhibit 24, and let me know
20   when you have that up.
21       A.   Well, it's not wanting to open. Bear with
22   me a second.
23       Q.   Okay.
24       A.   Oh, here it comes. Okay.
25       Q.   All right. Exhibit 24 is Sheffield 130

Page 79

1    through 134, and this looks like part of a
2    spreadsheet having to do with the Sherman account.
3    Is that right?
4        A.   Yes.
5        Q.   And the columns that we see at the top, are
6    those -- those are credit reports -- this is some
7    kind of Metro 2 spreadsheet. Right?
8        A.   Correct. This is a compilation of Metro 2
9    file reporting over a time period.
10       Q.   And I think, if I'm right, that this is the
11   second page of -- for the continuation of the
12   spreadsheet, which probably begins on Exhibit 25.
13   Sorry. I've got these in reverse order. Take a look
14   at Exhibit 25.
15       A.   You are correct.
16       Q.   Okay. So the way this should be read is 25
17   should be read, and it's got the base fields and
18   columns running across the top. Right?
19       A.   Correct.
20       Q.   Okay. Thank you.
21           And, just for the record, Exhibit 25 is
22   Sheffield 127 through 129. So let's try to look at
23   this for a minute. Let's start on Exhibit 25 on the
24   first page. The record number column identifies
25   what?

Page 80

1        A.   The record number in that Metro 2 file.
2        Q.   Okay. The time stamp, Column Number 3, is
3    that a -- does that represent a date?
4        A.   Yes.
5        Q.   Okay. So the last entry on the bottom is
6    4.30. Is that April 30th?
7        A.   Yes.
8        Q.   Okay. So just looking at this spreadsheet,
9    this shows the first set of reports, Metro 2 reports,
10   monthly reports, starting August 31, 2020. Am I
11   reading that right?
12       A.   That's what this shows, correct.
13       Q.   But there would be prior reporting on this
14   from the inception of the loan, which I think,
15   forgive me, was probably around 2016, I think?
16       A.   Correct.
17       Q.   Okay. So this only shows us the reporting
18   from August 31, '20, to April 30, 2020. Right?
19       A.   Correct.
20       Q.   Okay.
21       A.   You said April 2020 or April 2021?
22       Q.   I didn't say, but you're probably right.
23   Although it doesn't show it on the -- on the bottom
24   of Exhibit -- the first page of Exhibit 25, I see
25   where it says 4.30.20 -- or 202E plus 12.

Civil Action Group
763-576-8832

Page 81

1    A.   Yeah.  That's -- that's just where it fell
2    when you copy it over.  It applied a scientific
3    numeric there.
4    Q.   So do you think that represents April 30,
5    2021?
6    A.   Yes.
7    Q.   Okay.  Thank you.
8    MR. LYONS:  So, Counsel, I'm not sure where
9    the other reports are related to the earlier
10    reporting, but we would ask that those be produced,
11    and I'll send you an email on that.
12    Q.   (BY MR. LYONS)  Okay.  Now, if you turn to
13    the second page of Exhibit 25, we talked about this
14    briefly.  Field 20 or Column 20 has the Compliance
15    Condition Code.  It doesn't appear that, at least
16    during this time segment, there was ever any
17    Compliance Condition Code reported by tape.  Correct?
18    A.   Correct.
19    Q.   And is this the reporting for Amy Sherman or
20    Jesse Sherman?
21    A.   For both.
22    Q.   Okay.  So -- okay.  Because this is just the
23    reporting for the account itself.  Correct?
24    A.   Correct.
25    Q.   Not per person?

