# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

JESSE G. SHERMAN,

                                    Civil No. 20-1764 (JRT/LIB)
                    Plaintiff,

v.                              **MEMORANDUM OPINION AND ORDER**
                                **ON CROSS MOTIONS FOR SUMMARY**
SHEFFIELD FINANCIAL, LLC,                  **JUDGMENT**

                    Defendant.

---

Mark L. Vavreck, **GONKO & VAVRECK, PLLC**, 401 North Third Street, Suite 640, Minneapolis, MN 55401; and Thomas J. Lyons, Jr., **CONSUMER JUSTICE CENTER PA**, 367 Commerce Court, Vadnais Heights, MN 55127, for plaintiff.

Aaron A. Myers and Andrew R. Shedlock, **KUTAK ROCK LLP**, 60 South Sixth Street, Suite 3400, Minneapolis, MN 55402, for defendant.

In March 2016, Plaintiff Jesse Sherman and his then-spouse took out a joint loan from Defendant Sheffield Financial, LLC ("Sheffield") and set up automatic payments on the loan.  In 2019, Sheffield cancelled the automatic payments, Sherman missed two payments, and Sheffield charged off the loan after Sherman's now-former spouse filed for bankruptcy.  After Sheffield reported the missed payments and charged off loan to Sherman's credit history maintained by the various credit reporting agencies ("CRAs"), Sherman filed a series of six disputes through the CRAs about Sheffield's report.  Sherman brings this action alleging Sheffield's handling of these disputes violated the Fair Credit Reporting Act ("FCRA").  At the heart of the matter is whether Sheffield was required to

note that Sherman had disputed the information even though its reporting was technically accurate.  The parties have filed cross motions for summary judgment.

FCRA requires furnishers of credit report data such as Sheffield to note the existence of a consumer's bona fide, potentially meritorious dispute if the failure to note the dispute is materially misleading.  For three of the disputes Sherman filed, Sheffield had sufficient information such that it had a duty to note that Sherman had a bona fide dispute.  For the other three, there is a factual dispute as to whether Sheffield had enough information.  Further, because Sheffield had a policy to never acknowledge bona fide disputes even when the failure to do so was materially misleading so long as the report was technically accurate and Sheffield acted in accordance with that policy here, Sheffield's actions were willful as a matter of law.  A dispute of material fact remains as to Sheffield's actual damages.

The Court will deny Sheffield's Motion for Summary Judgment in its entirety.  It will grant Sherman's Motion for Summary Judgment in part and deny it in part.  It will grant Sherman's Motion as it relates to (1) whether Sheffield's actions violated the FCRA when responding to Sherman's last three disputes and (2) whether Sheffield's violations were willful.  The Court will, however, deny Sherman's Motion as to whether Sheffield violated the FCRA in its response to Sherman's first three disputes.  After this Order, a trial will be necessary to resolve (1) whether Sheffield violated the FCRA on the first three disputes

Sherman filed, (2) whether Sherman suffered actual damages and, if so, the value of those damages, and (3) whether to award punitive damages and, if so, in what amount.

BACKGROUND

I.    **FACTUAL BACKGROUND**

A.    **History of Sherman's Loan from Sheffield**

In March 2016, Sherman and his then-spouse, Amy Sherman ("Amy"), financed the purchase of a Polaris Ranger ATV by taking out a loan with Sheffield.  (Decl. of Mark Vavreck ("Vavreck Decl."), Ex. E ("Sherman Dep.") at 12:16–23, Nov. 1, 2021, Docket No. 51.)  Both were on the loan and were joint account holders of the Sheffield loan account.  (*Id.* at 15:11–19; Vavreck Decl., Ex. B ("Loan Application") at 4–5.)[1]  They were required to make payments on the loan by the thirtieth day of each month.  (Loan Application at 5.)  They signed up to make their payments via automatic withdrawals from their bank account.  (*Id.* at 2.)

In April 2018, Sherman and Amy divorced.  (Vavreck Decl., Ex. C.)  Sherman received the ATV in the divorce and took on responsibility for the outstanding debt.  (*See id.* at 7.)

---

[1] For clarity, the Court uses CM/ECF pagination except for depositions or when otherwise noted.

On September 4, 2019, Amy filed for Chapter 7 bankruptcy. (Vavreck Decl., Ex. D.)[2] In her bankruptcy filing, she included the ATV in her list of property, noting that she had an interest in the property, but that it was "[n]ot in [her] possession" because it was "[a]warded to [her] ex-husband per divorce decree." (*Id.* at 11, 18.) She listed BB&T as a secured creditor for the ATV, noting she had no value of collateral for the debt and that it was in Sherman's possession.[3] (*Id.* at 20.) The bankruptcy filing stated that Amy intended to surrender the ATV. (*Id.* at 41.)

In mid-September 2019, Sheffield received notice of Amy's bankruptcy filing. (Vavreck Decl., Ex. F ("Wiles Dep.") at 42:12–22, 50:2–5; Decl. of Andrew R. Shedlock ("Shedlock Decl."), Ex. G ("Collection History") at 1, Nov. 1, 2021, Docket No. 47.) Sheffield cancelled the automatic payments on the loan and stopped sending out monthly account statements. (Answer ¶ 31, Sept. 18, 2020, Docket No. 7; Wiles Dep. at 29:7–16.) Sheffield did not notify Sherman or Amy that it was cancelling the automatic payments. (Wiles Dep. at 18:4–21.)

Until Sheffield cancelled the automatic payments, every monthly payment was made in full and on time. (Vavreck Decl., Ex. A ("Account History") at 2–5.) After Sheffield cancelled the payments in September 2019, no payments were made in September or

---

[2] The CM/ECF pagination for the bankruptcy filing is illegible. Therefore, the Court uses the pagination at the top of the page that appears to be the bankruptcy court's pagination where it reads "Document Page X of 53."

[3] Sheffield was a division of BB&T at the time the loan originated. (Loan Application at 5.)

October 2019. (*Id.*) It is undisputed that these payments were required, and the failure to pay means that Sherman missed two required payments on the loan. (*See* Compl. ¶ 32, Aug. 13, 2020, Docket No. 1.) It is also undisputed that Sherman still had an obligation to make payments even though Sheffield cancelled the automatic payments and that he could have made manual payments. (*See* Sherman Dep. at 24:25–25:14.)

On October 31, 2019, Sheffield "charged off" the account because a person on the account was in bankruptcy, there were missed payments causing the account to be more than 30 days past due, and the bankruptcy filing indicated the borrower intended to surrender the collateral. (Wiles Dep. at 29:17–21, 64:9–15, 65:20–66:13; Collection History at 1.) Sheffield then began reporting this information to the credit reporting agencies for inclusion on Sherman's credit report. (*See* Vavreck Decl., Ex. I ("Grimes Dep.") at 71:5–71:24; Wiles Dep. at 76:10–13.)

