```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3                                   )
     Jesse G. Sherman,               )   File No. 20CV1764
 4                                   )        (JRT/LIB)
             Plaintiff,              )
 5                                   )
     vs.                             )   Minneapolis, Minnesota
 6                                   )   March 24, 2022
     Sheffield Financial, LLC,       )   3:44 P.M.
 7                                   )
             Defendant.              )
 8                                   )
     ------------------------------------------------------------
 9
          BEFORE THE HONORABLE CHIEF JUDGE JOHN R. TUNHEIM
10                  UNITED STATES DISTRICT COURT
                  (MOTIONS HEARING VIA VIDEO CONFERENCE)
11
     APPEARANCES
12     For the Plaintiff:          Gonko & Vavreck, PLLC
                                   MARK L. VAVRECK, ESQ.
13                                 401 North Third Street
                                   Suite 640
14                                 Minneapolis, MN 55401

15     For the Defendant:          Kutak Rock LLP
                                   ANDREW R. SHEDLOCK, ESQ.
16                                 60 South Sixth Street
                                   Suite 3400
17                                 Minneapolis, MN 55402

18     Court Reporter:            KRISTINE MOUSSEAU, CRR-RPR
                                  300 South Fourth Street
19                                P.O. Box 1005
                                  Minneapolis, MN 55415
20

21

22
          Proceedings recorded by mechanical stenography;
23   transcript produced by computer.

24

25
```

 1                          **(3:44 P.M.)**

 2

 3              **(In open court via video conference.)**

 4              THE COURT:  Good afternoon, everyone.  This is

 5      Civil Case Number 20-1764, Jesse Sherman versus Sheffield

 6      Financial.

 7              Counsel, would you note appearances?  First for

 8      the plaintiff, please.

 9              MR. VAVRECK:  Good afternoon, Your Honor.  Mark

10      Vavreck on behalf of the Plaintiff Jesse Sherman.

11              THE COURT:  Good afternoon, Mr. Vavreck.

12              And how about for the defendant?

13              MR. SHEDLOCK:  Good afternoon, Your Honor.

14      Andrew Shedlock from Kutak Rock on behalf of Defendant

15      Sheffield Financial.

16              THE COURT:  All right.  Good afternoon,

17      Mr. Shedlock.  We're having a little bit of trouble with

18      your voice coming through, but we'll see once we get to the

19      motions here.

20              MR. SHEDLOCK:  Sure.

21              THE COURT:  All right.  The Court has read the

22      briefs.  We have motions for summary judgment filed by each

23      side.  It does not matter to the Court who goes first.  I

24      will note defendant filed a motion first.

25              Does it matter to each side?

1          MR. SHEDLOCK:  It doesn't, Your Honor.  We

2    discussed it.  Mr. Vavreck and I discussed it, and we're

3    not set either way, but I'm fine going first if that's okay

4    with Mr. Vavreck and Your Honor.

5          THE COURT:  All right.  That's fine.  Since it's

6    cross motions, I'll give you both a chance to respond.

7          So go ahead, Mr. Shedlock.

8          MR. SHEDLOCK:  Thank you, Your Honor.

9          This Court should recognize that in opposing

10   Sheffield's motion for summary judgment, Mr. Sherman is

11   simply seeking to create factual disputes about

12   investigations and Sheffield's actions where no factual

13   disputes exist.

14          Here are the pertinent facts for Your Honor's

15   consideration:  Mr. Sherman missed two consecutive payments

16   on his account.  Those are two consecutive monthly payments

17   that he missed.

18          A joint account holder, Ms. Amy Sherman, who

19   never informed Sheffield in any manner that this account

20   was somehow Mr. Jesse Sherman's, rather than hers, filed

21   for bankruptcy.  No one, not Amy Sherman, not Jesse Sherman

22   nor anyone else ever called Sheffield within 60 days of the

23   bankruptcy filing to indicate that either Amy Sherman or

24   Mr. Jesse Sherman, the plaintiff in this case, would make

25   payments on the account.

1         Therefore, following proper reasonable procedures

2    Sheffield charged off the account.  There are two and only

3    two people responsible for Mr. Sherman's credit drop.  His

4    ex-wife Amy, who filed bankruptcy without telling

5    Mr. Sherman, and of course, Mr. Sherman himself, who

6    unquestionably missed two consecutive monthly payments and

7    now seeks to shift blame for those missed payments, hence

8    the charge-off, to Sheffield.

9         Sheffield did not miss the payments.  Mr. Sherman

10   did.  Sheffield did not file for bankruptcy.  Ms. Amy

11   Sherman did.  I won't recite the facts verbatim, Your

12   Honor, but I think it's important to recognize the

13   following for purposes of what happened in this case.

14        First, in about 2016 I believe, if I remember

15   correctly, Ms. Sherman and Mr. Sherman, who is the

16   plaintiff in this case, cosigned on a loan and became joint

17   account holders with Sheffield to own and operate a Polaris

18   Ranger.  There is no question that this debt and this

19   account is both their debt (unintelligible due to audio

20   malfunction.)

21        COURT REPORTER:  Mr. Shedlock, I cannot

22   understand you.  You sound distorted.