Page 82

1    A.   Right.  It's one -- it's one continuous line
2    all the way across regardless of the person.
3    Q.   Okay.
4    A.   They both are on the same one.
5    Q.   Right.  And that's why the special comment
6    code isn't flagged with any kind of bankruptcy,
7    because it's for the account, not for Amy.  Correct?
8    A.   The special comment wouldn't be there.  The
9    bankruptcy would be a Consumer Information
10    Indicator,
11    or the CII, and it would be on there with Amy.
12    Q.   Okay.  You're right.  You're absolutely
13    right.  And that's on the last page of Exhibit 25,
14    Row 38, and there's nothing that was reported, right,
15    for the Consumer Information Indicator?
16    A.   For Jesse.
17    Q.   Right.  Got it.  I see how this -- okay.
18    Now I'm understanding it.  Okay.
19    And for a little while, PO Box 103 was
20    reporting as the address for Jesse.  Right?
21    A.   Correct.
22    Q.   And then that got changed and then started
23    reporting at 22475 270th Avenue Southeast.  Right?
24    A.   Yes.
25    Q.   Okay.  I see how this is reporting.  I

Page 83

1    follow you.  Got it.
2    Okay.  Exhibit 17, would you pull that up?
3    A.   Okay.
4    Q.   Exhibit 17 is marked at the top "Indirect
5    Dispute Processing Audit."  Do you see that?
6    A.   Yes, sir.
7    Q.   And this shows 15 audits that were done in
8    April of 2020.  Am I reading that right?
9    A.   The audit was -- the audit would not have
10    been performed in April.  That would have been the
11    audit period, would have been April.
12    Q.   Okay.  Thank you.  I'm sorry.
13    And so 15 ACDVs were audited.  Am I reading
14    that right?
15    A.   Yes, sir.
16    Q.   And 15 out of the month of April of 2020,
17    and you said that it's roughly -- didn't you say it
18    was roughly like 1,500 or 2,000 a month?
19    A.   Yes.
20    Q.   Okay.  And do we -- oh, and we know that
21    these -- this audit pertains to some ACDVs that were
22    done by Spillman, Kirk, and White?
23    MR. SHEDLOCK:  Objection.  Foundation.
24    Assumes facts not in evidence.
25    You can answer, if you know.

Page 84

1    A.   The -- the audit is completely random, so
2    it's a random sample of that.  It could contain ACDVs
3    from any of the parties.
4    Q.   (BY MR. LYONS)  Or it could just be one.  It
5    could be just one person that was randomly -- right?
6    All these ACDVs can only have to do with one
7    specialist.  Correct?
8    A.   That's possible, yes.
9    Q.   Okay.  Exhibit 18, let me know when you have
10    that in front of you.
11    MR. SHEDLOCK:  18, you said?
12    MR. LYONS:  Yes.
13    A.   Okay.
14    Q.   (BY MR. LYONS)  All right.  Take a look
15    at -- well, Exhibit 18 is policies and procedures
16    related to BB&T and Sheffield.  Right?
17    A.   Correct.
18    Q.   All right.  Take a look at Sheffield 865.
19    A.   Okay.
20    Q.   At the very bottom of the page, "Direct
21    Credit Report Disputes," do you see that?
22    A.   Yes, sir.
23    Q.   All right.  So we talked about this, I
24    think, a little earlier today, but "Sheffield
25    receives direct credit report disputes in writing

21  (Pages 81 to 84)

Page 85

1  directly from the consumer.  Sheffield logs and date
2  stamps all direct credit report disputes.
3          We talked about that.  Correct?
4      A.  Correct.
5      Q.  All right.  "The dispute is reviewed to
6  determine if the dispute is a goodwill adjustment and
7  if sufficient information has been provided by the
8  consumer."
9          Who makes the determination about the
10  goodwill adjustments?
11      A.  Well, that would be the dispute processors.
12      Q.  Okay.  And those are the same people that we
13  talked about, or are those customer service reps, or
14  who are they?
15      A.  That's the same people we talked about.
16      Q.  Kirk, White, Spillman.  Right?
17      A.  Yes.
18      Q.  Okay.  And does this manual that I'm looking
19  at provide for the criteria on the goodwill
20  adjustment?
21      A.  It doesn't have the criteria for goodwill
22  adjustment here, no.
23      Q.  Is there criteria for goodwill adjustment?
24      A.  In that, yeah.  I mean, a goodwill
25  adjustment would be somebody asking for an adjustment