### B.    Sherman's Disputes with Sheffield

In November 2019, Sherman noticed that his credit score was dropping from Credit Karma.[4] (Sherman Dep. at 13:18–14:22.) Credit Karma indicated that the cause was late payments to Sheffield. (Sherman Dep. at 14:3–5.) On November 13, 2019, Sherman called Sheffield several times to inquire why the automatic payments stopped and to figure out what was happening. (*Id.* at 14:6–22; Collection History at 2.) During the calls,

---

[4] Credit Karma is a company that provides credit scores and credit report monitoring for its customers. *How Credit Karma Works*, Credit Karma, https://www.creditkarma .com/faq/howitworks.

Sheffield informed Sherman that one of the people on the account had filed for bankruptcy and so Sheffield stopped the automatic payments. (*Id.* at 14:6–11; Collection History at 2.) On November 14, 2019, Sherman paid the past due amounts by phone. (Account History at 5.) He also resumed monthly payments. (*Id.* at 5–6; Sherman Dep. at 28:15–20.) On February 6, 2020, Sherman paid off the remaining balance on the loan. (Account History at 6; Sherman Dep. at 28:11–14.) The Sheffield line of his credit report changed from "Charged Off" to "Charged Off Paid in Full." (Sherman Dep. at 72:6–9.) The late payments and the charge off remained on Sherman's credit history. (*E.g.*, Vavreck Decl., Ex. M ("Experian ACDV").)

Sherman also began trying to get the negative information removed from his credit reports. On December 18, 2019, Sherman called Sheffield to ask it to remove the information. (Collection History at 4.) Sheffield advised him that it cannot change his report but that he could file a dispute through a CRA. (*Id.*) He made similar calls with similar results on January 16 and 17, 2020. (*Id.* at 5.)

On January 17, 2020, Sherman filed a credit history dispute with Equifax. (Shedlock Decl., Ex. N. ("1st Equifax ACDV").) When a consumer files a dispute with a CRA as to how a lender is reporting a line on a credit history, the CRA generates an Automated Consumer Dispute Verification ("ACDV") for this indirect dispute that it then sends along to the

furnisher of the disputed information.[5]  (*See id.*)  On January 20, 2020, Sheffield sent the ACDV back to Equifax indicating that its information was accurate: two payments were missed and the balance was charged off.  (*Id.*; Collection History at 5.)  On January 22, 2020, Sherman called Sheffield to inquire why it confirmed its previous report was correct.  (Collection History at 5–6.)  He was told to resubmit the dispute and to specifically mention the bankruptcy because the first dispute did not.  (*Id.* at 6.)

On January 22 and 29, 2020, Sherman filed new disputes through Equifax.  (Vavreck Decl., Ex. J ("2nd Equifax ACDV"); Vavreck Decl., Ex. K ("3rd Equifax ACDV"); Collection History at 6–7.)  Sheffield again responded that it was accurately reporting the account as two payments were missed and the loan had been charged off.  (2nd Equifax ACDV; 3rd Equifax ACDV.)

In February 2020, Sherman hired attorney Kevin Duffy to assist him with the situation.  Duffy sent letters to the CRAs Experian, TransUnion, and Equifax disputing how Sheffield was reporting the loan, generating new ACDVs from each of these CRAs.[6] (Shedlock Decl., Ex. R ("Experian ACDV") at 2–3; Shedlock Decl., Ex. S ("4th Equifax ACDV") at 4–5; Collection History at 7.)  Sheffield responded to the Experian, TransUnion, and

---

[5] The Court discusses more details about the contents of the disputes and their resulting ACDVs when evaluating the Motions below.

[6] Duffy also sent a letter to BB&T.  (Vavreck Decl., Ex. L.)  The parties dispute whether Sheffield received this direct dispute and, if so, whether it was properly filed.  Because Sherman's theory of liability is based on the indirect disputes sent through the CRAs, this factual dispute is not material to the issues here.

Equifax ACDVs that its reporting was correct: two payments were paid after their due date and the account was charged off.  (Collection History at 7; Experian ACDV at 31; Vavreck Decl., Ex. N ("TransUnion ACDV") at 2; Vavreck Decl., Ex. P ("White Dep.") at 59:10–61:22, 63:9–25.)

In addition to the particular details of a person's credit history, credit reports can indicate whether a consumer has disputed a particular line of credit.  (*See* Vavreck Decl., Ex. O at 3, Nov. 1, 2021, Docket No. 52.)  One method of noting this is by adding certain dispute codes to a consumer's credit history.  (*See id.*)  Sheffield's policy and practice was to only add or change a dispute code in response to a direct dispute properly filed with Sheffield or when a consumer directly disputed a code, but to not note the existence of an indirect dispute.  (Grimes Dep. at 17:4–19; 26:2–14; 35:12–36:9; 48:11–50:6, 52:13–22, 67:1–9; White Dep. at 52:7–53:12.)  In accordance with this policy, Sheffield never added any indication that Sherman disputed how it was reporting his account with Sheffield.  (*See* Grimes Dep. at 36:7–13, 47:11–22, 67:1–9.)

### C.    Sherman's Alleged Harms

Sherman alleges Sheffield's handling of his credit line and his disputes with it caused him to suffer multiple types of harm.  Sherman claims that on November 4, 2019, Credit Karma reported his credit score at 775.  (Sherman Dep. at 60:11–18.)  But that by November 18, 2019, it had dropped to 638.  (*Id.* at 60:19–21.)  When he paid off the Sheffield loan and its status was changed from "Charged Off" to "Charged Off Paid in Full,"

his score increased by 30 points, though it remained below his previous score. (*Id.* at 72:10–12.)

In January 2020, Sherman attempted to use credit in two ways: to purchase a used car and to refinance his home mortgage. (Sherman Dep. at 40:3–5, 40:13–14.) He claims that when he first attempted to get a car loan, he was denied. (*Id.* at 40:4–8.) Then he was offered both a car loan and a loan to refinance his mortgage but at high interest rates. (*Id.* at 40:8–23.) For example, Sherman recalls that he was offered an 8 percent interest rate on the car loan. (*Id.* at 41:2–5.) Ultimately, in spring 2020, Sherman was able to obtain a car loan at what he considered a normal market rate of 4.5 percent. (*Id.* at 41:6–42:5, 47:19–48:1.) However, he was unable to purchase the vehicle he originally intended to purchase. (*Id.* at 41:2–4.) Sherman claims he was finally able to get the car loan by going to his long-time bank that was able to "fudge" his credit score to give him a better rate. (*Id.* at 41:6–17, 72:17–73:9.) On the mortgage, Sherman paid 5 percent interest until he was able to refinance in Spring 2021 for a 2.75 percent interest rate. (*Id.* at 48:23–49:22.) Sherman claims the inability to refinance sooner prevented him from saving money. (*Id.* at 40:24–41:1.) Sherman testified that he was told the cause of the denials and higher rates was his low credit score. (*Id.* at 40:17–18, 43:8–17, 49:1–6, 64:1–8.)