23        COURTROOM DEPUTY:  Sir, you need to slow down and

24   speak more slowly so our court reporter can catch every

25   word.

```
 1                 MR. SHEDLOCK:  Sure.  My apologies.

 2                 THE COURT:  You're a little bit distorted, so

 3      just I think it will work if you just slow down a little

 4      bit.  That's fine.

 5                 MR. SHEDLOCK:  Thank you.

 6                 So in 2016, the Shermans signed for this account,

 7      and they both acquired the debt.  In early February 2018,

 8      Mr. Sherman and Ms. Sherman became divorced.  Following

 9      that divorce, Mr. Sherman, the plaintiff in this case, took

10      no action to remove his ex-wife from the account.

11                 Now, remember.  They are both co-signers on the

12      account.  They are both joint account holders.  He took no

13      action whatsoever to refinance the loan, no action to

14      inquire on how to remove her from the loan and no action to

15      remove her from the account for well over a year.

16                 Unfortunately without telling Mr. Sherman, in

17      September 2019, Ms. Sherman filed for bankruptcy.

18      Following the advice of her bankruptcy attorney, she listed

19      the Polaris Ranger as an asset on which she owed money.

20                 Now the bankruptcy filing made clear what the

21      divorce decree made clear, namely that Ms. Sherman had no

22      interest or no possession of the Polaris Ranger.  That fact

23      is not in dispute.  However, there is no connection that

24      she was still liable for the account.  She was still listed

25      on the account, and she is still liable for the debt.
```

 1          Now, when Sheffield Financial received notice of

 2     Ms. Sherman's bankruptcy in September of 2019, it did the

 3     only thing it had to do.  It immediately cut auto payments

 4     from the account so as to not violate the automatic stay,

 5     because remember.  This is still Ms. Sherman's debt.

 6          It ceased communicating with the borrowers

 7     because it did not want to violate the automatic stay.

 8     Following reasonable procedures that Mr. Sherman does not

 9     challenge because he does not cite any case law to this,

10     following 30 days -- following two consecutive month missed

11     payments and no indication that the account would be paid

12     for in 30 days, Sheffield charged off the account.  Now

13     those facts are not in dispute.  There is simply no dispute

14     about those facts.

15          What is in dispute is what happened next.  Now,

16     Ms. Sherman did not tell Mr. Sherman that she was filing

17     for bankruptcy.  However, at his deposition, Mr. Sherman

18     admitted that he still is liable and still had to make

19     payments on the account regardless of whether the auto

20     payments were cut off or not.

21          The auto payments are a convenience feature for

22     borrowers.  They're not a contractual obligation.  They are

23     not a promise.  Mr. Sherman in his motion papers, both for

24     and opposing summary judgment, has not cited a single case

25     or other controlling statute that requires Sheffield to

1    deliver notice that payments were cut off.  Same for

2    statements.  There is no obligation to send statements to a

3    borrower.  The borrower remains liable for that debt.

4           What happens next is that after Mr. Sherman

5    discovers that his auto payments have been turned off and

6    after he misses two consecutive monthly payments, he

7    contacts Sheffield and pays off the account.  Now what

8    does -- he pays off the account eventually.

9           To demonstrate Sheffield's accurate reporting,

10   what does Sheffield do?  Once Mr. Sherman has paid off the

11   account, the account is re-coded from charge-off to

12   charge-off paid in full.

13          This is important, Your Honor, because that

14   notation going from charge-off to charge-off paid in full

15   raises his credit score by 30 points, as Mr. Sherman

16   admitted in his deposition.

17          What this dispute comes down to from plaintiff's

18   perspective is whether or not Sheffield Financial was

19   required to make a technical marking on each of the ACDVs

20   or AUDs that it received from the credit reporting

21   agencies, from the CRAs.

22          Now, we're going to have a lot of discussion

23   about the codes XC, XP and XH in this case.  I want to be

24   clear, Your Honor, that the only thing that either party

25   cited in the Eighth Circuit that speaks to whether or not a

1   furnisher is obligated to mark an account as disputed is

2   the *Hrebal II* and *II* cases.  I apologize if I am

3   mispronouncing that, but *Hrebal I* was a summary judgment

4   denial and then following that motion for reconsideration.

5            *Hrebal II* was of the grant of summary judgment

6   finding that based on the specific facts of that case that

7   that furnisher was required to mark the account as

8   disputed.

9            Now, in *Hrebal II*, the Court did not note what

10   exactly the furnisher -- in that case I believe it was

11   Mr. Cooper -- should have marked the account, whether XB,

12   XC or XH.  Each code is important, Your Honor.

13            So the code XB is defined to be used after a

14   consumer disputes the reporting from the furnisher but the

15   furnisher has not yet completed its investigation.  Now

16   when XB is indicated on an ACDV and AUD, it causes credit

17   scoring systems, like the industry standard FICO and

18   Vantage Score Systems, to ignore the disputed entry in the

19   scorer's scoring model payment history and debt related

20   matrix.