Page 86

1  with an acknowledgment of an error on their part, not
2  on Sheffield's.
3      Q.  A goodwill adjustment would -- say that
4  again -- would be based on the consumer making an
5  error and then pleading with Sheffield to change it?
6      A.  Yeah.  That would be -- that would be
7  something that would be considered a goodwill
8  adjustment, something where a consumer does not
9  dispute that Sheffield did anything wrong; however,
10  they request Sheffield to make a change.
11      Q.  Okay.  And is that procedure or criteria in
12  writing?
13      A.  I'm not sure that it is.  It may be.
14      Q.  Okay.  So if you wanted to find out if it
15  was in writing, who would you talk to?
16      A.  Well, that would be me.  I don't know that
17  it's in writing that I've ever seen.
18      Q.  Okay.  So Spillman, Kirk, White, how do they
19  know what to do?  There's no manual for them to look
20  at, so was it something you told them at one point in
21  time, and now you don't remember if you did; or
22  what -- how does that work?
23      A.  So the definition of a credit dispute I
24  believe we have clearly documented, as well as the
25  definition of a privilege dispute.  Anything outside

Page 87

1  of that would be something that would be reviewed in
2  saying the -- the goodwill adjustment, that's
3  something where we've told them this is what a
4  goodwill adjustment actually is.  This is what is
5  classified as a goodwill adjustment.
6      Q.  And so you've communicated that to the
7  dispute analyst, so they know what that is.  Right?
8      A.  Yes.
9      Q.  Okay.  So can you convey that to me now?
10      A.  Yeah.  A goodwill adjustment is if -- if it
11  is a -- where somebody is -- they are not
12  disputing
13  their account history as incorrect or inaccurate;
14  however, they are asking for an adjustment to an
15  account or an adjustment to their credit reporting
16  from Sheffield, whether they are admitting guilt on
17  their part or not.
18      Q.  Okay.  So would Jesse Sherman qualify as a
19  goodwill adjustment?
20      A.  Meaning the letters he has written or just
21  the account in general?
22      Q.  Let's do both.  So on the letters that
23  he's -- that he and the lawyer have written, would
24  that constitute a goodwill adjustment?
25      A.  No.

Page 88

1      Q.  That wouldn't qualify for one?
2      A.  No.
3      Q.  Why?
4      A.  Because, I mean, qualification for --
5  qualify as -- it wouldn't qualify as one because they
6  weren't requesting a change in something that they
7  were -- they were claiming that Sheffield was
8  reporting something inaccurate for them.  They
9  weren't -- they weren't saying, "I have done
10  something wrong; therefore, please make a change for
11  me."
12      Q.  Right.  They weren't doing that.  They were
13  saying, "Hey, Sheffield, this is your problem.  Clean
14  it up."  Right?
15          MR. SHEDLOCK:  Objection.  Misstates
16  documents.
17          You can answer.
18      A.  Correct.
19      Q.  (BY MR. LYONS)  Okay.  So, really, to get
20  the goodwill adjustment, you kind of have to fall on
21  your sword and say, "I did something wrong.  Please
22  change it"?
23      A.  Not necessarily, but you can't -- to be a
24  goodwill adjustment, you can't say that Sheffield did
25  something wrong, Sheffield's reporting inaccurately.