Sherman also testified that he has been harmed by the amount of time he has spent addressing these issues and by paying $250 to Duffy to repair his credit. (*Id.* at 46:10–24, 86:12–17.)

Finally, Sherman alleges that he suffered embarrassment, mental anguish, anxiety, and humiliation when he applied for a vehicle loan and a mortgage refinance loan and was told he had low credit and was forced to explain himself. (*Id.* at 43:21–44:10, 44:18–45:3, 46:25–47:18.) Sherman submitted affidavits from Amy, a friend and co-worker of his, and his current girlfriend who claim that as a result of his credit report, they have seen the stress, loss of sleep, and effect on his mood and personality which resulted in him becoming more withdrawn, depressed, and agitated. (2nd Decl. of Mark Vavreck, Ex. R ¶¶ 15–16, 22, Ex. S ¶¶ 9–10, Ex. T ¶¶ 5, 8–15, Nov. 22, 2021, Docket No. 59.) Sherman has not sought professional help for the emotional distress he claims to have suffered. (Sherman Dep. at 44:11–15, 45:4–8.)

## II. PROCEDURAL HISTORY

Sherman filed this action against Sheffield, alleging that Sheffield violated the FCRA. (Compl.) Specifically, Sherman alleges Sheffield violated the FCRA by (1) failing to conduct a reasonable investigation in response to his disputes, (2) failing to update or remove inaccurate information, and, (3) at a minimum, failing to mark the Sheffield line as disputed. (Compl. ¶ 52.) Sherman alleges Sheffield's conduct was willful or, in the alternative, negligent. (*Id.* ¶¶ 54–55.) He seeks actual damages, statutory damages, punitive damages, and an award of his costs and attorney fees. (*Id.* ¶ 56.)

The parties filed cross motions for summary judgment. (Def.'s Mot. Summ. J., Nov. 1, 2021, Docket No. 44; Pl.'s Mot. Summ. J., Nov. 1, 2021, Docket No. 49.) Sheffield seeks

to dismiss the Complaint.  (Def.'s Mem. Supp. Mot. Summ. J. at 33, Nov. 1, 2021, Docket No. 46.)  Sherman seeks to have the Court determine that Sheffield violated the FCRA and that it did so willfully as a matter of law and requests a trial to determine damages.  (Pl.'s Mem. Supp. Mot. Summ. J. at 21, Nov. 1, 2021, Docket No. 50.)

**DISCUSSION**

## I.   STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

-11-

## II.    ANALYSIS

Under the FCRA, when a furnisher of credit information, such as Sheffield,[7]

receives notice from a CRA that a consumer disputes:

> the completeness or accuracy of any information provided by a [furnisher] to a consumer reporting agency, the [furnisher] shall--
> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the consumer reporting agency . . . ;
> (C) report the results of the investigation to the consumer reporting agency;
> (D) if the investigation finds that the information is **incomplete or inaccurate**, report those results to all other consumer reporting agencies to which the [furnisher] furnished the information and that compile and maintain files on consumers on a nationwide basis; and
> (E) if an item of information disputed by a consumer is found to be **inaccurate or incomplete** or cannot be verified after any reinvestigation . . . , for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly--
> > (i) modify that item of information;
> > (ii) delete that item of information; or
> > (iii) permanently block the reporting of that item of information.

18 U.S.C. § 1681s-2(b)(1) (emphasis added).  In other words, if a furnisher receives notice

of a consumer's indirect dispute from a CRA, the furnisher must investigate the dispute

and then report the results to the CRA that provided notice of the indirect dispute.  It

---

[7] It is undisputed the Sheffield is a furnisher of credit information subject to the FCRA.

must also report the results to the other CRAs if the investigation finds the disputed information was incomplete or inaccurate. The "investigation 'requires some degree of careful inquiry'" by furnishers. *Schaffhausen v. Bank of Am., N.A.*, 393 F. Supp. 2d 853, 858 (D. Minn. 2005) (quoting *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430–31 (4th Cir. 2004)).

If a furnisher fails to satisfy these requirements, the consumer has a cause of action against the furnisher. If the furnisher is "negligent in failing to comply with" the requirements, the consumer may recover "any actual damages sustained . . . as a result of the failure" as well as "the costs of the action together with reasonable attorney's fees as determined by the court." 15 U.S.C. § 1681*o*(a). Alternatively, if the furnisher "willfully fails to comply with" the requirements, the consumer may recover not only actual damages and costs and attorney's fees, but also statutory and punitive damages. 15 U.S.C. § 1681n(a). Here it is undisputed that Sherman filed indirect disputes through the CRAs based on how Sheffield reported his credit such that if Sheffield failed its duties, Sherman has a cause of action. Instead, the parties dispute (1) the nature of a furnisher's duty, (2) whether Sheffield failed its duty, (3) if so, whether Sheffield did so willfully, and (4) whether Sherman has demonstrated damages sufficient to maintain a negligence FCRA cause of action.

The gravamen of Sherman's claim is that because Sheffield failed to mark that he had disputed his account, Sheffield violated the FCRA because it rendered the report of

his account inaccurate or incomplete.  Sherman further contends that because Sheffield followed its own policy and practice of refusing to mark accounts with bona fide disputes, it willfully violated the FCRA.  Sheffield contends it did not violate the FCRA because it accurately reported the undisputed information that Sherman had missed two payments and that the debt had been charged off.  Therefore, the Court must first determine whether Sheffield's report was sufficient to satisfy its duties under the FCRA.

### A.   Furnishers' Duty to Avoid Materially Misleading Omissions

The Court must decide whether, in addition to imposing a duty to accurately report any information it furnishes to CRAs, the FCRA imposes on furnishers a duty to report the existence of bona fide and potentially meritorious consumer disputes if failing to do so would be materially misleading.

### 1.   Nature of the Duty

15 U.S.C. § 1681s-2(b) requires furnishers to determine if their reports are "incomplete or inaccurate."  The plain language of the statute, thus, requires furnishers to do more than just verify the accuracy of the reported information.  Sheffield contends that it did not violate § 1681s-2(b) because the information it reported was always accurate.  Adopting an interpretation that furnishers satisfy their duty by merely verifying the technical accuracy of the information would require the Court to ignore the word "incomplete."  It would also run counter to the FCRA's purpose of eliminating inaccurate credit reports and "unfair credit reporting methods [that] undermine the public

confidence" and would allow furnishers to flout their duty to "exercise their grave responsibilities with fairness [and] impartiality."  15 U.S.C. § 1681 (listing Congress's purpose for passing the FCRA).