21            Now, there are two other codes that furnishers

22   can mark, XH and XC.  They're slightly different, but for

23   purposes of this motion, they're the same because the

24   furnisher in that case has completed its investigation, and

25   the consumer either disagrees with the outcome of the

1    investigation or the furnisher is not aware of the

2    consumer's disagreement of the investigation.

3            However, when XH and XC appear on the credit

4    report of the consumer, the default and payment history of

5    the account will be considered when calculating the credit

6    score.  So in short, it doesn't matter if XH or XC are

7    marked because the consumer's credit score is still going

8    to be dinged.  It's still going to be lowered, and the

9    credit will suffer.

10           That's important in this case because the facts

11    establish that Mr. Sherman filed about six, and I know

12    Mr. Sherman alleges he filed six or seven, but the point is

13    not material at this time.  But he filed six or seven AUDs

14    with various credit bureaus, Equifax, TransUnion and the

15    like.

16           I go through in our brief exactly what Sheffield

17    did in response to each of those ACDVs.  It investigated

18    them properly.  It confirmed information.  It did more than

19    match information.  It made sure that the information was

20    accurate.

21           Mr. White, who handled I believe three or four of

22    the ACDVs, testified that his job was not just to match

23    information but to make sure that the information was

24    accurate.  And how do we know that he actually made sure

25    that the information was accurate?

1          Well, we have his testimony, as laid out in our

2     brief, that he noticed that one of the payment history

3     dates was incorrect, and he changed that.

4          Now, the consumer compliance condition code,

5     which is at the heart of this dispute, was never marked by

6     the CRA in this matter, and it was never indicated that

7     Mr. Sherman was alleging that there was some sort of

8     wrongful marking of the compliance condition code here.

9          So that comes down to the fact of this:  The

10    compliance condition code XB should have never been used in

11    this case because, first, Sheffield never received a direct

12    dispute from Mr. Sherman.  I know Mr. Sherman disputes

13    that.

14         But the testimony of Justin Grimes, who is the

15    corporate representative of Sheffield, is clear that there

16    was one address to which consumers send direct disputes,

17    and Mr. Sherman did not send a direct dispute to that

18    address.  So there was no direct dispute received by

19    Sheffield.

20         Mr. Sherman only sent a series of indirect

21    disputes.  Each time Sheffield received those disputes,

22    conducted a reasonable investigation, reviewed the

23    information in its files and correctly and accurately

24    confirmed that, yes, Mr. Sherman had missed two consecutive

25    monthly payments.  There is no dispute about that fact.  He

1  missed those payments.

2  THE COURT:  Does the organization ever redirect

3  an indirect dispute that's made to a direct dispute office

4  in order to make sure it's properly handled?

5  MR. SHEDLOCK:  Not that I'm aware of, Your Honor.

6  I know that in this case that the evidence in the record

7  shows that Mr. Sherman did not send a direct dispute to the

8  correct address per Sheffield's guidelines, and I know that

9  the record shows that Mr. Sherman called and asked for

10  their direct dispute address, and he was given that.

11  I believe that Mr. Sherman's attorney sent what

12  he considers to be the direct dispute to the wrong address.

13  So what happened here is when considering these six or

14  seven indirect disputes, Sheffield confirmed that the

15  information was accurate.

16  It completed its investigation and returned the

17  ACDVs or AUDs to the credit bureaus.  It did not need to

18  mark XB because, remember, XB means that there is an

19  investigation ongoing.  Once Sheffield had completed its

20  investigation, there was no need or reason to mark XB, nor

21  was there a reason for Sheffield to mark the ACDVs with the

22  codes XH or XC.

23  And I will posit that, again, *Hrebal* is the only

24  case in the Eighth Circuit that I believe that the parties

25  briefed that even touch on these dispute codes, but

1    Sheffield's position is that Mr. Sherman's dispute was

2    neither bona fide nor meritorious; therefore, Sheffield was

3    not required to mark the consumer compliance condition code

4    with either XH or XC.

5            Now clearly Mr. Sherman disagreed with the

6    results of Sheffield's investigation.  However, under

7    *Hrebal,* which is not necessarily binding in the Eighth

8    Circuit, Judge Nelson held that only bona fide and

9    meritorious disputes may be marked with these compliance

10   condition codes.

11           So why didn't Sheffield mark the compliance

12   condition code XH and XC?  The first reason is because it

13   was neither bona fide nor meritorious.  Mr. Sherman missed

14   these payments, and his account was properly charged out.

15   Mr. Sherman cannot dispute he missed these payments.  He

16   certainly disputes the reason why he missed the payments,

17   but missing payments is 100 percent accurate in this case.

18           Now, in terms of the charge-off, the account was

19   charged off after two consecutive missed payments and no

20   indication by either borrower that it would be paid.

21   That's a reasonable procedure under Sheffield's policies

22   and procedures that Mr. Sherman does not challenge.

23           All that Mr. Sherman does is indicate that under

24   a blog from Equifax dated to 2019, most charge-offs occur

25   in 180 days.  I posit, Your Honor, that that cannot create

1    a fact issue on whether or not Sheffield's procedures were

2    reasonable.