Page 89

1  Once people fall on their sword -- in the general
2  aspect of goodwill adjustment that you see,
3  99 percent of them that I've ever seen always say, "I
4  admit wrongdoing here; however, I'm requesting a
5  goodwill adjustment based off of wrongdoing that I
6  have completed."
7      Q.   Okay.  So that's the problem for Jesse, is
8  he did it wrong?  He should have called Sheffield and
9  said, "Hey, I did something wrong.  Please change
10  it."  Right?  If he had done that, would they have
11  changed it?
12     A.   No.
13     Q.   Why?
14     A.   Because we don't honor goodwill adjustments.
15     Q.   At all, ever?
16     A.   No.
17     Q.   Why is it in the manual?
18     A.   It is in the manual.  If you go further down
19  on page -- Sheffield page 867, the last thing before
20  the redactions, Sheffield does not honor goodwill
21  adjustments.
22     Q.   So they have a whole manual written about
23  goodwill adjustments, but it doesn't matter anyway?
24     A.   Well, we don't respond to them directly from
25  our department.  That's why it's in there.

Page 90

1      Q.   Who responds to them?
2      A.   Credit bureau services.
3      Q.   And that's over at BB&T?
4      A.   Yes.
5      Q.   Okay.  So let me get this straight.  So
6  goodwill adjustments exist, it's a thing, but it's
7  over on the BB&T side.  Right?
8      A.   No.  The response to the letter exists.
9  It's not -- they're not granting goodwill
10  adjustments; however, they handle the correspondence
11  out to the consumer or the customer -- the client
12  that's requested.
13     Q.   Okay.  I think you lost me again.  So
14  Sheffield doesn't honor and doesn't respond to
15  goodwill adjustment requests?
16     A.   Internally, we do not respond to them, no.
17  They're responded to on behalf of credit bureau
18  services, or on our behalf.
19     Q.   By BB&T?
20     A.   Yes.
21     Q.   Okay.  And BB&T doesn't honor them either
22  because that's not their job; they just respond to
23  the request on behalf of Sheffield?
24     A.   No.  I think the corporate standpoint is --
25  and I don't know if it's in this procedure document,

Page 91

1  but it's in the policy, that we report accurately as
2  to the account information, and a goodwill adjustment
3  is not considered reporting accurately.
4      Q.   So what would they -- what goodwill
5  adjustments would they make?  Anything other than
6  credit reporting.  Right?
7      A.   I mean, from a credit reporting standpoint,
8  you don't make goodwill adjustments.
9      Q.   Ever?
10     A.   Not that I'm aware of.
11     Q.   So even if he falls on his sword and says,
12  "Hey, I'm sorry," it doesn't matter because they're
13  not going to change it anyway.  Right?
14     A.   Correct.
15         MR. LYONS:  Okay.  Mr. Grimes, thank you for
16  your time today.  Thanks for being patient with me.
17  There's a lot of information here that -- you know,
18  you know kind of the ins and outs, and I'm trying to
19  catch up to you.
20         Subject to the information that has not yet
21  been produced or that you couldn't answer, I reserve
22  the right to recall you or somebody else that can
23  answer it.
24         I don't have any further questions at this
25  time, but thank you again for your testimony.

Page 92

1         THE WITNESS:  Absolutely.  Thank you.
2              EXAMINATION
3  BY MR. SHEDLOCK:
4      Q.   Mr. Grimes, just one question from me.  Can
5  you pull up page 2 of Exhibit 15 again?
6      A.   Yes, sir.  Hang on one second.
7      Q.   Sure.  Let me know when you're there.
8      A.   You said page 2?
9      Q.   Yes.  It's a letter from the Duffy Law
10  Office to that PO box and BB&T?
11     A.   Yes, sir.
12     Q.   And so you remember discussing this
13  extensively with Mr. Lyons earlier today.  Correct?
14     A.   Correct.
15     Q.   Now, the address listed here on this letter
16  is BB&T, Attention:  Bankruptcy, Post Office
17  Box 1847, Wilson, North Carolina 27894.  Do you see
18  that?
19     A.   Yes.
20     Q.   Is that the correct address for a customer
21  to send a direct credit dispute to Sheffield
22  Financial?
23     A.   No.
24         MR. SHEDLOCK:  I have no further questions.
25              FURTHER EXAMINATION