Furnishers, therefore, have a duty to avoid omitting material information that renders the report incomplete or inaccurate.[8]  This is so because "even if the information is technically correct, it may nonetheless be inaccurate if, **through omission**, it 'create[s] a materially misleading impression.'"  *Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014) (quoting *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008)) (emphasis added).   And when carrying out this duty, furnishers may need to look beyond the four corners of the dispute received from the CRA when the furnisher has additional information beyond that provided by the CRA.  *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1306 (11th Cir. 2016).

---

[8] Although the Eighth Circuit has never addressed this, five circuits have agreed with this conclusion that 15 U.S.C. § 1681s-2(b) imposes a duty on furnishers to avoid material omissions even if the report is technically accurate.  *Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014); *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1186 (10th Cir. 2013); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009); *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008).  Additionally, at least one other circuit has found that a different FCRA accuracy duty imposes upon other FCRA-regulated parties a duty to do more than ensure a report is technically correct.  *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 40 (D.C. Cir. 1984) ("Congress did not limit the Act's mandate to reasonable procedures to assure only technical accuracy; to the contrary, the Act requires reasonable procedures to assure 'maximum accuracy.'").

Failing to note that a consumer has disputed an account may in some circumstances qualify as a material omission.[9]   This is so because furnishers could otherwise provide materially misleading but technically correct information that has a severely adverse effect on the consumer and misrepresents the consumer's creditworthiness as well as how the consumer handled the debt at issue.   This would undermine the purpose of the FCRA to provide credit information in a manner that is fair to consumers.   15 U.S.C. § 1681; *see also Gorman*, 584 F.3d at 1163 (holding that an alternative rule would "contravene[] the purpose of the FCRA, to protect against 'unfair credit reporting methods'"); *Saunders*, 526 F.3d at 150.   This information flags for those reviewing a consumer's credit history that the consumer has filed a dispute and believes the information does not accurately state the consumer's creditworthiness.   This information may, in turn, place another lender on notice that it may need to further investigate the situation before determining a consumer's creditworthiness.   The omission of a potentially meritorious dispute thus fails the furnisher's duty of completeness.

---

[9] Again, the Eighth Circuit has not directly addressed this issue, but three courts of appeals have held that failing to flag an account as disputed in response to an indirect dispute can violate 15 U.S.C. § 1681s-2(b) because it may mean the information is incomplete or inaccurate. *Seamans*, 744 F.3d at 867 ("[A] private cause of action arises under 15 U.S.C. § 1681s–2(b) when, having received notice of a consumer's potentially meritorious dispute, a furnisher subsequently fails to report that the claim is disputed."); *Gorman*, 584 F.3d at 1163; *Saunders*, 526 F.3d at 148–50.

Sheffield's interpretation that accuracy alone is sufficient would also allow creditors to threaten consumers with a negative, if technically accurate report, with no recourse whatsoever.  *See Gorman*, 584 F.3d 1147 at 1163 ("[S]uch a rule [might] intimidate consumers into giving up bona fide disputes by paying debts not actually due to avoid damage to their credit ratings[.]"); *Mason v. Chase Home Fin., LLC*, No. 11-4144, 2014 WL 37219, at *5 (D.N.J. Jan. 6, 2014).

In sum, the plain language as further supported by the FCRA's purpose shows that furnishers have a duty to ensure not only that the information they report is itself correct, but also to ensure that they do not omit material information if failing to report the information creates a misleading impression.  And not reporting that a consumer disputes the information can, in some circumstances, constitute a failure of this duty.

### 2.    Attachment of the Duty to Avoid an Omission

Holding that furnishers can be held liable for failing to report the existence of a dispute does not, however, mean that they can be held liable whenever they fail to report the existence of a consumer dispute.  FCRA does not impose strict liability on furnishers who omit a consumer dispute.  *See Gorman*, 584 F.3d at 1163; *see also Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329 (9th Cir. 1995) (refusing to impose strict liability on CRAs for inaccurate reports).

Furnishers have no duty to report wholly meritless, frivolous disputes.  *See Hrebal v. Seterus, Inc.* ("*Hrebal I*"), 598 B.R. 252, 270 (D. Minn. 2019); *Gorman*, 584 F.3d at 1163

-17-

(failing to report a "meritless dispute" does not violate § 1681s-2(b)); *see also Saunders*, 526 F.3d at 151 (assuming liability attaches only if a furnisher fails to report a meritorious dispute). Requiring furnishers to report even frivolous disputes would allow fraudulent consumers to easily avoid negative credit scores. *Horton v. Trans Union, LLC*, No. 12-2072, 2015 WL 1055776, at *9 (E.D. Pa. Mar. 10, 2015). This is inconsistent with the FCRA's purposes of fairness and accuracy. Moreover, failing to report frivolous disputes is unlikely to be materially misleading. *Gorman*, 584 F.3d at 1163.

Instead, furnishers only have a duty to report (1) potentially meritorious or bona fide disputes that (2) could materially affect how one interprets the consumer's creditworthiness. *Seamans*, 744 F.3d at 867 ("We . . . conclude that a private cause of action arises under 15 U.S.C. § 1681s–2(b) when, having received notice of a consumer's potentially meritorious dispute, a furnisher subsequently fails to report that the claim is disputed."); *Gorman*, 584 F.3d at 1163 ("It is the failure to report a bona fide dispute . . . that gives rise to a furnisher's liability under § 1681s–2(b)."); *Lichtman v. Chase Bank USA, N.A.*, No. 18-10960, 2020 WL 1989486, at *7 (S.D.N.Y. Apr. 27, 2020) (collecting cases).

### 3. Sheffield's Duty to Sherman

Because a furnisher must note a consumer's potentially meritorious or bona fide dispute if the failure to do so is would be materially misleading, the Court must now decide whether the undisputed facts establish that Sherman's disputes meet or fail to meet this standard as a matter of law sufficient to grant summary judgment. The material

background facts in this case are undisputed.  Instead, the question is whether after drawing all reasonable inferences from these facts in the nonmovant's favor, a reasonable jury could find for the nonmovant.