3            So that leaves why didn't Sheffield code XH or XC

4    on the CCC line for another reason.  It's because there was

5    no direct dispute received, and this is also a reason not

6    only for why Sheffield shouldn't be liable but also because

7    why its action are not willful.

8            I don't need to read our brief into the record,

9    but I would direct the Court's attention to page 32 and 33

10   of our memorandum of law in support of motion for summary

11   judgment, the section being:  We break down the statute,

12   and under a very reasonable interpretation of the statute,

13   we cite exactly why under the provision of the FCRA,

14   Sheffield is the person and the consumer, Sherman, would

15   need to provide notice of a dispute directly to Sheffield

16   in order for one of those compliance condition codes to be

17   activated there.

18           And other courts have agreed with this.  The case

19   of *Collins v. BAC Home Loan Servicing*, 912 F.Supp.2d 997,

20   it's a district of Colorado case, 2012, held that a

21   furnisher has an affirmative duty to report a debt is

22   disputed only when the consumer disputes the debt directly

23   with the furnisher.

24           In that case in the *Collins v. BAC* case, that

25   court held that that is not the case here where plaintiff

1    disputed the account with Equifax, not defendant.  Now

2    those facts parallel ours here, that Mr. Sherman disputed

3    with the CRAs, not us.

4         Then finally, the *Collins* court held, plaintiff

5    has not shown that failing to mark the account as disputed

6    was materially misleading in the context of that case, and

7    I posit, Your Honor, that Sheffield has no liability for

8    the same reasons.

9         There simply is nothing materially misleading

10   about accurately reporting that Mr. Sherman missed two

11   payments and that because the account was in bankruptcy

12   that the charge-off occurred after 30 days.  Mr. Sherman

13   does not cite anything in the record other than an Equifax

14   blog post showing that that was unreasonable.

15        THE COURT:  Is it possible in your view,

16   Mr. Shedlock, to not violate the statute by failing to put

17   a correct code into the credit reporting agency report, so

18   doing everything right there but still being materially

19   misleading and violate FCRA and cause damages to a party?

20        MR. SHEDLOCK:  Your Honor, I believe that might

21   fall more into the negligence aspect of a case like this

22   where Sheffield I guess could have done more but certainly

23   wasn't trying to harm a consumer.

24        In that case, I believe that Mr. Sherman would

25   only be entitled to his actual damages, which we discussed

1    in our brief are in our view nothing.

2              THE COURT:  But the case law shows that is

3    theoretically possible.  I mean, obviously if the facts fit

4    the situation where you're not obligated to place any code

5    or any limitation in the credit report, but by so doing,

6    you caused some level of damage by being materially

7    misleading.

8              That's possible under the case law, correct?

9              MR. SHEDLOCK:  That is, Your Honor.  Under *Hrebal*

10   *II*, I believe Judge Nelson made clear that a furnisher may

11   be liable for that.  If information is materially

12   misleading, yes, then a furnisher could be liable for that.

13             Obviously our position is that none of the

14   information that Sheffield published with CRAs is

15   materially misleading because it's not only technically

16   accurate but actually accurate.  I won't take much more of

17   the time, Your Honor, except to say that I do think that

18   the damages Mr. Sherman had were unsupported.

19             He cites a few affidavits from his current

20   girlfriend, his ex-wife and a coworker.  We were not

21   provided with these affidavits at any point during

22   discovery, so we never had a chance to depose those

23   affiants about the information they put in their affidavit.

24             I don't believe that that's the purpose of

25   summary judgment, to hold information until the end.

1          THE COURT:  But you were aware of those people as

2     potential witnesses, weren't you?

3          MR. SHEDLOCK:  We were, Your Honor, yes.

4          THE COURT:  So in theory, you could have, had you

5     chosen to do so, deposed them to find out what they were

6     going to say?

7          MR. SHEDLOCK:  Yes, Your Honor.  I understand

8     that.  I just wanted to be clear that we weren't provided

9     the affidavits, but, yes, they were disclosed as witnesses.

10    Mr. Sherman discussed them at his deposition.  That's

11    correct, Your Honor.

12         THE COURT:  Okay.

13         MR. SHEDLOCK:  In terms of damages, Your Honor

14    had a case, the *Dao* case, and I apologize if I am

15    misunderstanding that, where I think this case should come

16    out.  You know, Mr. Sherman was able to obtain all the

17    credit he needed.  He had a text message that we put in the

18    record where after his ex-wife filed her bankruptcy, he

19    basically said something to the effect of, it's no big

20    deal.  I'm not planning on buying anything anytime soon

21    anyway.

22         So I think that's very strong evidence, Your

23    Honor, that he has no damages because he admits before

24    litigation, before lawyers got involved, that he wasn't

25    planning on buying anything.

1        So, of course, it's his right to go off and try

2   to refinance a home and try and get a new car loan.  I'm

3   not sure if he was told to do that or if he did that of his

4   own volition.  Doesn't really matter for the purposes of

5   this case, but he testified he was able to obtain a car

6   loan at market rate.

7        He was able to obtain -- refinance the mortgage,

8   I believe, at a 2.75 percent rate.  I didn't see any

9   letters in the record that indicate that because of how

10  Sheffield reported this he was denied credit or anything

11  like that.