23  (Pages 89 to 92)

Page 93

1  BY MR. LYONS:
2      Q.   Mr. Grimes, wait a minute.  You said that
3  the address for disputes is on the website.  Right?
4      A.   Right.
5      Q.   But in no other place does Sheffield provide
6  that address to the customer.  Right?  It's not on
7  the statements.  Correct?
8      A.   No, it's not on the statements.
9      Q.   And it's not on the initial documentation
10  with Sheffield, the loan documents.  Right?
11      A.   Not that I'm aware of, but I can't speak to
12  that.
13      Q.   Do they send out some kind of other flier
14  directing them to the website saying:  Hey, if you're
15  going to make a direct dispute, make sure you check
16  out the website for the right address?  Do they do
17  that?
18      A.   No.
19      MR. LYONS:  I have no further questions at
20  this time in response to Mr. Shedlock's questions,
21  but reserve the right to recall you with regard to
22  the other ones.
23      FURTHER EXAMINATION
24  BY MR. SHEDLOCK:
25      Q.   Mr. Grimes, one last question.  Again, the

Page 94

1  address listed on Exhibit 15, page 2, that's not the
2  correct address for a customer to send a direct
3  credit dispute to.  Correct?
4      A.   Correct.
5      MR. SHEDLOCK:  That's all for me.
6      We'll read and sign.
7      (These proceedings were concluded at
8  4:05 p.m.)
9      (Deposition Exhibit Number 30 was marked
10  following the conclusion of the deposition.)
11      - - - - -
12      (The original deposition transcript of Justin
13  Grimes, on behalf of Sheffield Financial, LLC, was
14  forwarded in a sealed envelope to Attorney Lyons, who
15  is to retain the same until such time as it can be
16  filed.)
17      - - - - -
18
19
20
21
22
23
24
25

Page 95

1      C O R R E C T I O N S
2  JUSTIN GRIMES, on behalf of SHEFFIELD FINANCIAL, LLC
3  Page No. Line No.  Correction  Reason for Correction
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 96

1      I, JUSTIN GRIMES, on behalf of SHEFFIELD
2  FINANCIAL, LLC, have read the foregoing deposition
3  and hereby affix my signature that the same is true
4  and correct, except as noted above.
5
6
7
8      JUSTIN GRIMES, on behalf of
        SHEFFIELD FINANCIAL, LLC.
9
10
11
12
13
14  Dated this      day of        , 2021.
15
16
17
        Notary Public
18
19
20
21
22
23
24
25

Page 97

1          NOTARY REPORTER'S CERTIFICATE
2     STATE OF MINNESOTA
      COUNTY OF CLAY
3
          BE IT KNOWN, I took the foregoing
4     videoconference deposition of JUSTIN GRIMES, on
      behalf of SHEFFIELD FINANCIAL, LLC;
5
          THAT, I was then and there a Notary Public in
6     and for the County of Clay, State of Minnesota, and
      exercised the power of that office in taking said
7     deposition;
8         THAT, said witness, before testifying, was
      remotely sworn to tell the truth, the whole truth,
9     and nothing but the truth;
10        THAT, the reading and signing of the deposition
      by the witness was not waived;
11
          THAT, I am not related to or employed by any of
12    the parties or attorneys to the action in which this
      deposition is taken and am not financially interested
13    in this action;
14        THAT, the cost of the original has been charged
      to the party who noticed the deposition, and that all
15    parties who ordered copies have been charged the same
      rate for such copies;
16
          THAT, the testimony was taken down in stenotype
17    by me and reduced to ninety-four (94) typewritten
      pages and is a true and correct transcript of the
18    proceedings to the best of my ability.
19        WITNESS my hand and seal this 13th day of July,
      2021.
20
21
22    /s/ Carolyn Sue Pekas
23
      Carolyn Sue Pekas, Notary Public, Clay County
24    My commission expires:  January 31, 2025
25

Civil Action Group
763-576-8832