### a.   Bona Fide or Potentially Meritorious Dispute

The Court must determine what it means for a dispute to be bona fide or potentially meritorious.  First, the dispute must be relevant to the information provided by the furnisher to whom the dispute is directed.  The purpose of FCRA disputes is to ensure the completeness and accuracy of the information on consumers' credit reports, and the process laid out in 15 U.S.C. § 1681s-2(b)(1) is designed to do just that.  It creates a duty to conduct an investigation with respect to the disputed information and to verify the accuracy and completeness of that information, not to verify all information on a consumer's credit history.  A furnisher also need only verify a tradeline it has reported. 15 U.S.C. § 1681s-2(b)(1) ("After receiving notice . . . of a dispute with regard to . . . any information provided by a [furnisher].").  This is in line with the procedure the FCRA establishes for how CRAs are to handle disputes as the FCRA allows CRAs to terminate reinvestigation of irrelevant disputes.  15 U.S.C. § 1681i(a)(3)(A).

Second, the dispute must be factually correct in general and provide sufficient information for the furnisher to undertake a reasonable investigation.  Section 1681s-2(b)(1)(B) requires furnishers to review the information provided by the consumer through the CRA as it conducts its investigation.  And the furnisher's duty to investigate is

triggered by the notice it receives from the CRA. *Anderson v. EMC Mortg. Corp.*, 631 F.3d 905, 907–08 (8th Cir. 2011). Therefore, the dispute must contain enough information for the furnisher to determine the nature of the dispute. *See id.* at 908. Without this, furnishers are unable to conduct investigations that would otherwise reveal incompleteness or inaccuracy.[10] *See Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) ("[The furnisher's] investigation in this case was reasonable given the scant information it received regarding the nature of [the consumer's] dispute."). And if the information in the dispute is wholly inaccurate, the furnisher should not and will be unable to rely upon it to verify the accuracy of its own information. This is again in line with the FCRA's purpose of ensuring accuracy. Factually incorrect disputes, if anything, hinder this purpose. Moreover, a dispute that is wholly inaccurate will necessarily be frivolous as it based on a false premise. This is again consistent with how CRAs are to handle disputes as the FCRA allows them to terminate reinvestigation of frivolous disputes, "including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information." 15 U.S.C. § 1681i(a)(3)(A).

Third, noting the existence of the dispute must suggest that a borrower is less financially irresponsible than the undisputed report tends to suggest. The purpose of

_____

[10] This, however, does not mean that that the scope of the investigation is limited to the information provided in the dispute. *Gorman*, 854 F.3d at 1157 n.11; *Hinkle*, 827 F.3d at 1306 ("When a furnisher has access to dispute-related information beyond the information provided by the CRA, it will often be reasonable for the furnisher to review that additional information and conduct its investigation accordingly.").

credit reports is to gauge the creditworthiness of consumers and improve the efficiency of credit markets, and the purpose of the FCRA is to ensure fairness to the consumer in this process. *See* 15 U.S.C. § 1681(a). If seeing the existence of a dispute would not affect how a potential creditor would view a consumer's creditworthiness, it is unclear how omitting the dispute would then be unfair to a consumer or effect the efficiency of credit markets and it would not accomplish the purpose of noting disputes to avoid inaccurately reflecting a consumer's financial responsibility. *See Gorman*, 584 F.3d at 1163 ("The consumer must still convince the finder of fact that the omission of the dispute was 'misleading in such a way and to such an extent that [it] can be expected to have an adverse effect.'" (quoting *Saunders*, 526 F.3d at 150) (alteration in original)).

In sum, a dispute is bona fide or potentially meritorious if it is relevant to the disputed credit line provided by the furnisher, generally factually correct and sufficiently complete to provide the furnisher notice of the nature of the dispute, and suggests that a borrower is less financially irresponsible than the undisputed report tends to suggest. Additionally, a dispute may be potentially meritorious and need to be reported even if the dispute would not succeed at a trial. *See Saunders*, 526 F.3d at 150; *see also Alexander v. Moore & Assocs., Inc.*, 553 F. Supp. 948, 954 (D. Haw. 1982) (suggesting that a factually correct but legally incorrect defense may be relevant and therefore must be disclosed by a CRA if it tends to "negate a conclusion of financial irresponsibility" under § 1681i(c)). A dispute is also more likely to be bona fide if the reported information showing

irresponsibility did not arise from the actions of the borrower. *See Hrebal v. Nationstar Mortg. LLC* ("*Hrebal II*"), 385 F. Supp. 3d 849, 852 (D. Minn. 2019).

The undisputed facts demonstrate that Sherman's three indirect disputes filed by Duffy—through Equifax, Experian, and TransUnion (collectively, the "Duffy Disputes")—were bona fide and potentially meritorious as a matter of law. First, the Duffy Disputes are relevant to the Sheffield credit line. The letters from Duffy contained in the ACDVs clearly indicate which loan is at issue and Sheffield acknowledges that it knew which line was in dispute. (*See, e.g.*, Def.'s Mem. Supp. Mot. Summ. J. at 10–15.)

Second, there is no genuine dispute of material fact that the Duffy Disputes were, at their core, factually correct and provided sufficient information for Sheffield to investigate and evaluate how it was reporting Sherman's account. These three disputes included the letter Duffy wrote describing the nature of Sherman's dispute and his understanding of the situation. (Experian ACDV at 2–3; 4th Equifax ACDV at 4–5; TransUnion ACDV; Grimes Dep. at 59:14–60:15.)[11] The included letters document that Sherman's dispute is that his credit history was improperly affected by Amy's bankruptcy, not any of his own actions, and asks for this part of his credit history to be changed so

---

[11] The TransUnion ACDV provided to the Court did not include the letter to Duffy. It, is however, undisputed that Duffy sent the same letter to TransUnion and TransUnion included images with its ACDV. A Sheffield employee explained that for some reason these images were not saved with the TransUnion ACDV as they were with the Experian ACDV and 4th Equifax ACDV. (Grimes Dep. at 59:14–60:15.) There is no allegation of foul play or claim that this creates a factual issue.

that he is unaffected by Amy's bankruptcy. Sheffield does not dispute that the core of Sherman's dispute was factually correct[12] and does not dispute that the letters provided sufficient information to allow Sheffield to evaluate the nature of his dispute.[13] (*See* Def.'s Mem. Opp. Mot. Summ. J. at 14–16, Nov. 22, 2021, Docket No. 56.) Moreover, Sheffield's internal records indicate that it was aware of Sherman's disputes and the reasons for them because of his many phone calls. This is a type of additional information furnishers may be required to rely on when they receive an ACDV. *See Hinkle*, 827 F.3d at 1306.