12       He has no doctor records that he has emotional

13  injury or embarrassment or anxiety.  So I do believe that

14  this case is very similar to the *Dao* case where Your Honor

15  found no damages.

16       Finally, and this will be the last thing I say in

17  terms of my time moving here, the Duffy letter, which is

18  what Mr. Sherman will argue is the direct dispute to

19  Sheffield, it is inaccurate.  It is incorrect.

20       Mr. Duffy was the attorney that Mr. Sherman

21  retained.  He is not affiliated with Mr. Lyons or

22  Mr. Vavreck, his current counsel.  I don't think that FCRA

23  and credit issues were his specialty, but Mr. Sherman paid

24  him money to try and clean this up.

25       The Duffy letter basically says Mr. Sherman has

1    never missed a payment.  His ex-wife filed bankruptcy.

2    Here is all the divorce decree where Mr. Sherman gets the

3    vehicle, things like that.  Clearly that's incorrect, Your

4    Honor.  Mr. Sherman did not make all his payments.  He

5    missed two payments.

6            And so the direct dispute that Mr. Sherman claims

7    he sent to Sheffield would be incorrect because it does not

8    accurately portray that Mr. Sherman missed two payments.

9    So with that, Your Honor, I will defer to you and

10   Mr. Vavreck.

11           THE COURT:  All right.  Thank you, Mr. Shedlock,

12   for your argument.

13           Mr. Vavreck?

14           MR. VAVRECK:  Thank you, Your Honor.  So, Your

15   Honor, the plaintiff is before you today on a Fair Credit

16   Reporting Act claim, and there is two bases for that claim.

17   It's 1681(s)(2)(B).  So plaintiff wants to be clear about

18   that because plaintiff only triggers 1681(s)(2)(B) by

19   reaching out to the credit reporting agencies.

20           That's an indirect dispute.  When he sends those

21   disputes to Equifax, TransUnion and Experian, they digitize

22   it and then send it in this case to Sheffield.  So in this

23   case, there is not six or seven of those.  There are six of

24   those.  There are three in January.  There are three in

25   February.

1          Now, there is a direct letter that was sent by

2     the law firm on Mr. Sherman's behalf directly to the

3     defendant in this case.  However, there is no private right

4     of action for that, and so plaintiff doesn't want to

5     confuse this subject matter with that dispute letter.  We

6     will talk briefly about that later.

7          So regarding these indirect disputes, all the

8     case law and the different circuits that have come across

9     this have all consistently ruled the same, and those

10    circuits are the Third, the Fourth, the Fifth, the Sixth,

11    the Ninth and the Tenth, two of which were also mentioned

12    in Judge Nelson's case *Hrebal*.  It is actually pronounced

13    *Hrebal*.  That was one of my clients.

14         In that case *Saunders* was the case and *Siemens*

15    was the case that those turned on.  Now, the point about

16    whether or not a dispute code is important, it very much so

17    is.  Whether it's HC, which is the investigated but the

18    plaintiff disputes, or if it's XH, which is there has been

19    subsequent investigations but the plaintiff still disputes,

20    or whether it's XB, which would be that the furnisher is

21    currently investigating and the consumer disputes.

22         Now, you know, the defendant would like to

23    believe that, you know, it doesn't matter if it's marked

24    disputed, but of course it does, and case law turns on that

25    point because whether or not it's materially misleading

1   impression is left, that is what the duty of a furnisher

2   must have.  Case law has been consistent on this throughout

3   all of the circuits.

4        So one of the things that's very important here,

5   Your Honor, is that through the deposition of Mr. Grimes

6   what we have learned is, there is a policy from defendant.

7   This isn't negligence.  This isn't somebody who went rogue

8   and didn't follow some policy that they had.

9        In fact, according to the defendant, their policy

10  is when they receive an indirect dispute -- remember that's

11  going to the credit reporting agencies and then back down

12  to them.  When they receive one of those indirect disputes,

13  they never change the code.  Never change the code.

14        Now it's important in this case, there was a

15  direct dispute that was sent.  It was also sent on February

16  20th when other indirect disputes were sent.  You know, we

17  have e-mails from the parent company where this is kicking

18  around back and forth, and it doesn't end up where it's

19  supposed to go.

20        Was there a direct dispute?  It certainly looks

21  as much.  I guess we could say there are six or seven

22  disputes.  Nonetheless, we know for a fact that there are

23  six indirect disputes, only one of which would have been

24  enough to have a duty if in fact there is a dispute that's

25  bona fide with merit.

1          And I think that's where the Court should really

2    go next.  Well, let's talk about these disputes.  Did they

3    have merit?  Is this somebody who is just hiring a credit

4    reporting agency who blanket throws disputes on everything?

5    That's not what happened here.

6          What we have here, Your Honor, is -- well, before

7    we get to *Hrebal*, I would like to talk about one other case

8    that was mentioned.  It's called *Horton*.  The *Horton* case

9    is what defendant uses to basically state that there is no

10   duty regarding an indirect dispute, but that's not exactly

11   how *Horton* moves.