Third, when viewed in the light most favorable to Sheffield, the undisputed facts show that had Sheffield reported Sherman's dispute it would have suggested that Sherman was less financially irresponsible than the report suggested. Sherman never missed a payment for more than 3 years before Fall 2019 and only missed payments after Sheffield cancelled the automatic payments. Once Sherman was aware of the missed payments and the cause, he paid them the next day and resumed monthly payments before paying the loan off in its entirety. The reported information, however, showed two missed payments and then a loan charge off without stating any other context. No

---

[12] The letters do include the inaccurate statement that Sherman made all payments in accordance with the loan's terms. Sherman does not dispute that this was untrue as two payments were made late after Sheffield cancelled the automatic payments. This, however, is not the essential element of Sherman's disputes. The essential point is that Sherman's credit score was affected by Amy's bankruptcy and Sheffield's actions in response to the bankruptcy, not Sherman's actions.

[13] Indeed, a Sheffield employee told Sherman to mention Amy's bankruptcy in his disputes to ensure his disputes were properly processed. (*See* Wiles Dep. at 102:19–103:2; Collection History at 6.)

reasonable jury could find that noting Sherman's dispute would not have suggested that he was less financially irresponsible. Moreover, the missed payments and charge off were caused by Amy's and Sheffield's actions, not Sherman's, which tends to show that Sherman's dispute is bona fide. *See Hrebal II*, 385 F. Supp. 3d at 852. Although Sheffield's reporting was technically accurate, Sherman's disputes filed by Duffy were not frivolous or meritless.

Although no reasonable jury could find that the three Duffy Disputes were sufficient, based on the record available here, a reasonable jury could find that that the three disputes Sherman filed on his own through Equifax may not have contained sufficient information for Sheffield to investigate and evaluate how it was reporting his account. Reviewing the copies of the ACDVs provided to the Court, the first and third ACDVs only note that Sherman disputes the payment history while the second ACDV only notes that Amy filed for bankruptcy and seems to suggest he is marked as included in this bankruptcy but fails to explain how. (1st Equifax ACDV at 2; 2nd Equifax ACDV at 2; 3rd Equifax ACDV at 2.) Nor do they explain what Sherman wants changed in his credit report. These ACDVs, therefore, provide much less information than the disputes Duffy filed for Sherman. Based on this limited information, a reasonable jury could find in either party's favor whether Sheffield had sufficient information as to the nature of Sherman's actual dispute when it received these ACDVs. Therefore, a trial will be necessary to resolve

whether these three disputes provided sufficient information to Sheffield such that they meet the requirements of bona fide or potentially meritorious disputes.[14]

Because at least three of Sherman's disputes were potentially meritorious and bona fide, the Court must now decide whether Sheffield's failure to report the dispute was materially misleading.

### b.    Materially Misleading

Sheffield contends that its reporting was not materially misleading because its reports were always correct.  Similar to whether a dispute is bona fide, limiting the FCRA to just requiring correct information alone is an incorrect interpretation of the statute.

Although in most cases, "reporting an actual debt without noting that it is disputed is unlikely to be materially misleading," exceptions exist.  *Gorman*, 584 F.3d at 1163. Failing to report a dispute is materially misleading "where a dispute . . . could materially alter how the reported debt is understood."  *Id.*  Thus, a report need not be "patently incorrect" to be misleading if the report omits the context necessary to evaluate the debt. *Saunders*, 526 F.3d at 148.  In addition to being misleading, it must be material meaning that "it can be expected to have an adverse effect."  *Saunders*, 526 F.3d at 148 (cleaned up).

---

[14] No reasonable jury could find, however, that these three ACDVs do not satisfy the other parts of the analysis: they are relevant to the disputed credit line and noting the existence of a dispute would have suggested Sherman is less financially irresponsible than the undisputed line suggested.  Therefore, the Court has narrowed the issues on these disputes such that a jury will only need to decide whether Sheffield had sufficient information for liability to attach.

Although the question of whether an omission was materially misleading is a question typically best left to the fact finder, *Seamans*, 744 F.3d at 865, no reasonable jury could conclude that the omission of Sherman's dispute was not materially misleading. The undisputed facts show that Sherman had never missed a payment until the automatic payments were cancelled through no fault of his own.  Once he learned of the cancellation, he promptly addressed the missed payments, restarted payments, and then paid off the full amount of the loan.  A report that he missed payments and had a loan charged off without additional context misleadingly suggests he is far less creditworthy than his full history with this loan would suggest.  The undisputed facts also show that his credit score dropped, he had trouble securing a loan, and was only able to secure the car loan at market rates by convincing a bank to ignore this report on his credit history as if it were in dispute.  This demonstrates that the omission of Sherman's dispute on Sheffield's reported information was material.

There are thus no factual disputes for a jury to resolve as to whether Sheffield violated its duties under 15 U.S.C. § 1681s-2(b)(1) for the Duffy Disputes.  *See Hrebal II*, 385 F. Supp. 3d at 852–53.  Even after viewing all facts in Sheffield's favor, the only reasonable inferences are that (1) Sherman's dispute was bona fide and potentially meritorious and (2) the omission of Sherman's dispute here was materially misleading. Although it is undisputed that Sheffield's information was technically accurate, technical accuracy is not always sufficient as a matter of law.  Sheffield had a duty to, at a minimum,

note the existence of Sherman's dispute.[15]    It did not.   Therefore, Sheffield violated § 1681s-2(b)(1) on at least three of Sherman's disputes.

### B.    Actual Damages

Consumers are entitled to recover any actual damages caused by a furnisher's violation of FCRA, whether the violation was negligent or willful.    15 U.S.C. §§ 1681n(a)(1)(A), 1681o(a)(1).   Actual damages under the FCRA includes (1) denial of credit or higher interest rates, *Edeh v. Equifax Info. Servs., LLC*, 974 F. Supp. 2d 1220, 1242 (D. Minn. 2013), *aff'd*, 564 F. App'x 878 (8th Cir. 2014) and (2) emotional distress damages, *Taylor v. Tenant Tracker, Inc.*, 710 F.3d 824, 828 (8th Cir. 2013).   Sheffield contends there is no evidence Sherman suffered any damages.