12          *Horton* actually cited *Siemens*, which is the Third

13   Circuit case out of 2018, which basically states just the

14   opposite.  In *Siemens,* it states the furnishers must mark

15   accounts disputed when alerted to consumer's potentially

16   meritorious claim.  It couldn't be said without more

17   certainty.

18          In *Hrebal II*, the Court granted summary judgment

19   because the furnishers were liable for failing to mark an

20   account as disputed following indirect disputes.  There

21   were no direct disputes in *Hrebal*, and so that was based on

22   indirect disputes.

23          In that case, Judge Nelson cited *Saunders*.

24   That's the Fourth Circuit case out of 2008.  In that case,

25   the furnisher was liable for not marking disputed following

1    one single incident.  That was sufficient.

2              Also in *Hrebal*, Judge Nelson also cited *Boggio*

3    *versus USAA*.  That's the Sixth Circuit case that happened

4    in 2012.  In that case, there were three indirect disputes.

5    Now, very important on this is whether or not something

6    could be technically correct and yet still be considered

7    inaccurate.

8              And the fact is, again, consistent with *Hrebal,*

9    consistent with all these other appellate cases, is that,

10   yes, it can be inaccurate through omission if it creates a

11   materially misleading impression.  Again, this is *Siemens*

12   who is citing *Saunders* who was in that case.

13             Now, we would like to also have the Court take

14   notice of a nonappellate case, *Wood v. Credit One*.  It's in

15   the Eastern District of Virginia.  It's a 2017 District

16   Court case, but in that case, it went one step further to

17   even cite that to continually report a dispute as resolved

18   when the consumer continues to dispute the validity is

19   itself materially misleading.

20             And we think that does speak for itself, and

21   that's very similar to what we have here.  Where I would

22   like to take us, Your Honor, briefly is just to compare the

23   case.  You know, we talked about the cases across the

24   nation.

25             I sent Your Honor an e-mail prior to this earlier

1       today which had a case that had just come to our attention.

2       That case is *Hauge v. Amerihome Mortgage Company*.  It's a

3       District Court case out of Massachusetts, and the reason,

4       Your Honor, that we wanted to bring that to the Court's

5       attention is because as far as we know, this is the most

6       recent case in the nation that's actually ruled on this

7       issue.

8               Now, also interesting, this comes out of

9       Massachusetts which is, as we all know, the first appellate

10      circuit.  They haven't, as the Eighth Circuit has not,

11      ruled on this, but this case was a summary judgment order,

12      and the defendants moved for summary judgment, and that was

13      denied.

14              And they denied that case based on *Llewellyn*,

15      which we also cite in our brief.  That's the Tenth Circuit

16      case that was in 2013, and basically how that court ruled

17      was, you know, in the *Hauge* case, the plaintiff tried to

18      make payments, and they messed up one of the account

19      numbers.

20              And they made some payments with the wrong

21      account number; and then they made three payments with the

22      wrong account number, and those payments were denied.

23      That's it, and so because -- now in that case, you know,

24      they missed those payments, just like in this case, you

25      know.

1           Were there two payments missed?  Yes, there were

2     two payments missed, but in that case because they had

3     accepted payments beforehand with the wrong account number,

4     the Court ruled that the plaintiff's omission of a single

5     digit in a ten-digit account number has no bearing on the

6     plaintiff's financial responsibility.

7           And in fact, the Court found that the defendant's

8     reporting that the plaintiff's payments were late without

9     explanation could have been expected to have an adverse

10    effect, and whether that omission rises to that level is a

11    jury question, and so summary judgment was denied in that

12    case.

13          Now, I would like to focus on the *Hrebal* case,

14    *Hrebal I* and *II*, so we have been able to -- this is a 2019

15    case.  So ultimately, you know, we didn't have some of

16    these other cases that we quoted in our briefs, but

17    nonetheless, I think it is very important again, and I'll

18    do this briefly for the Court.

19          But in the *Hrebal* case what happened was, is that

20    there were two missed payments prior to a filing of

21    bankruptcy, and then the two payments that were made by

22    Hrebal prior to the bankruptcy, the mortgage company,

23    Mr. -- or servicing company, Mr. Cooper, returned those.

24          So arguably Hrebal was actually behind four

25    payments.  Now he filed bankruptcy, and Cooper only

1    requested two of those payments be part of the confirmation

2    plan.  That plan went on for five years.  Hrebal paid all

3    of those payments, and then at the very end that is when

4    Cooper who then dinged his credit and said you still owe us

5    two payments.

6         Ultimately what happened out of that is, Hrebal

7    disputed that indirectly through the credit reporting

8    agencies.  He was never provided notice by Cooper that he

9    was behind.  At no time did Cooper ever tell the Court,

10   file a motion to amend the plan.

11        And ultimately what ended up happening is, Judge

12   Nelson ruled that the reporting gave an impression that

13   Hrebal fell behind on his mortgage, even though he made

14   five years of mortgage payments consistently, and any

15   delinquency that was in Hrebal's account stemmed more from

16   the internal confusion on his mortgage servicer's part than

17   from financial responsibility on Hrebal's part.