Sheffield argues that Sherman did not suffer any out-of-pocket financial damages because Sherman was able to get a car loan in Spring 2020 at a rate Sherman acknowledges was a decent, normal market interest rate and then was able to refinance his mortgage rate.   While both are true, they do not necessarily mean that Sherman suffered no financial damages.   First, he received this loan sometime later than he initially

---

[15] The parties spend a considerable amount of their briefs arguing over whether Sheffield should have used the Compliance Condition Codes XB, XC, or XH.  These codes are often used to indicate consumer disputes on credit reports.  (*See* Vavreck Decl., Ex. O at 3–5.)  The FCRA does not require the use of—or even mention—these codes.  Therefore, Sheffield need not have used these codes specifically.  Sheffield was required to sufficiently acknowledge the existence of Sherman's dispute, through these codes or in other ways.  Because it is undisputed that Sheffield did not do so at all, the Court need not wade into exactly how furnishers must note the existence of a dispute.

wanted and Sherman testified that he did not purchase the vehicle he originally intended to purchase.  Second, he did not refinance his mortgage until March 2021 at a 2.75 percent interest rate and therefore continued paying on a 5 percent mortgage up to that point.  These undisputed facts support multiple reasonable inferences.  First, Sherman suffered damages by not getting the car he originally wanted and was unable to get a car at all for a few months.  Second—and something Sherman specifically testified to be the case—Sherman had to pay more interest on his mortgage than he otherwise would have had he been able to refinance earlier.  On these undisputed facts, however, a reasonable jury could also determine that Sherman suffered no actual harms if perhaps market interest rates dropped such that the delay in time actually saved Sherman money in the long run or if there are other reasons he was denied credit or offered a higher rate.  As such, there is a genuine dispute of material fact as to whether Sherman suffered out-of-pocket financial harms.[16]

Sherman also seeks actual damages for "emotional distress, embarrassment, frustration, and anxiety."  (Compl. ¶ 48.)  Sheffield agrees that emotional distress

---

[16] The Court also notes that Sherman testified that he paid Duffy $250 to send the letters on his behalf.  At the hearing on these motions, his attorney claimed the amount was $300 and asserted it should be considered credit repair expenses and not attorney fees for this litigation.  At least one court in the Eighth Circuit has awarded credit repair damages for a FCRA violation in a default judgment.  *Davis v. Fid. Info. Corp.*, No. 18-441, 2018 WL 6171438, at *3 (E.D. Mo. Nov. 26, 2018).  Because the parties did not brief whether credit repair damages are available, whether these should be properly considered actual damages or attorney fees, and there are conflicting statements on the amount, the Court will also not award these damages at this time and will resolve them alongside the other damages issues.

damages are available under the FCRA but argues that Sherman has not offered sufficient evidence to survive summary judgment on the issue of emotional distress. Sheffield points to the fact that much of the evidence of emotional damages are Sherman's deposition statements that are unsupported by medical or other professional testimony.

FCRA emotional distress damages "must be supported by competent evidence of 'genuine injury,' which 'may be evidenced by one's conduct and observed by others.'" *Taylor*, 710 F.3d at 828 (quoting *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978)). "While an emotional distress injury may be established solely by a plaintiff's own testimony," the testimony must show a "concrete" and "genuine injury." *Edeh*, 974 F. Supp. 2d at 1244. Although not dispositive, courts will also consider whether the plaintiff suffered a physical injury or received medical treatment in connection with the alleged emotional distress. *Taylor*, 710 F.3d at 829. Time spent resolving a problem can be taken into account when considering emotional damages. *Edeh*, 974 F. Supp 2d at 1242.

In addition to Sherman's deposition testimony, in response to Sheffield's Motion, Sherman provided affidavits from three other people that support and supplement his testimony.[17] This testimony describes the time Sherman has spent, his loss of sleep, the

---

[17] Sheffield argued the Court should refuse to consider these affidavits because Sherman did not disclose these affidavits until his response to Sheffield's Motion—well after the close of fact discovery. Sheffield, however, acknowledges that Sherman disclosed them as potential witnesses, Sherman discussed the evidence they had during his deposition, and that it could have chosen to depose them. Therefore, it appears on the record before the Court that Sherman met his duties under Federal Rule of Civil Procedure 26, and the Court will not exclude this testimony under Rule 37(c)(1) at this time. Even if the Court did not consider this evidence, it is also possible

effect on his mood and demeanor, and his agitation over more than a year dealing with this issue.  This evidence of emotional distress over a significant period of time observed by others is "competent evidence of genuine injury" and is sufficient to support emotional damages at the summary judgment stage.  *See Taylor*, 710 F.3d at 828 (citing *Millstone v. O'Hanlon Reps., Inc.*, 528 F.2d 829, 834 (8th Cir. 1976) and (collecting cases)); *see also Hrebal I*, 598 B.R. at 274.  The fact that Sherman did not seek out medical help and failed to present medical evidence also does not defeat his claim for emotional damages.  *See Hrebal I*, 598 B.R. at 273–74; *Johnson v. Collecto, Inc.*, 127 F. Supp. 3d 1012, 1019–20 (D. Minn. 2015).  It is, however, possible a jury will not credit the testimony, find that the emotional damages are insufficiently substantiated, or find that Sherman's emotional distress is too minimal to support emotional distress damages.

In sum, there is a genuine dispute of material fact as to Sherman's actual damages and a jury must decide whether Sherman is entitled to actual damages, and if so, to what extent.

### C.   Willfulness

Sherman has alleged that Sheffield willfully violated FCRA and has moved for summary judgment on this issue.  Sheffield argues that Sherman has presented no

---

that Sherman's testimony alone may have been sufficient to survive summary judgment.  *See Meyer v. F.I.A. Card Servs., N.A.*, 780 F. Supp. 2d 879, 885 (D. Minn. 2011) (expressing skepticism about an emotional damages claim based solely on a plaintiff's statements but finding them sufficient to survive summary judgment).

admissible evidence that Sheffield had a deliberate policy that has harmed any other customer and, therefore, the Court cannot find that its actions were willful.[18]

Although willfulness is not an element of a FCRA claim, if a furnisher willfully violated the FCRA, a plaintiff may seek statutory and punitive damages which are unavailable if a furnisher's violation was merely negligent.  *See* 15 U.S.C. §§ 1681*o*(a), 1681n(a)(1).  Moreover, a plaintiff can recover statutory and punitive damages after a willful violation even if the plaintiff did not suffer any actual damages as a result of the violation.  *Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998) ("Actual damages are not a statutory prerequisite to an award of punitive damages under the [FCRA]." (quotation omitted) (alteration in original)).

Under the FCRA, willful violations include both knowingly and recklessly violating the law with actions that "entail[] an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57–58, 68–69 (2007) (quotation omitted).  "[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the

---

[18] Sheffield also argues its actions were not willful because Amy's filing for bankruptcy caused the automatic payments to terminate, Sherman was still legally responsible for making payments, Sheffield was not required to report Sherman's account as disputed, and Sheffield adequately investigated the details of each dispute before reporting back to the CRAs.  The Court has already rejected Sheffield's argument that it did not violate the FCRA even assuming these facts are true.  Still these facts may in some circumstances be relevant to willfulness as they might help evaluate Sheffield's "mens rea."  *See Hrebal II*, 385 F. Supp. 3d at 852.  As the Court discusses below, because Sheffield had a policy and practice that violated the FCRA, they are insufficient to create a genuine dispute as to Sheffield's willfulness in this case.

statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69; *accord Hammer v. Sam's E., Inc.*, 754 F.3d 492, 501–02 (8th Cir. 2014).  A violation based on an erroneous but objectively reasonable reading of the FCRA is not willful.  *Safeco*, 551 U.S. at 69.  To assess whether a reading is objectively reasonable, courts consider whether the reading "has a foundation in the statutory text" or whether parties have the "benefit of guidance from the courts of appeals" or federal regulatory agencies.  *Id.* at 69–70.