18        And that is what this case turns on as well, Your

19   Honor.  If we compare that to the case before the Court,

20   the Plaintiff Sherman in this case, he's got a great job.

21   The first thing he did when he opened this account, he set

22   up automatic payment, and he has been making all those

23   payments for well over a year.

24        Unlike *Hrebal*, the plaintiff in this case has

25   never filed bankruptcy.  The plaintiff in this case, Your

1    Honor, has perfect credit.  He has never missed a payment.

2    That is not true.  He has missed two payments, only two

3    payments, and that's it.

4          Why did he miss those payments?  Does it matter?

5    Well, it certainly does.  Your Honor, you know the second

6    half of the story but no potential credit lender would.

7    The only way for them to potentially even know the back

8    story is by having this account marked as disputed.

9          I think it's also important to show exactly what

10   happened when the plaintiff did find out because again

11   there was no notice.  This automatic payment was just

12   arbitrarily shut off.  No information was provided at all

13   to the plaintiff.  There was multiple occasions when that

14   could have happened.

15         Plaintiff actually had called in once or twice to

16   the defendant, and nothing was provided at those times,

17   either.  When he did find out, the first thing he did was

18   pay the two payments, as well as the payment for that

19   current month.  He brought everything current.  Then the

20   very next month he paid off the entire account.

21         So again on this perfect credit, we have two

22   missed payments.  Does it materially misrepresent or give a

23   misrepresentative impression as to Mr. Sherman's financial

24   irresponsibility that he missed those payments, and the

25   plaintiff believes that, no, that is -- it's not correct

1    for that to happen.  The fact that this may be arguably

2    accurate, it certainly is not the complete picture.

3    Defendant's reporting projected an image of plaintiff as an

4    untrustworthy deadbeat.

5            Regarding the damages, Your Honor, there is case

6    law, and we refer to our briefs, that emotional distress,

7    the Eighth Circuit in *Taylor* said that emotional distress

8    could be the only basis for potential actual damages.  Your

9    Honor is correct that of the three witnesses that were

10   conveyed, were conveyed in the initial disclosures as well

11   as in the depositions.  Not certain why they weren't

12   deposed, but nonetheless that is the case.

13           Your Honor, we're not moving for an award of

14   damages at this point.  We want to leave that to a jury,

15   but we do think there is enough facts in front of the Court

16   right now to be able to move as to whether or not punitive

17   damages should apply.  It's not something that the parties

18   disagree on.

19           It's defendant's own words that this is not

20   negligence.  This is not somebody who did something that

21   they weren't supposed to do.  This was six opportunities of

22   a couple different individual agents who did exactly as

23   they were trained to do, nothing.

24           They did not use any dispute code at all, and the

25   reason they decided to do that, Your Honor, nobody

1    testified in their depositions that it was based on the

2    fact that bona fide or merit, neither.  Nobody testified to

3    that.

4         The reason they testified to it is because they

5    said it was indirect.  They were never going to change it.

6    That's a policy, and that policy, Your Honor, could be

7    expected to have an adverse effect, and in fact, it did.

8    Had Mr. Sherman not been the recipient of this, it could be

9    somebody else whose credit is not perfect.

10        It could be somebody else who although they have

11   some bad other payments that are on their account somehow

12   couldn't represent this claim as good as Mr. Sherman can.

13   His claim is far better than Mr. Hrebal's.  Mr. Sherman did

14   not declare bankruptcy.  Mr. Sherman was responsible in all

15   of his financial transactions with the defendant.  It was

16   defendant that changed those terms.

17        Proper, reasonable procedures, that's how

18   opposing counsel talked to us about Sheffield's policies.

19   Are they proper and reasonable?  It's plaintiff's position

20   that they're not.  It's the plaintiff's position that

21   similar to what happened in *Hrebal*, those procedures could

22   have been expected to have an adverse effect.

23        And it doesn't take much more than common sense

24   to know that if people have automatic payments, you just

25   forget about it.  It just comes out.  That's why you do it.

1    All of a sudden if that changes and nobody tells you, what

2    is going to happen?  More likely than not exactly what

3    happened in this case is going to happen.

4            If it does, perhaps that is reasonable.  What is

5    a duty of that furnisher is if the consumer says, hey, I

6    think I got a bad shake and they send a bona fide dispute

7    indirectly that at the very least, there is a duty for the

8    furnisher to have to mark that as disputed, which at least

9    gives a more full picture that there is something else

10   here.

11           There is testimony that the plaintiff was not

12   able to obtain credit for a while.  Of course he was

13   attempting to do so.  He needs to mitigate his damages, but

14   he had to wait, and he couldn't get the vehicle that he

15   wanted.

16           All of this caused him emotional distress

17   damages, some physical manifestations of that as well,

18   which have been laid out in our brief by three different

19   individuals.  We believe that according to the Eighth

20   Circuit case of *Taylor* that that is supportive of the

21   actual damages, emotional distress that he has felt in this

22   matter.

23           THE COURT:  Did he suffer any out-of-pocket

24   expenses?

25           MR. VAVRECK:  Your Honor, he did.  He ended up

1    paying I believe $300 to the attorney that he hired to

2    write these letters initially to take care of --

3                 THE COURT:  Is that damages in this kind of

4    context, or is it separate attorneys' fees?