It is undisputed here that Sheffield had a policy of never marking a particular credit line as disputed if it received an indirect dispute through a CRA even if the dispute was bona fide or potentially meritorious unless someone explicitly disputed the compliance code.  Two Sheffield employees—Justin Grimes and Brandon White—testified that this was Sheffield's policy.  One of these employees—Grimes—was a designated Sheffield corporate representative and managed Sheffield's credit dispute department.  Because furnishers have a duty to note the existence of a bona fide or potentially meritorious dispute, this policy violated the FCRA.

Sheffield's policy, based on its interpretation of § 1681s-2 as only requiring technical accuracy, has no foundation in the statutory text.  As discussed above, the plain language of the § 1681s-2 requires completeness.  This requirement is consistent with the FCRA's purpose laid out in § 1681.  Nothing in the statute supports Sheffield's interpretation.  Although Sheffield did not have guidance from the Eighth Circuit, no court

of appeals to consider this issue has accepted an interpretation consistent with Sheffield's policy. Before Sheffield's actions here, five circuits had rejected Sheffield's interpretation. This is evidence of willfulness. *See Hrebal I*, 598 B.R. at 272. Thus, Sheffield's interpretation was objectively unreasonable.

Sheffield's actions also ran a substantially great risk of violating the law that should have been known. As an objectively unreasonable interpretation of the statute and the numerous court decisions rejecting its interpretation, it should have been clear to Sheffield that it was violating the law.[19] Blanket policies of refusing to report accounts as disputed can demonstrate willfulness because, by their nature, they guarantee that a company violates the FCRA no matter the individual circumstances. *Seamans*, 744 F.3d at 868–69; *Saunders*, 526 F.3d at 150–51; *Hrebal I*, 598 B.R. at 271; *Van Veen v. Equifax Info.*, 844 F. Supp. 2d 599, 610 (E.D. Pa. 2012). This is so even if the furnisher did not "put" the person in the situation as Sheffield claims it did not do so here. *See Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 620 (6th Cir. 2012). Put another way, Sheffield's policy meant there was not just a substantial risk, but a near certainty that it would violate the law whenever posed with a problem similar to Sherman's unless an employee violated Sheffield's policy.

---

[19] Indeed, BB&T—a member of the same corporate family as Sheffield—was the defendant in *Saunders*, 526 F.3d 142, one of the cases where a court of appeals rejected Sheffield's interpretation.

As the parties agree, willfulness is generally a question of fact for a jury.  *See Hrebal II*, 385 F. Supp. 3d at 851.  There are, however, no undisputed facts for a jury to resolve here.  It is undisputed Sheffield had a policy of refusing to mark accounts as disputed.  This policy violated FCRA as a matter of law and was based on an objectively unreasonable interpretation of the statute.  And Sheffield acted in accordance with this policy here.[20]  Therefore, Sherman is entitled to judgment as a matter of law that Sheffield willfully violated FCRA, and § 1681n damages are available.[21]

## CONCLUSION

When furnishers report information to a CRA, FCRA does not permit them to omit material information that renders the report incomplete or inaccurate.  Therefore, furnishers have a duty to report a consumer's bona fide or potentially meritorious dispute if the failure to do so would be materially misleading.  The undisputed facts here establish that Sheffield violated this duty to Sherman on three of his disputes.  Moreover, although FCRA bars Sheffield from omitting material information, it had a policy of doing so that was based on an objectively unreasonable interpretation of the FCRA that it applied to

---

[20] Because the only thing differentiating the first three disputes Sherman filed himself with the three Duffy filed on Sherman's behalf is a question of whether the information was sufficient to place Sheffield on notice, if a jury concludes that Sheffield had sufficient information such that its duties attached, Sheffield would also be liable for willful violations for these disputes.

[21] The Court notes that, although it is rare for a court to grant an FCRA plaintiff summary judgment on the issue of willfulness, it is not unheard of.  *See, e.g.*, *Marchisio v. Carrington Mortg. Servs.*, LLC, 919 F.3d 1288, 1303–04 (11th Cir. 2019); *Myers v. Am. Educ. Servs.*, No. 18-144, 2021 WL 4381315, at *2, 5–6 (S.D. Ohio Sept. 24, 2021).

Sherman's disputes.  As such, Sheffield willfully violated the FCRA as a matter of law. Although there are many disputes of law on these issues, there are no genuine factual disputes for a jury to resolve on most issues.  Therefore, the Court will deny Sheffield's Motion for Summary Judgment and grant Sherman's Motion for Summary Judgment as to liability for the three indirect Duffy Disputes.

There remains, however, some genuine disputes of material fact that cannot be resolved at this stage.  First, although the undisputed facts support much of Sherman's claims as to his first three disputes he filed through Equifax, a reasonable jury could find that the ACDVs for these disputes provided insufficient information for Sheffield to evaluate the dispute.  So, a jury is necessary to determine whether Sheffield violated FCRA with regards to these three initial disputes.  Second, there is a dispute as to Sherman's actual damages.  Therefore, a jury must decide whether to award Sherman actual damages and, if so, the amount of damages.  Finally, as punitive damages are available under § 1681n(a)(2), a trial is also necessary to resolve whether to award punitive damages and, if so, the amount of those damages.  These issues cannot be resolved at the summary judgment stage, though the Court has winnowed down the issues as this case proceeds towards trial.   The Court will therefore grant in part and deny in part Sherman's Motion.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Docket No. 44] is **DENIED**; and

2. Plaintiff's Motion for Summary Judgment [Docket No. 49] is **GRANTED in part** and **DENIED in part** as follows:

   a. The Motion is **DENIED** as to Defendant's liability for alleged violations arising out of the disputes Plaintiff filed with Equifax on January 17, 22, and 29, 2020;

   b. The Motion is **GRANTED** as to Defendant's liability for alleged violations arising out of the disputes Plaintiff filed with Equifax, Experian, and TransUnion through his attorney in February 2020; and

   c. The Motion is **GRANTED** as to Defendant's liability for willfully violating 15 U.S.C. § 1681s-2(b) under 15 U.S.C. § 1681n.

DATED:  September 14, 2022
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
United States District Judge