5                 MR. VAVRECK:  Well, in this context that was for

6    credit repair, not for this matter.  So I would say that

7    that was out-of-pocket as if he was paying a credit repair

8    company.

9                 That attorney is not part of this matter at all.

10   So I would state that that would be out-of-pocket expenses

11   that he attempted to do in order to not bring litigation.

12                THE COURT:  All right.

13                MR. VAVRECK:  I have nothing further at this

14   time, Your Honor.  I'm more than happy to answer any

15   questions from the Court.

16                THE COURT:  All right.

17                Anything else, Mr. Shedlock?

18                MR. SHEDLOCK:  Yes, briefly.  Obviously Sheffield

19   strongly opposes any finding of punitive damages here.  I

20   won't repeat, Your Honor.  It's in our brief.  Page 20 to

21   24 in our opposition to plaintiff's motion for summary

22   judgment, which is doc 56, clearly states why Sheffield

23   does not mark compliance condition codes unless they are

24   received from a direct dispute.

25                It's because under a very reasonable

1    interpretation of the pertinent statute, Sheffield's

2    interpretation of that statute is that compliance condition

3    codes are only marked upon receipt of a direct dispute.

4    So I would encourage the Court to look at 20 to

5    24 of our opposition to plaintiff's memorandum of law and

6    impose punitive damages.  Second Mr. White also testified.

7    You know, Mr. White is one of the dispute analysts who

8    handled I think three of these disputes.

9    He looks at the compliance condition code, and

10    he's trained to if the compliance condition code is called

11    out in the dispute, which it was not here.  I believe a lot

12    of these were identity and payment history disputes as they

13    were marked.

14    So the fact that opposing counsel alleges that

15    Sheffield never changes the code is not true.  If it's

16    called out, Mr. White testified that it would be changed.

17    Third, Your Honor, *Hauge v. Amerihome Mortgage*

18    case, Your Honor should disregard that.  It's not in

19    plaintiff's briefs, whether moving for summary judgment or

20    not.  You will see in the e-mail that Mr. Vavreck sent

21    today that that case was decided and issued I believe on

22    September 30th, 2021.

23    The dispositive motion briefing in this case took

24    place between November 1st, 2021, and I believe December

25    14th, 2021.  What's the reason that wasn't included until

1   it was dropped here at the last minute, Your Honor?  You

2   should strike that and not consider that because it was not

3   disclosed to me until three hours before, which puts me at

4   a disadvantage.

5          Second, bona fide or with merit is extremely

6   important in this case, because under the only Eighth

7   Circuit case that we have seen, the *Hrebal* case, that's

8   what Judge Nelson has found triggers the duty to mark XB,

9   XC or XH for any of the disputes.

10          What you don't see in Mr. Sherman's briefs are

11   any mention of any cases that say that his particular

12   dispute is bona fide or meritorious because it's not.  He

13   missed these two payments.  The account was charged off

14   because a joint account holder had filed bankruptcy.

15          He has cited no cases that Sheffield turning off

16   automatic payments was wrong.  They cite no cases that

17   stopping statements was wrong.  They cite no cases that

18   charging off after 30 days was wrong.  This is not a bona

19   fide or meritorious dispute.

20          Ms. Sherman, who filed bankruptcy, really put

21   Mr. Sherman in a bad spot, and Mr. Sherman put himself in a

22   bad spot because he didn't take his ex-wife off the loan

23   for over a year and a half.  How is any of the actions of

24   Ms. Sherman Sheffield's fault, Your Honor?

25          There is no discussion or analogy to making this

1    case a bona fide or meritorious dispute because Mr. Sherman

2    cannot prove that it is.  They're moving for summary

3    judgment on liability, Your Honor, asking the Court to

4    decide as a matter of law that Sheffield is liable because

5    it did not put XB or XH or XC on one or more of these

6    compliance condition codes.

7            But what you have before the Court, Your Honor,

8    is that even with XC and XH, your credit score is still

9    dinged, still lowered.  It makes no material difference,

10   other than that it's there, which Mr. Sherman could explain

11   to a potential creditor anyway.

12           So, you know, with that, Your Honor, I'm happy to

13   answer any questions.

14           THE COURT:  That's fine.

15           Any final word, Mr. Vavreck?

16           MR. VAVRECK:  No, Your Honor.  Thank you.

17           THE COURT:  Okay.  Thank you, Counsel.  The Court

18   will take the motions under advisement.  We will issue a

19   written order as quickly as possible, and I appreciate your

20   participating by video conference today.  We will be in

21   recess.

22           Thank you.

23           MR. SHEDLOCK:  Thank you, Your Honor.

24           MR. VAVRECK:  Thank you, Your Honor.

25           **(Court was adjourned.)**

1                    *          *          *

2          I, Kristine Mousseau, certify that the foregoing

3     is a correct transcript from the record of proceedings in

4     the above-entitled matter.

5

6

7

8          Certified by:  s/  *Kristine Mousseau, CRR-RPR*
                           Kristine Mousseau, CRR-RPR
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25